In the Matter of PENN CENTRAL
TRANSPORTATION COMPANY,
Debtor.

In re OPINION APPROVING PLAN OF
REORGANIZATION.

No. 70–347.

United States District Court,
E. D. Pennsylvania.

March 9, 1978.
Order Approving the Plan
March 17, 1978.

Charles A. Horsky, Brice M. Clagett, Philip R. Stansbury, J. Michael Hemmer, Wesley S. Williams, W. Crosby Roper, Jr., Jeffrey S. Berlin, Wynne M. Teel, Eric A. Eisen, John E. Heintz, Covington & Burling, Washington, D.C., James J. Howard, Carl Helmetag, Jr., Terrence M. Quirin, Philadelphia, Pa., John F. Bomster, John F. Corrigan, Providence, R.I., John J. Ehlinger, Jr., Robert Szwajkos, Philadelphia, Pa., for Penn Central Trustees.

White & Williams by John Francis Gough, Philadelphia, Pa., for Brown Brothers Harriman and Co., et al., The Cleveland Trust Co., City of Indianapolis, et al.

Becker, Ross & Stone by Stephen E. Michelman, New York City, for Sterling National Bank and Trust Co. of New York.

Leon Leighton, Scarsdale, N.Y., for Minority Stockholders at Mahoning Coal.

Winthrop, Stimson, Putnam & Roberts by Stephen A. Weiner, Fredrick I. Miller, New York City, for Irving Trust Co.

Ballard, Spahr, Andrews & Ingersoll by Frederic L. Ballard, Frederick W. Clark, Vincent Hatton, Philadelphia, Pa., for the Girard Bank.

Duane, Morris & Heckscher by Henry T. Reath, Reeder R. Fox, Gene E. K. Bruton, Philadelphia, Pa., for New England Merchants National Bank.

Ropes & Gray by David L. Thomas, Jr., Boston, Mass., for New England Merchants National Bank.

Edith I. Spivack, New York City, for the City of New York.

Sullivan & Worcester by Joseph Auerbach, Morris Raker, Boston, Mass., for Richard Joyce Smith, Trustee, New Haven Railroad.

James William Moore, New Haven, Conn., for Smith, Trustee of the New York, New Hampshire and Hartford Railroad.

Shearman & Sterling by George J. Wade, Robert H. Mackinnon, Kenneth M. Kramer, Michael K. Diana, New York City, for Cikhank, N.A., as agent for the Committee of Secured Bank Creditors.

Willkie, Farr & Gallagher by Louis A. Craco, Walter H. Brown, Jr., Thomas L. Bryan, Michael B. Targoff, New York City, for Institutional Investors Penn Central Group.

John J. Degman, Atty. Gen. of N.J. by Herbert K. Glickman, Barry D. Szaferman, Douglas G. Sanborn, Deputy Attys. Gen., Trenton, N.J., for the State of New Jersey.

Proskauer, Rose, Goetz & Mendelsohn by Philip M. Hahn, New York City, for the Bank of New York as Indenture Trustee.

Dahlberg, Mallender & Gawne by John J. Iseman, Birmingham, Mich., for Manufacturers National Bank of Detroit.

Kohn, Savett, Marion & Graf by Stuart H. Savett, Robert A. Swift, Philadelphia, Pa., for Consolidated Edison Co., Philadelphia Electric Co., Pennsylvania Power & Light, Baltimore Gas & Electric Co., Du-

quesne Light Company and Evans Products Co.

Pepper, Hamilton & Scheetz by Laurence Z. Shiekman, Teresa R. Novick, Philadelphia, Pa., for Consolidated Rail Corp., Excelsior Truck Leasing Co., Pennsylvania Truck Lines, Merchants Dispatch Transp. Co.

Lipper, Lowey & Dannenberg by Richard B. Dannenberg, New York City, Nemser & Nemser by Stanley Nemser, New York City, David Berger, P.A. by Daniel Berger, Philadelphia, Pa., and David Berger, Philadelphia, Pa., for Robinson petitioners.

Fell, Spalding, Goff & Rubin by William P. Quinn, for Trailer Train Co.

Krusen, Evans & Byrne by Thomas A. Bell, Philadelphia, Pa., for American Dredging Co., Burroughs Corp. and Dresser Industries, Inc.

White & Case by Ted Neuenschwander, John E. Osnato, New York City, for Bankers Trust Co.

Rogers & Wells by William R. Glendon, Donald F. Luke, New York City, for the Committee of Interline Railroads.

Clark, Ladner, Fortenbaugh & Young by Edward C. Toole, Jr., Philadelphia, Pa., for the Committee of Interline Railroads.

Douglas MacGillivray, Bellefontaine, Ohio, for Ohio's County Treasurers and Local Taxing Authorities.

United States Railway Association by Gearold L. Knowles, for United States Railway Association.

Dechert, Price & Rhoads by Alfred W. Cortese, Jr., Philadelphia, Pa., for Amoco Oil Co., Ashland Oil, Inc., Exxon Co., U.S.A., Shell Oil Co., The Standard Oil Co. (Ohio) and Texaco, Inc.

Friedman, Medalie & Ochs by Alvin Friedman, Washington, D.C., for Union Bank of Los Angeles.

U. S. Dept. of Justice by John H. Broadley, Washington, D.C., for United States.

Reavis & McGrath by Leonard M. Leiman, Lawrence W. Boes, New York City, for Special Representatives Noyes Leech and Robert H. Mundheim.

Grant G. Guthrie, Washington, D.C., for Securities and Exchange Commission.

Tyler, Reynolds & Craig by H. Theodore Cohen, Boston, Mass., for Charles S. Jeffrey.

Schnader, Harrison, Segal & Lewis by Gilbert W. Oswald, Philadelphia, Pa., for Penn Central Co.

Schnader, Harrison, Segal & Lewis by David S. Hope, Philadelphia, Pa., for First National Bank of Chicago, et cetera.

Schnader, Harrison, Segal & Lewis by Gilbert W. Oswald, David S. Hope, Philadelphia, Pa., for AT&T and its subsidiaries, General Motors Corporation, Syntonic Technology, Incorporated, Federal Transportation Company, Frank and Vincent Visceylia, Federal Storage Warehouses and Peddie Buildings.

Jaffin, Schneider, Conrad & Wertheimer by George M. Jaffin, New York City, for Carret & Co., et al.

Wolf, Block, Schorr & Solis-Cohen by Michael L. Temin, Philadelphia, Pa., for First Pennsylvania Bank, N.A.

City of Pittsburgh by D. R. Pellegrini, Grace S. Harris, Pittsburgh, Pa., for the City of Pittsburgh, County of Allegheny.

Harold H. McLean, Pittsburgh, Pa., for Earl E. Barton, Betty Barriger, John W. Barriger, Stanley Barriger, Margret Henderson, Arthur M. McLean, Harold H. & Sarah N. McLean, Hugh C. & Katherine McLean and Ann Salyard.

Hepburn, Ross, Willcox & Putnam by Herbert G. Schick, Philadelphia, Pa., for Philadelphia & Trenton, Union of Baltimore, Northern Central, Michigan Central, Pittsburgh, Youngstown & Ashtabula.

Goodman & Ewing by William H. Ewing, Joseph J. Connolly, Philadelphia, Pa., for The Connecting Railway Co., Trustee John C. Kohl, Fairfax Leary, Trustee of the United New Jersey Railroad & Canal Co.

Kelley, Drye & Warren by Edward Roberts, III, New York City, for Manufacturers Hanover Trust Co.

Henry Fogler, pro se.

## TABLE OF CONTENTS

### PART I

| | | Page |
|---|---|---|
| A. | INTRODUCTION | 1243 |
| B. | SUMMARY OF OPINION | 1244 |

### PART II

A. BACKGROUND

 1. Reorganization Process ... 1245
 2. History of the Penn Central Reorganization ... 1248

B. SUMMARY OF THE PLAN

 1. Introduction ... 1254
 2. New Securities and Their Distribution ... 1256
 3. Scope of the Plan ... 1260

C. THE "COMPROMISE" FEATURES OF THE PLAN ... 1261

D. MAJOR COMPROMISES

 1. United States Claims ... 1264
 2. Settlement of Pennco Pledge Dispute ... 1266
 3. New Haven Trustee Claims ... 1269

E. THE VALUATION CASE

 1. Status of the Valuation Case ... 1270
 2. Relationship of the Valuation Case to the Plan Distributions ... 1274

F. STATE AND LOCAL TAX CLAIMS

 1. Description of Claims ... 1276
 2. Treatment of State and Local Tax Claims Under the Plan ... 1279
 3. The Alternative Settlement Program ... 1280
 4. Objections to the Plan by State and Local Tax Claimants ... 1280
 a. Exclusion of Penalties ... 1281
 b. Payment in Full in cash ... 1281
 5. Fairness to Tax Claimants ... 1283
 6. Objections of Taxing Entities in the State of Ohio ... 1284

G. CLASS J—SECURED CREDITORS

 1. The Distribution to Class J Creditors ... 1284
 2. "Super Secureds" Objections ... 1290
 a. Identifying the "Super Secured" Claims ... 1290
 b. The Alleged Disparities in Treatment ... 1291
 c. The Proposed Alternate Distribution Scheme ... 1293
 d. Tracing Retained Asset Values ... 1295
 e. Liquidation Analogy ... 1297
 f. Comparison with General Creditors and Equity Interests ... 1300
 3. Disputes Involving the Retained Asset Analysis ... 1302
 a. The R & I Mortgage ... 1303
 i. Chargeback Against Michigan Central and Big Four for Operating Losses ... 1303
 ii. The Harlem Leasehold ... 1307
 iii. Rents from the Park Avenue Properties; Dividends on the Harlem Stock ... 1309
 iv. Interest on Beech Creek, Harlem and Big Four Bonds ... 1311
 v. Prebankruptcy Sales ... 1312
 vi. Lien Rights of Matured Bonds ... 1314

G. CLASS J—SECURED CREDITORS—Continued

 3. Disputes Involving the Retained Asset Analysis—Continued

| | | Page |
|---|---|---|
| b. Pennsylvania Railroad General Mortgage | | 1314 |
| c. Michigan Central Collateral Indenture Claim of Michigan Central Assets | | 1316 |
| d. New York Central 6% Collateral Trust Bonds due 1980 | | 1317 |
| e. Carthage & Adirondack | | 1318 |

H. CLAIMS FOR PRIORITY UNDER THE "SIX MONTHS RULE"

| | | |
|---|---|---|
| 1. Definition and Development of the Six Months Rule | | 1319 |
| 2. The "Current Debt Fund" | | 1321 |
| a. Net Income rather than Gross Income | | 1322 |
| b. Inclusion of Non-Rail Income | | 1322 |
| c. Determination as of Distribution Date | | 1323 |
| d. Accounting Methods | | 1323 |
| 3. The Existence of a Current Debt Fund in the Present Case | | 1324 |
| a. The Earnings Component | | 1324 |
| b. Diversions from Earnings to Benefit Secured Creditors | | 1324 |
| c. Unmortgaged Assets | | 1325 |
| 4. Claims for Priority Based Upon the "Necessity of Payment" Rule | | 1326 |

I. OTHER ASSERTIONS OF PRIORITY STATUS

| | | |
|---|---|---|
| 1. Bank Setoff Claimants | | 1328 |
| 2. Interline Railroads | | 1330 |
| a. Equitable Lien | | 1331 |
| b. Setoff | | 1332 |
| c. Per Diem Accounts | | 1332 |
| 3. Freight Loss or Damage Claims | | 1334 |
| 4. Priority of the United States under Revised Statutes 3466 | | 1336 |
| a. Pre-bankruptcy Claims | | 1336 |
| b. Tax Claims | | 1338 |

J. CLASS G CLAIMANTS

| | | |
|---|---|---|
| 1. Amtrak | | 1339 |
| 2. ConRail | | 1340 |

K. TREATMENT OF GUARANTEE CLAIMS | | 1342

L. EQUITY INTERESTS HELD BY PENN CENTRAL COMPANY | | 1343

PART III

SECONDARY DEBTORS | | 1343

PART IV

A. CONSUMMATION DATE | | 1344

B. CONCLUSION | | 1345

---

FULLAM, District Judge.

## PART I

### A. INTRODUCTION

The Trustees of the Penn Central Transportation Company, Debtor, have presented for approval a Plan of Reorganization for that company and 15 Secondary Debtors whose lines were a part of the Penn Central system. These related documents are generally referred to collectively in these proceedings as "the Plan." I have concluded

that, subject to a few relatively minor adjustments, the Plan complies with all legal requirements, is feasible, fair and equitable, and should therefore be submitted to the vote of the participants. The Opinion which follows sets forth the reasons for those conclusions.

The Opinion deals with a great many issues and the contentions of a large number of litigants. The reader will encounter certain recurring themes, because the same legal concepts, or the necessities of a certain set of circumstances, may have important, but slightly different, bearing upon the issues being decided in a variety of contexts. Every effort has been made to avoid unnecessary repetition, but in some instances reprise seemed preferable to constant cross-references.

In anticipation of the hearings on the Plan, this Court extended an invitation to the Securities & Exchange Commission to review the proposed Plan and comment upon it. This was done because the traditional role of the Interstate Commerce Commission in railroad reorganization proceedings has been abrogated by statute, with respect to the Northeastern bankrupt railroads subject to the RRRA. The SEC graciously responded to the Court's invitation, and its Report has provided very valuable assistance to the Court and to the parties.

The SEC Report has been particularly helpful with respect to feasibility issues and what may be referred to as the legitimacy of the new securities proposed to be issued pursuant to the Plan. I am satisfied that the SEC's valuations, and its conclusions concerning feasibility are sound. I incorporate herein the elaboration of these issues contained in the SEC Report, and have concluded that further discussion of feasibility and valuation issues in this Opinion would be superfluous.

The excellent sketch of the pre-bankruptcy history of the Debtor which is included in the SEC Report has also made it unnecessary to repeat that material here.

Because of the unavoidable length and complexity of the Opinion, I have provided at the outset a brief summary of the contents, for the benefit of those who are more interested in the decision of a particular issue than in the legal reasoning leading to that decision.

## B. SUMMARY OF OPINION

The Opinion begins by explaining what a reorganization is, and how it occurs. This is followed by a review of the history of the Penn Central reorganization proceedings from June 21, 1970 to date. In combination, these opening sections of the Opinion point up the unique problems for this estate stemming from the implementation of the RRRA: the existence of huge amounts of unpaid administration claims against the estate, and the fact that the rail assets have been conveyed to ConRail but have not yet been paid for.

Next, a summary of the Plan itself is provided. This section begins with an explanation of how the Plan attempts to deal with the uncertainties stemming from the RRRA-related problems. This is followed by a detailed description of the significant terms of the new securities to be issued under the Plan, and the proposed distribution of those securities. The section concludes with an explanation of the relationship between the Penn Central Plan and those of the Secondary Debtors.

The next section contains a discussion of the compromise aspects of the Plan. The principal conclusions are that a reorganization plan may be achieved at this time without finally litigating all of the many disputed legal and factual issues; that it is permissible to incorporate in a reorganization plan compromise resolutions of disputed issues, *regardless of whether the compromises are agreed upon by all of the affected parties*, so long as the resolution is fair and reasonable, within the range of results which litigation could be expected to provide, and in the best interests of the affect-

ed parties. The major compromise settlements embodied in the Plan—with the Federal Government, the secured bank group, and the New Haven Trustee—are then discussed and approved.

The following section contains a summary of the principal issues involved in the Valuation Case litigation before the Special Court, the status of that litigation, and its relationship to the provisions of the Plan.

The balance of the Opinion deals with objections to various features of the Plan which have been expressed by the litigants. Section II–F deals with the claims of state and local taxing entities. In summary, the Court concludes that penalties should be disallowed, that tax claims need not be paid in full in cash; that the lien of tax claims against the rail assets conveyed to ConRail are not automatically transferred to the Debtor's retained assets; and that the Plan makes adequate provision for these claims.

Section II–G deals with the Plan's provisions relating to the claims of secured creditors (Class J), and with a number of objections to that treatment. The conclusion is that the claims of secured creditors are properly classified in a single class, and are accorded fair and equitable treatment under the Plan. The various arguments of the so-called "super-secured" claimants (creditors whose claims are more than fully secured by retained assets) are discussed, and rejected for the most part; but the Court has concluded that slightly different treatment should be provided the claims of bondholders under four specified mortgages (Mohawk & Malone; Gold Bond; New York Central 6% due 1990; Penn Central 6½% Bonds due 1993). Specifically, their rights to redeem their preference stock are to have priority over the random-selection-by-lot redemptions for other Class J creditors.

The Opinion then deals with various disputes concerning the manner in which retained assets have been allocated among various mortgages for purposes of establishing the correct allocations of A and B bonds under the Plan. The Court rejects most of the objections against the Plan but does require a slight revision in the allocation of

retained assets to the R & I Mortgage in recognition of the denial of recourse against properties sold by the Debtor before bankruptcy and not released from the mortgage.

The remaining objections of Class J creditors are discussed and overruled, with minor exceptions. The Court agrees with the contention of Girard Bank as Indenture Trustee of the Pennsylvania Railroad General Mortgage that the after-acquired property clause renders that mortgage a lien on certain disputed branch lines.

Section II–H of the Opinion discusses the claims for priority under the so-called "six months" rule and under the "necessity of payment" doctrine. The conclusion is that the six months priority cannot be recognized in this proceeding, because there is no "current debt fund" and because there have been no diversions for the benefit of mortgagees. And the Court concludes that the "necessity of payment" doctrine does not apply at this time.

Section II–I deals with claims for priority asserted by Bank Setoff claimants, the interline railroads, and claims for freight loss and damage. All of these claims for priority treatment are rejected.

Finally, the Opinion deals with the contingent claims asserted by Amtrak and Con-Rail, and with certain miscellaneous claims of the Federal Government, and concludes that the Plan contains adequate provisions for these claims.

## PART II

### A. BACKGROUND

#### 1. Reorganization Process

Federal bankruptcy law addresses the problems of financially embarrassed business debtors, and provides solutions which fall into two general categories: (1) liquidation, or "straight" bankruptcy, in which the assets of the debtor are sold and the proceeds distributed to its unsecured creditors in proportion to the amounts of their claims, whereupon all debts are discharged

and the debtor can start anew[1]; and (2) rehabilitation through reorganization of the enterprise[2]. Generally speaking, if there is a reasonable prospect that the debtor can become successful, so that greater economic benefits would be realized by preserving it as a going concern than would be achieved through liquidation, then rehabilitation rather than liquidation is the correct choice.

Railroads, however, are in a special category, both because the public interest requires that they continue to operate, and because dismantling and liquidating them would ordinarily be economically wasteful, and would be unlikely to provide as great a return to their creditors as would their preservation as operating units. Congress has therefore precluded railroads from availing themselves of the "straight" bankruptcy liquidation alternative, but instead has enacted the special provisions of § 77 of

the Bankruptcy Act for the rehabilitation of railroad debtors[3]. The Penn Central bankruptcy proceeding is a § 77 railroad reorganization proceeding.

Assuming it makes economic sense to keep the enterprise going—that is, assuming the value of its earning power is greater than the amount which would be produced by sale of its assets—reorganization of the enterprise is feasible. Reorganization is achieved through the mechanism of a Plan[4], which translates the value represented by the earning power of the enterprise into a new set of securities, and distributes these new securities appropriately among creditors and other claimants, in discharge of the debtor's obligations. Valuation of the enterprise involves at least two exercises of judgment: determining what the earning power of the enterprise realistically is

1. Chapters I through VII of the Bankruptcy Act.

2. Chapter X of the Bankruptcy Act.

3. As will be developed in the next section of this Opinion, § 77 of the Bankruptcy Act has been modified and supplemented, in the course of these proceedings, by enactment of the Regional Rail Reorganization Act of 1973 (RRRA) and its amendments.

4. A railroad reorganization plan must conform to § 77(b), which provides:

(b) "A plan of reorganization within the meaning of this section (1) shall include provisions modifying or altering the rights of creditors generally, or of any class of them, secured or unsecured, either through the issuance of new securities of any character or otherwise; (2) *may include provisions modifying or altering the rights of stockholders generally, or of any class of them, either through the issuance of new securities of any character, or otherwise;* (3) may include, for the purpose of preserving such interests of creditors and stockholders as are not otherwise provided for, provisions for the issuance to any such creditor or stockholder of options or warrants to receive, or to subscribe for, securities of the reorganized company in such amounts and upon such terms and conditions as may be set forth in the plan; (4) shall provide for fixed charges (including fixed interest on funded debt, interest on unfunded debt, amortization of discount on funded debt, and rent for leased railroads) in such an amount that, after due consideration of the probable prospective earnings of the

property in light of its earnings experience and all other relevant facts, there shall be adequate coverage of such fixed charges by the probable earnings available for the payment thereof; (5) shall provide adequate means for the execution of the plan, which may include the transfer of any interest in or control of all or any part of the property of the debtor to another corporation or corporations, the merger or consolidation of the debtor with another corporation or corporations, the retention of all or any part of the property by the debtor, the sale of all or any part of the property of the debtor either subject to or free from any lien at not less than a fair upset price, the distribution of all or any assets, or the proceeds derived from the sale thereof, among those having an interest therein, the satisfaction or modification of any liens, indentures, or other similar interests, the curing or waiver of defaults, the extension of maturity dates of outstanding securities, the reduction in principal and/or rate of interest and alteration of other terms of such securities, the amendment of the charter of the debtor and/or the issuance of securities of either the debtor or any such other corporation or corporations for cash, or in exchange for existing securities, or in satisfaction of claims or rights or for other appropriate purposes; and may deal with all or any part of the property of the debtor; may reject contracts of the debtor which are executory in whole or in part, including unexpired leases; and may include any other appropriate provisions not inconsistent with this section."

(based upon past performance, present circumstances, and supportable predictions of future events), and establishing the appropriate capitalization rate for converting the predicted future earnings into present value.

The design of the capital structure of the reorganized enterprise must be such that the debtor's earnings will support the new capital structure. The reorganized company must be reasonably likely to be able to comply with the requirements of the securities issued. That is, it must be reasonable to suppose that the reorganized company will be able to meet when due the payments required by the new debt securities, and that it will have sufficient earnings to enable it to pay dividends and grow, so that its equity securities will have value.

By definition, if the Debtor were able to pay off its existing debt obligations according to their terms, it would not be in bankruptcy. Thus, the new securities provided for in a reorganization plan inevitably represent substantial alterations in the rights of creditors and other claimants.

In a straight liquidation proceeding, the assets would be sold and the cash divided among the unsecured creditors, subject to priorities established by statute. All claims would be discharged, even though the proceeds from the sale of the Debtor's assets proved insufficient to pay all claims in full, or even left many claims unpaid altogether. By the same token, in a reorganization proceeding we are dealing with a finite quantity of values (the total value of the ongoing enterprise, represented by the new securities, or cash plus new securities) to be distributed among creditors and other claimants. The essential requirement is that the distribution be fair and equitable, and in accordance with the absolute priority rule.

Under the absolute priority rule, all claims against the estate must be classified and ranked in accordance with the system of priorities established by law. The claims in each class must receive the fair equivalent of the rights lost through discharge, if there is to be any distribution to claimants of lesser rank. This does not mean that senior claimants must be paid in cash before junior claimants participate, nor does it mean that distributions to junior claimants must be made at later times than to senior claimants. But what is required is that the distributions to senior claimants must have value which is substantially equivalent to the value of the claim being surrendered, before claims of lower rank can be recognized.

Generally speaking, there are four classes of claims: claims of administration (*i. e.*, the costs and expenses incurred in conducting operations during bankruptcy), secured claims, unsecured claims, and equity interests. To the extent that a secured claim is not fully secured (that is, to the extent the assets securing the claim are worth less than the amount of the claim), it is treated as an unsecured claim. If the total amount of the claims against the estate exceed the total value of the estate, the estate is insolvent, albeit still reorganizable, and equity interests cannot be permitted to participate under the plan.

A § 77 Plan of Reorganization must be submitted to the Court for approval[5]. If

---

**5.** Section 77(e) establishes the standards for approval of a plan:

"After . . . hearing, and without any hearing if no objections are filed, the judge shall approve the plan if satisfied that: (1) It complies with the provisions of subsection (b) of this section, is fair and equitable, affords due recognition to the rights of each class of creditors and stockholders, does not discriminate unfairly in favor of any class of creditors or stockholders, and will conform to the requirements of the law of the land regarding the participation of the various classes of creditors and stockholders; (2) the approximate amounts to be paid by the debtor, or by any corporation or corporations acquiring the debtor's assets, for expenses and fees incident to the reorganization, have been fully disclosed so far as they can be ascertained at the date of such hearing, are reasonable, are within such maximum limits as are fixed by the Commission, and are within such maximum limits to be subject to the approval of the judge; (3) the plan provides for the payment of all costs of administration and all other allowances made or to be made by the judge, except that allowances provided for in subsection (c), paragraph (12)

approved as fair and equitable, and as complying with all legal requirements, the Plan must then be submitted to the vote of all who are entitled to participate in the Plan. If the vote is favorable [6], the Plan is then confirmed by the Court, and carried out. If one or more classes of participants reject the Plan, the Court will review the matter in light of the results of the voting, but the Court is empowered to confirm the Plan notwithstanding the negative vote, in the absence of changed circumstances, if it deems that course appropriate.

If the Court initially disapproves the Plan, it is not submitted to vote; the Court may require that a new Plan be submitted, or may dismiss the proceedings [7].

The Penn Central Plan is now before the Court for approval. The Court is required to decide whether the Plan conforms to legal requirements, whether it is feasible and whether it is fair and equitable.

### 2. History of the Penn Central Reorganization

The Penn Central reorganization differs from the 'normal' railroad reorganizations of the past in many ways. The immediately apparent difference, of course, is the magnitude of the enterprise and the complexity of its financial structure; but these are only matters of degree. The really important differences in kind have become manifest during the course of the proceedings, and require some explanation, as a prelude to our examination of the proposed Reorganization Plan.

If a bankrupt railroad can be sufficiently revitalized so that it becomes income-producing again, it can be reorganized. In previous railroad reorganizations, the question whether the enterprise could be restored to profitability depended upon changes in the economic climate, or changes within the control of management (e. g., cost reductions, increases in efficiency, etc.). The successful reorganizations of the past were generally achieved because a combination of changed economic circumstances and management improvements provided sufficient net income to support a scaled-down and stretched-out debt structure.

In instances where it proved impossible to achieve profitability, there were several alternatives. Merger into larger, profitable, railroads could sometimes provide a solution to the problem. Or, preservation of essential rail service could be achieved by selling major portions of the bankrupt railroad to other, profitable, carriers, and the remaining assets could be liquidated. Or, in rare instances, the bankrupt railroad could simply be shut down and liquidated, with only temporary and localized adverse consequences to the public.

In the case of Penn Central, however, it early became apparent that profitability could not be restored by means within the control of the Trustees or of this Court. Very substantial changes in the regulatory climate, both procedural and substantive, were required, and sweeping changes in work rules and other aspects of labor-management relations bearing upon productivity. Some of these changes could theoretically have been brought about without further legislation by Congress. For example, greater flexibility in rate-making, more expeditious and more equitable divisions proceedings, and expedited proceedings for abandonment of unprofitable lines, were theoretically attainable through the actions of regulatory agencies.[8] And the labor-

---

of this section, may be paid in securities provided for in the plan if those entitled thereto will accept such payment, and the judge is hereby given power to approve the same."

**6.** Under § 77 voting is by amount of claim. A class accepts a plan if two-thirds of the total amount of claims voted are cast for acceptance.

**7.** Dismissal of a § 77 reorganization proceeding would presumably result in some form of liqui-

dation of the enterprise, in further judicial proceedings similar to the equity receivership proceedings utilized before § 77 was enacted.

**8.** While theoretically possible, this was a practical impossibility. For example, when a district court held that environmental impact statements were required in abandonment proceedings, the ICC declined to hold hearings on all abandonment applications until the Supreme Court decided the appeal. And a major

management issues were theoretically susceptible of resolution through the mechanisms provided by the Railway Labor Act.[9] But the changes needed here would have ramifications far beyond the Penn Central system itself; important issues of national transportation policy were at stake. Hence, as a practical matter, congressional action was essential.

Thus, in the case of Penn Central, restoration of profitability which would render reorganization feasible was dependent upon governmental action. And many of the alternatives to independent reorganization which had provided acceptable solutions in other railroad reorganizations were simply not available to Penn Central because of its size, the magnitude of its problems, and the importance of its rail service to the nation's economy. For example, merger with another railroad was out of the question, and cessation of operations was unthinkable.

The other major distinction between the Penn Central reorganization and earlier reorganizations, namely, the accumulation of huge amounts of unpaid administration expenses, is a product of the passage of time before legislative action occurred, and the nature of the legislative actions taken.

The historical review which follows shows how these problems developed, and puts in chronological perspective the genesis of the proposed Plan of Reorganization.

From the first day of the Penn Central reorganization, June 21, 1970, the full powers of § 77 were brought to bear. Pursuant to various Orders of this Court, the Trustees suspended all tax payments, leased line rents, and debt service, and all creditors'

actions against the estate were stayed.[10] Notwithstanding the substantial reduction in expenses which resulted from these actions, there was inadequate cash available to continue operations. A federal guarantee provided $100 million from the issuance of trustees certificates and the entire amount was used to pay operating expenses during the early months of the case.[11]

While the immediate cash shortage problem was working its way to resolution, the Trustees endeavored to cut costs and increase demand for the Debtor's services. They made some progress and predicted additional progress. Yet, on February 10, 1971, the Trustees reported to the Court:[12]

Penn Central is presently locked by circumstances beyond its managerial control into a situation which had best be recognized *now* as completely precluding viability unless certain constraints are removed, or other arrangements are made to compensate for their effects. (Emphasis in original).

The Trustees identified four conditions for viability: (1) elimination of losses on passenger service; (2) rationalization of freight plant through elimination or subsidy of uneconomic lines; (3) more flexible rate and division procedures; and (4) improved labor productivity. The Trustees properly observed with respect to these conditions:

It is appreciated that the conditions to Penn Central's viability are hard and introduce factors that go far beyond the normal boundaries of railroad reorganization proceedings under § 77. But in the firm opinion of the Trustees, nothing less has a chance.

divisions dispute which had been in litigation for 15 years was dismissed because the record was stale.

9. When the lengthy procedures mandated by the Railway Labor Act have been exhausted without successfully resolving the controversy, management is free to promulgate the work rule changes, and labor is free to strike. Once that position is reached, as it was in this case in February 1973, and a strike is called, as it was in this case, the public interest in avoiding disruptions in rail service inevitably leads to a legislative solution, as it did in this case. On

February 9, 1973, the President signed a Senate Joint resolution abrogating the Trustees' work rule changes and mandating continued operation under the old arrangements while Congress addressed the overall problems of the rail industry.

10. Order No. 1.

11. *In re Penn Central Transp. Co.*, 325 F.Supp. 302 (E.D.Pa.1971).

12. Doc. No. 857.

**1250**

In September of 1971, the Trustees filed a further report. Progress had been made in improving the internal operations of the railroad, and the enactment of the Amtrak statute had resulted in a substantial diminution, but not elimination, of the estate's non-commuter passenger service losses[13]. Between September of 1971 and January of 1972, the Trustees completed a series of economic studies, and in February of 1972, reported their conclusion that unless the conditions of viability were substantially met by the end of 1973, the estate could not be reorganized[14]. On the positive side, the Trustees also reported that their studies indicated that there was within the 20,000 route miles of the Penn Central system a core freight railroad of about 11,000 miles which carried approximately 80% of the traffic, and which would be a viable economic entity if certain labor practices were changed. However, the projected revenues of this core railroad would be inadequate to absorb the continuing losses under the Amtrak contract and from commuter operations. In sum, at the very early stages of the case the basic question was clearly drawn. Would the private and public institutions whose cooperation was essential to the attainment of the conditions of viability embrace the proposal for an 11,000-mile core railroad?

On April 1, 1972, the Trustees filed a proposal for a Plan of Reorganization which spelled out in more specific terms the justification for and the method of implementing the core railroad concept[15]. In October of 1972, the Trustees again reported their belief that the core railroad concept was appropriate but suggested increasing the size of the core to 15,000 miles[16]. The reasons for this change were that reduction to the 11,000-mile core would not generate sufficient cash to pay the labor severance expenses which would flow from the concomitant reduction of the work force; and that the ICC's procedures for abandonment of rail lines would be inadequate to handle, within a reasonable time, the abandonment applications which would be necessary to reduce the system to the 11,000-mile core. The October 1972 report also contained an analysis by the Trustees of a variety of measures, short of outright nationalization, which would be necessary if the core system and the conditions of viability were not attained.

In February of 1973, the Trustees again, eschewing nationalization, but apparently reconciled to the inevitability of delay before the conditions of viability could be achieved, concluded that plant improvement in the range of $600 to $800 million would be necessary and that the only source of this financing was the United States. Absent such capital investment even a sharply reduced freight system would not be viable[17].

The dilemma facing the Trustees was that each day the estate operated, additional deferred charges were accruing. Time was expensive. High administration expenses gave rise to two concerns. First, the potential economic viability of any railroad which might emerge was diminished by each increase in high-priority obligations. Second, the continued accrual of administrative expenses would soon reach the point of being an unconstitutional impairment of the rights of the estate's creditors.

During this early period this Court resolved virtually every question presented to it in such a way as to give the Trustees an opportunity to preserve the railroad. After all, that is the purpose of § 77. The problems came to a head in early 1973, as the April 1, 1973 deadline for the filing of a Plan of Reorganization approached. On March 6, 1973, I filed Memorandum and Order No. 1137, granting an extension of time for filing a Plan, but directing the Trustees, not later than July 1, 1973, to file either a Plan of Reorganization or their proposals for liquidating the enterprise. In

13. Doc. No. 1828.

14. Doc. No. 2637.

15. Doc. No. 3033.

16. Doc. No. 4428.

17. Doc. No. 5053.

the course of that Memorandum I made the following observations [18].

It has long been apparent that the particular problems of Penn Central cannot be completely divorced from problems of national transportation policy. Railroads are, after all, a regulated industry. However unappealing may be the notion that a regulated industry can become bankrupt, the Trustees' efforts to rehabilitate the Debtor are circumscribed by existing statutes and regulations. To the extent that these statutes and regulations, whether in the area of abandonment, tariffs, or resolution of labor disputes, preclude the exercise of self-help in achieving profitability, the legislative and executive branches of government must be looked to for solutions, if solutions are to be forthcoming.

And this is as it should be, for it is those branches of government which should determine whether the kind of railroad which could emerge from a private income-based reorganization would be consistent with long-range goals of national transportation policy. Such matters as how much rail transportation should be provided, how much competition among railroads is desirable in the Northeast, and the extent of public interest in maintaining rail service which cannot be operated profitably, are clearly beyond the province of the Trustees, the other parties to this reorganization, and this Court.

I take judicial notice of the fact that the legislative and executive branches are now addressing themselves to these problems. . . . It would obviously be premature, therefore, for this Court to make final determinations as to the future course of this reorganization proceeding on the basis of the existing legislative and regulatory framework. The legal and constitutional rights of the parties to this reorganization should be evaluated in the light of whatever changes Congress sees fit to enact.

By the same token, however, this Court cannot ignore the realities of the Debtor's situation. On the basis of the record to date, it appears highly doubtful that the Debtor could properly be permitted to continue to operate on its present basis beyond October 1, 1973.

In July of 1973, the Trustees submitted a Plan of Reorganization which contemplated termination of rail operations and liquidation of rail properties unless arrangements were made with public authorities to assume interim losses.[19] That Plan contemplated that public agencies, and other carriers, would have preference in the bidding for the rail properties, and that service would be continued under interim operating agreements until ICC and Court approvals of any purchases could be obtained. Nonrail real estate was to be spun off into and managed by a new real estate company. Finally, after consummation of the sales of the rail property, the remaining rail assets would be conveyed to a real estate company. When and how the creditors would be compensated was left open. The Commission concluded, after extensive hearings, that the Trustee's Plan was not a "plan" within the meaning of § 77 because it did not provide concretely for the continuation of rail services.[20] The Commission specifically declined to take into account the evidence before the Commission relating to the unconstitutionality of continued loss operations, holding that that issue was exclusively for the courts. The Commission referred to the legislation then under preliminary consideration in the Congress as perhaps the appropriate solution to Penn Central's problem.

In order to trace the efforts of the Congress to formulate a response to Penn Central's financial plight and that of the other bankrupts in the Northeast portion of the country, it is necessary to return to February of 1973. One step in the Trustees' efforts to achieve their conditions of viabili-

---

**18.** *In re Penn Central Transp. Co.,* 355 F.Supp. 1343, 1345–46 (E.D.Pa.1973).

**19.** Doc. Nos. 5926, 5927.

**20.** 347 ICC 45 (1973).

ty was the implementation of far-reaching work rule changes which, after exhaustion of the Railway Labor Act procedures, were promulgated on February 8, 1973. The United Transportation Union immediately called a strike. With the trains at a standstill, Congress enacted Senate Joint Resolution 59 on the same day and the President signed the resolution into law on the next. As a result of this congressional action, the work rule changes were suspended and service resumed promptly. The Congress also directed the Department of Transportation to file a comprehensive report setting forth the Department's views "for the preservation of essential rail transportation services in the Northeast section of the country." The Department and the ICC filed reports on March 26, 1973, which by and large agreed that the conditions of viability set forth by the Trustees were correct, and recommended procedures for creating a new core freight system. However, both the Department and the Commission saw a broader need, the consolidation of the Northeast bankrupt carriers into one or more new rail systems.

From March of 1973 to the end of that year, the Congress was engaged in the process of drafting and enacting legislation designed to remedy the Northeast rail crisis. On January 2, 1974, the Regional Rail Reorganization Act of 1973 (RRRA) became law.[21]

The broad outline of the RRRA is relatively straightforward. The bankrupts would operate under the aegis of the Reorganization Courts for a further period, approximately 20 months, during which time the United States Railway Association (USRA), a new corporate entity created under the Act, could complete the task of planning the new rail system or systems, and deciding what portions of the Northeast bankrupts' rail facilities should be con-

veyed to Consolidated Rail Corporation (ConRail), the company which was to take over the system which USRA designed. The statute contemplates a system which, while not profitable immediately, would ultimately be a profitable private sector carrier. In return for the properties conveyed to ConRail, the bankrupts were to receive common stock and other securities of ConRail in amounts commensurate with the value of the properties conveyed. The Act also created the Special Court, a three-judge panel selected by the Judicial Panel on Multidistrict Litigation, to rule on the adequacy of USRA's valuation of the conveyed property and the value of the stock of ConRail which was given in return.

Before a debtor in a § 77 reorganization could be subjected to the regimen of the RRRA, the presiding reorganization court had to find the debtor was not reorganizable under § 77, or, if it was, that the public interest would be best served by reorganization under the RRRA. With respect to Penn Central and a number of the Secondary Debtors, I concluded that they were not reorganizable under § 77.[22] As to certain other Secondary Debtors, I found that, although they were reorganizable under § 77, the public interest would best be served by their reorganization under the RRRA.[23] Shortly after these preliminary decisions were handed down, a three-judge court (of which I was a member) held the RRRA unconstitutional.[24] Although that Court found a number of the plaintiffs' key contentions premature, it concluded that the failure to provide a mechanism for compensating the estates for unconstitutional erosion between the time of the passage of the Act and the conveyance to ConRail rendered the Act unconstitutional.

The next sequence of judicial review occurred pursuant to the RRRA. This Court found that the processes of the Act were

---

21. 45 U.S.C. §§ 701–794.

22. *In re Penn Central Transp. Co.,* 382 F.Supp. 831 (E.D.Pa.1974).

23. *In re Penn Central Transp. Co.,* 382 F.Supp. 851 (E.D.Pa.1974).

24. *Connecticut Gen. Ins. Corp. v. United States Ry. Ass'n,* 383 F.Supp. 510 (E.D.Pa.1974), *rev'd sub nom., Regional Rail Reorganization Act Cases,* 419 U.S. 102, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974).

not "fair and equitable," and an appeal was taken to the Special Court.[25] At about the same time the three-judge court's judgment was appealed directly to the United States Supreme Court.

The Special Court reversed this Court's decision on the grounds that unconstitutional erosion of the estates, if any, would be compensable under the Tucker Act.[26] Shortly thereafter, the United States Supreme Court reversed the three-judge court's finding that the Act was unconstitutional.[27] The Supreme Court's two essential findings were (1) that the securities of ConRail were a constitutional medium of exchange for the properties conveyed, because the Tucker Act provided a remedy to satisfy any difference between the constitutional minimum value of the property conveyed and the value of the ConRail securities, and (2) that any unconstitutional erosion of the estates which occurred prior to the conveyance of the properties to ConRail could also be compensated under the Tucker Act. The upshot of all this was that the RRRA, as supplemented by the potential Tucker Act remedy, was held constitutional.

The Preliminary System Plan was filed on February 27, 1975, and the Final System Plan on July 26, 1975. The end result of the planning process was that the service and trackage of the competing Northeast bankrupts was trimmed somewhat and consolidated into one system to be operated by ConRail.

Throughout this period, the parties faced the problem of maintaining rail services until the conveyance date. There was almost constant litigation in the reorganization courts concerning the implementation of the § 213 grant program and the § 215 improvement program, the statutory mechanisms for providing cash necessary to continue rail operations.[28] That litigation

aside, the Trustees and the respective Federal agencies joined in the cooperative effort to insure that the transfer of the Debtor's properties to ConRail went smoothly.

Before the conveyance of the properties took place, however, Congress made a number of important amendments to the RRRA. Of primary importance to the consideration of the Plan are § 306 of the Act, which authorized the issuance of Certificates of Value, and the § 211(h) loan program.[29]

Section 306 Certificates of Value are interest-bearing USRA securities backed by the full faith and credit of the United States, redeemable on December 31, 1987 (but potentially callable earlier). The certificates are a pledge of the United States to make up with cash any difference between the net liquidation value of the assets conveyed by Penn Central and the other Northeast bankrupts, and the value of ConRail's stock and other benefits conferred on the estates by the RRRA. Recourse to the Tucker Act would, however, be necessary if the Special Court should find that the constitutional minimum value of the assets conveyed exceeds the net liquidation value of the assets.

As the conveyance date approached, it became clear to all that even after all funding provided under §§ 213 and 215 was exhausted, Penn Central's payables would far exceed its receivables as of the date of conveyance. The situation was potentially tantamount to a second bankruptcy, since ConRail was not to assume any liability for Penn Central's pre-conveyance obligations. And ConRail's operations might be adversely affected if the bills remained unpaid. Section 211(h) was enacted to remedy this situation. It created a mechanism by which ConRail borrowed from USRA in order to pay certain classes of the Debtor's payables. In turn, the estate was obligated to recog-

---

**25.** *In re Penn Central Transp. Co.,* 382 F.Supp. 856 (E.D.Pa.1974).

**26.** *In re Penn Central Transp. Co.,* 384 F.Supp. 895 (Special Ct. 1974).

**27.** *Regional Rail Reorganization Act Cases,* 419 U.S. 102, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974).

**28.** *See, e. g., In re Penn Central Transp. Co.,* 395 F.Supp. 567 (E.D.Pa.1975); *In re Penn Central Transp. Co.,* 400 F.Supp. 920 (E.D.Pa.1975).

**29.** 45 U.S.C. §§ 746, 721(h).

nize as a current cost of administration the amount of § 211(h) funds expended by Con-Rail on the estate's behalf.

On April 1, 1976, the Debtor's rail properties designated in the Final System Plan were conveyed to ConRail. Of the retained rail lines, some are being operated under RRRA-funded subsidy agreements with state and local governmental entities.

As a consequence of all this, the Debtor's estate now consists of real estate and other investments not acquired by ConRail, plus the eventual right to receive ConRail securities (backed by USRA Certificates of Value) in exchange for the Debtor's rail assets conveyed to ConRail.

## B. SUMMARY OF THE PLAN

### 1. Introduction

The presence of huge amounts of unpaid administration claims (represented in large part by the claims of the United States Government, for which Congress has mandated the highest possible priority) and the unanswerable questions concerning the amount and timing of the receipt of the consideration for the rail properties conveyed to ConRail, have greatly compounded the difficulties inherent in fashioning a Plan of Reorganization of this magnitude. In my 1974 Opinion dealing with the so-called "180-day" issues under the RRRA, I had occasion to anticipate (but not resolve) these problems:

Another problem relating to valuation is the lack of any mechanism for establishing a relationship between the values to be assigned to the rail properties conveyed, and the valuation of the interests of secured creditors holding liens against those properties. There are several facets to that problem. In the first place, the timing is off. In determining whether a plan of reorganization is fair and equitable, it is necessary to determine the extent to which particular groups of creditors are secured, and the value of their respective securities, so as to be sure that they will receive equivalent value before any junior classes of claimants participate. Since the exchanges under RRRA

would be between Conrail and the Debtor's estate, rather than the creditors, the problem of later recognition of the correct treatment of the creditors in a reorganization plan would be rendered quite difficult.

Moreover, the valuation of the property for sale to Conrail might very well not be on a basis which would permit rational allocation of the consideration on a segment-by-segment basis for purposes of later assigning lien values. And that difficulty would itself be greatly magnified by the fact that Conrail will presumably be made up of parts of various existing railroads, blended together in a smaller system designed to handle the traffic now being handled by several different railroads.

A further difficulty with the statute is the lack of precision in defining what 'other benefits of the Act' are to be taken into account as part of the purchase price for the rail properties conveyed to Conrail.

*In re Penn Central Transp. Co. (180-Day Decision Under § 207(b)),* 382 F.Supp. 856, 865 (E.D.Pa.1974). The Plan now before the Court is the product of the Trustees' Herculean and, in my judgment, successful, efforts to surmount these difficulties.

The problems would be easily resolved if the value of the assets remaining in the Trustees' hands after the conveyance to ConRail were sufficient to satisfy all claims against the estate. Unfortunately, the facts are otherwise. The assets remaining on hand are valued at almost $1.85 billion, but the principal amount of all claims against the estate totals more than $3 billion. Therefore, any reorganization plan which is to be consummated before 1987 (the anticipated conclusion of the Valuation Case) must distribute securities based in part upon the anticipated proceeds from the Valuation Case, and must also take into account the correlative, albeit theoretical, risk that there will be no proceeds.

The assets remaining after conveyance to ConRail fall into two principal categories: (1) Penn Central's ongoing, successfully op-

erating, non-railroad business enterprises, principally consolidated in the Pennsylvania Company (Pennco); and (2) a variety of real estate and other investments. The key business judgment reflected in the Plan is that Pennco is a sound company with growth potential, and that it is in the best interests of all concerned to make Pennco the nucleus of the reorganized company. The soundness of this business judgment is amply supported in the evidentiary record, and is unquestioned.

The Plan contemplates that most of the other assets (herein referred to collectively as the "retained assets") will be liquidated in an orderly fashion during the next 10 years pursuant to an Asset Disposition Program. This is a very detailed and carefully constructed plan of liquidation, and there is reasonable certainty as to the amount and timing of the fruits of that program.

Pursuant to the conventional reorganization process outlined in Section II–A above, the first step is to arrive at a value for Pennco and the other retained assets. The next step is to determine what claims are secured by those assets, and in what amount; this step includes applying marshalling principles. The final step is to establish a feasible capital structure and to design a fair and equitable scheme of distribution. It is at this final step that the Valuation Case must be taken into account.

The Trustees have integrated the known values of Pennco and the retained assets with the unknown value of the proceeds from the Valuation Case in two ways: First, the various securities to be issued under the Plan are related primarily, and in some cases exclusively, to either the Asset Disposition proceeds, the value of the reorganized company, or the proceeds of the Valuation Case. Second, in determining an appropriate distribution scheme, the Trustees made two essential assumptions: (1) that the Debtor is solvent; and (2) that each secured creditor has a lien upon assets equal in value to the amount of his claim (principal and interest). If the Valuation Case should produce a very small recovery,

the assumption of solvency would be incorrect, and the assumption of full security would be incorrect in many instances. But if a more favorable result is achieved in the Valuation Case litigation, both assumptions would be clearly correct. Since the record does not permit a finding of insolvency, and indeed it seems more probable than not that the estate is solvent, I am satisfied that the Trustees' assumptions represent the proper course of action.

The Plan provides for the issuance of securities in various combinations designed to recognize the differing characteristics of each class of claims, and to achieve a fair and equitable distribution of both the known values and the risks and potential rewards of the Valuation Case litigation.

The new securities to be issued under the Plan consist of four series of secured notes—A through D; Series E unsecured notes; two series of general mortgage bonds—A and B; preference stock; common stock; and certificates of beneficial interest (CBI). In addition, the reorganized company will assume the outstanding trustees certificates (due in 1986) which will have a first lien on all of its assets.[30] Administration claimants receive the secured notes or a combination of cash and secured notes; secured claimants receive the so-called "10-triple-30" package (10% cash, 30% mortgage bonds, 30% preference stock, and 30% common stock); unsecured creditors receive a combination of CBIs and common stock; and the Penn Central Company, the sole owner of the Debtor's stock, receives common stock (10% of the total).

Two of the securities, the Series B general mortgage bonds and the preference stock, are convertible to common stock under certain circumstances.

The rights of the respective securities to cash from the Asset Disposition Program and other sources are rather complex. Therefore, in connection with the discussion of the securities, frequent reference will be made to the Trustees' 11-year cash fore-

---

**30.** The Trustee's certificates in default will be paid on consummation.

cast.[31] Having a reasonable estimate of when the securities are scheduled to be paid makes it easier to understand the complicated rights of each security in relation to the other securities issued under the Plan.

### 2. New Securities and Their Distribution

*Series A Notes:* These notes are an escape valve to be issued only if needed to pay approximately $56 million now due on the defaulted trustees certificates or to make scheduled principal payments on Series B notes. Cash is already on hand to pay the defaulted trustees certificates and cash flow should certainly be adequate to meet the payments on the Series B notes. There is, as the SEC Report has observed, therefore no need to consider the Series A notes in this analysis.

*Series B Notes:* Approximately $350 million face amount of these notes are to be issued to satisfy the claims of the United States arising from its advances in that amount under § 211(h) of the RRRA. All interest on these notes is deferrable until December 31, 1987, when the principal and accrued interest are payable without any provision for extension. Interest will be compounded semi-annually at a rate slightly above the Treasury's cost for 10-year borrowings. The Trustees estimate the rate will be 7½%. B notes will have a lien on the reorganized company's assets subject only to the lien of the 1986 trustees certificates and any outstanding Series A notes, and will also have a similar lien on the proceeds of the Valuation Case. Moreover, between 1978 and 1981 the outstanding principal of the Series B notes must be reduced by at least $80 million and under certain circumstances an additional, but limited, reduction of principal must be made. If the Valuation Case concludes before the B notes mature, the notes become payable to the extent that funds are available. The net effect of the Series B notes is to postpone payment of most of the priority claims of the United States Government until termination of the Valuation Case, permitting the use of cash and the proceeds from the Asset Disposition Program to satisfy the claims of other creditors.

The Plan contains an important covenant which protects the B notes. Pennco may not dividend to the reorganized company more than 50% of its consolidated net earnings. As a result, until the Series B notes are paid, there will be a substantial cash buildup in Pennco. This covenant insures the adequacy of the security which will be available to satisfy the Government first lien on the reorganized company.

The cash flow forecast contemplates aggregate payments on B notes of $100 million by 1981 ($20 million more than the amount required). If this forecast is correct, at maturity the total outstanding obligation on the B notes will be $579 million, consisting of $249.8 million in principal and $329.2 million in accrued interest.

*Series C, D, and E Notes:* These notes together with some cash, will be distributed to state and local tax authorities to satisfy pre- and post-petition taxes, including interest but excluding penalties, totaling $451.5 million. Forty-four percent of each tax claim will be paid within two years: 26.4% in cash at consummation, and 17.6% in Series D serial notes which mature during that period. The remaining 56% of each claim will be paid with a combination of Series C–1 notes, and D term notes which mature in December of 1987. As will be more fully described below, under certain circumstances, the principal of the C–1 notes will be converted to either D term notes or E notes, or a combination of both.

---

**31.** Exhibit to affidavit of Ernest Varalli, Doc. No. 14434. Neither Mr. Varalli's cash forecast nor the figures used by the Court contemplate the issuance of any C–2 notes. *See* Section II–J for discussion of the claims which may be satisfied with C–2 notes. In discussing the various lien priorities of the securities issued under the Plan, generally no mention is made of the liens of the Trustees Certificates due in 1986 or Series A notes because it is contemplated that the Trustees Certificates will be paid on maturity and that no A notes will be issued.

The original allocation of D term notes and C–1 notes depends on the extent to which the tax claims accrued on conveyed or retained property. Basically, tax claims are segregated into two classes: (1) real estate taxes assessed on conveyed property; and (2) real estate taxes assessed on retained property plus all other taxes. C–1 notes are distributed in an amount equal to 56% of the total tax claim on conveyed property and D term notes are distributed in an amount equal to 56% of the total tax claims attributable to retained property. By way of illustration, assume a tax claim of $40 on conveyed and $40 on retained assets with $10 in accrued interest on each. The tax claimant receives (subject to certain rounding principles) $26.40 in cash; $17.60 in Series D serial notes; $28 in C–1 notes; and $28 in D term notes. In the aggregate, $131.2 million in C–1 notes and $121.6 million in D term notes will be issued.

Both the D term and serial notes are general secured obligations of the reorganized company, carry a 7% interest rate payable semi-annually, and have a claim to the Valuation Case proceeds subordinate to the B and C notes. Approximately $79.5 million in D serial notes will be issued, one-half payable on December 31 of 1978 and the remainder on December 31, 1979. Payment of the principal and interest of the D serial notes is to be from the asset disposition proceeds, subject only to the prior claim of the B notes. The maturity date of the $121.6 million in D term notes which are to be issued originally under the Plan is December 31, 1987, but if these notes are not redeemed on that date, they are automatically extended for five years with pro rata redemption in each year of the extension period. Between consummation and the redemption date, $85 million in interest will be paid on the D term notes.

C notes will be issued in two series, C–1 and C–2. C–2 notes are reserved for Class G creditors.[32] Except for an important conversion provision applicable only to the C–1 notes, C–1 and C–2 notes have the same terms. Both series mature on December 31, 1987, and interest, which is deferred until maturity, accrues at 8% compounded annually. Although the C notes are not general obligations of the reorganized company, the interest and principal of the C notes, in that order, have a claim against the Valuation Case proceeds subject only to prior claims of the B notes. Any portion of the interest or principal of the C notes which is not paid from Valuation Case proceeds is extinguished.

There is, however, a rather complex conversion scheme which applies only to the principal of the C–1 notes which may remain outstanding after application of Valuation Case proceeds. Depending on the exact amount of the Valuation Case proceeds, the principal of the C–1 notes will convert to either D term notes, E notes, or a combination of both. The table below shows the treatment of principal and interest of C–1 notes for various amounts of 1987 Valuation Case proceeds and comparable 1976 base values.

| Valuation Case Proceeds 1987 | Base Values 1976 | Treatment of C Notes (in millions) |
| --- | --- | --- |
| $447 or less | $181 or less | All C-1 interest cancelled |
| | | All C-1 principal to E notes |
| $447-$578 | $181-$234 | All C-1 interest cancelled |
| | | Mix of D term and E notes |
| $579 | $234 | All C-1 interest cancelled |
| | | All C-1 principal to D notes |
| $579-$731 | $234-$296 | C-1 interest paid to extent Valuation Case proceeds exceed $579 |
| | | All C-1 principal to D notes |
| $732-$862 | $296-$349 | All C-1 interest paid |
| | | Some C-1 principal paid and remainder converted to D notes |
| $862 | $349 | All C-1 interest and principal paid |

32. *See* Section II–J for a discussion of the claims that may be satisfied with C–2 notes.

If the Valuation Case proceeds (1987) are between $447 million and $578 million, the allocation of D term notes and E notes is computed as follows: C–1 notes convert to E notes in an amount equal to the amount of B notes outstanding after application of the Valuation Case proceeds, and the balance of the C–1 notes convert to D term notes. By way of illustration, assuming $500 million in Valuation Case proceeds (1987), the balance due on B notes is $79 million and that amount of C–1 notes is converted to E notes with the remaining principal of the C–1 notes, $52.2 million ($131.2 million less $79 million), converted to D term notes.

The integration of D term notes issued as a result of conversion of C–1 notes with the original D term notes requires some fine tuning. If the Valuation Case is concluded before December 31, 1987, and some or all of the C–1 notes are converted to D term notes, the conversion issue of D term notes will share *pari passu* with the original D term notes and be subject to the automatic five-year extension. However, if the Valuation Case is concluded after December 31, 1987, but before December 31, 1991, the D term notes issued in conversion of C–1 notes will be payable in equal amounts so as to retire the entire conversion issue by the end of 1992. The last but, it is hoped, unnecessary provision of the conversion scheme is that if the Valuation Case is concluded on or after December 31, 1991, the principal of the C–1 notes is immediately payable in cash on the later of December 31, 1992, or the conclusion of the Valuation Case.

Series E notes are fully subordinated unsecured obligations of the reorganized company which do not bear interest and mature on the later of December 31, 1993, or six years after the conclusion of the Valuation Case. In the event any E notes are outstanding on the maturity date, there is an automatic 10-year extension. E notes do have the benefit of a cumulative redemption covenant under which a maximum of $30 million a year in E notes may be retired. Payments will be made on the E notes only if cash is available, and then only to the extent the earnings of the reorganized company, subject to certain adjustments, exceeded $50 million in the previous year.

*General Mortgage Bonds:* Two series of general mortgage bonds—Series A and Series B—are to be distributed in various combinations to secured creditors to satisfy 30% of each secured creditor's claim. The mortgage bonds have the benefit of a complicated set of priorities as to the funds available to make principal and interest payments. For present purposes, all that need be noted is that the bonds are subordinate to the notes as to lien priority and cash availability, and as between the two series, the principal and interest of A bonds must be paid before Asset Disposition proceeds may be used to service the B bonds. Both series bear a 7% per annum interest rate beginning on April 1, 1981, but if cash is not available, the interest is deferred and compounded semi-annually. The maturity date for the bonds is December 31, 1987, but if the Valuation Case is not concluded as of the maturity date, there is an automatic 10-year extension. With respect to the Valuation Case proceeds, the B bonds are paid first, but in the event that the Valuation Case proceeds are inadequate to satisfy the B bonds, any remaining amount of principal is converted into common stock at the same number of shares per thousand dollars as the unsecured creditors received per thousand dollars of claim (estimated to be 11.40 shares per thousand dollars). On the other hand, A bonds are general obligations of the reorganized company, and if the Valuation Case proceeds are inadequate to satisfy the A bonds, they must be paid either at maturity or pursuant to the terms of the automatic extension. The cash forecast indicates that A bonds will be retired easily from the Asset Disposition Program.

Early redemption of the mortgage bonds is controlled by two separate provisions of

the Plan. Mortgage bonds have a very high claim to Asset Disposition proceeds, and to the extent all prior claims to Asset Disposition proceeds are met in any given year, there will be mandatory early redemption of the mortgage bonds. However, the Plan puts a limit on the mandatory redemption feature by establishing the following maximum percentages of the total amount of mortgage bonds which may be redeemed as of any given year: 1978—33.34%; 1979—44.45%; 1980—55.56%; 1981–66.67%; 1982–77.78%; 1983–88.89%; 1984—100%. Because A bonds must be paid first, the actual A bond redemption limitation for 1978 is 55%, with an additional 18.3% cumulatively thereafter until all the A bonds are redeemed. If the cash forecast is correct, $304.9 million of the $344 million in A bonds will be paid by 1980 and the remainder will be paid by 1983, and $25.1 million in B bonds will be paid in 1983 and most of the accruing B bond interest will be paid through 1987.

*Preference Stock:* Secured creditors will receive non-dividend preference stock, computed at a ratio of 1 share per $20 of claim, for 30% of their claim. Of the 30 million preference shares authorized, it is expected that 28.36 million will be issued to secured creditors. Each share will have two-thirds of a vote, and the aggregate preference shares will represent 45% of the voting power of the reorganized company. Since secured creditors will also receive 12.73 million shares of common stock, which has one vote per share, the secured creditors as a class will have 75% of the voting power.

Beginning in 1981, annual redemption of 5% of the preference stock at $20 per share is required if an income test is met. If the income test is met but cash is not available, the redemption obligation carries over. The cash forecast does not indicate that any preference stock will be redeemed. However, the forecast does show that the income test would permit redemption of $25.3 million of preference stock in 1981. Since no estimate of Pennco's earnings past 1981

is available, additional redemptions cannot be predicted. Unredeemed preference stock will have a claim against the proceeds of the Valuation Case subordinate to the Series B, C, and D notes and the Series B bonds. If the Valuation Case proceeds are not adequate to redeem the preference stock, preference stock automatically converts to common at a ratio of 1 share of common for each 6.5 of preference.

*Certificates of Beneficial Interest:* It is estimated that $213.2 million in Certificates of Beneficial Interest will be issued to satisfy 30% of the unsecured claims. The certificates are payable only out of the Valuation Case proceeds which are available after the satisfaction of the secured notes, general mortgage bonds and preference stock.

*Common Stock:* Of the 40 million shares of common stock which are authorized under the Plan, 23.153 million are to be originally issued: Secured creditors—12,734,562 shares (55%); unsecured creditors—8,103,-813 shares (35%); and Penn Central Company—2,315,375 shares (10%). However, due to the provisions of the Plan which preclude the issuance of fractional shares the stock issued on consummation will be somewhat less than the shares allocated to the class. The difference in shares between the full allocation and the amount issued will be sold to the public within one year, and the proceeds distributed to those who would have received the fractional shares. Conversion of the full amount of B bonds and preference stock would require issuance of 6.9 million additional shares of common. Any Valuation Case proceeds in excess of the amount necessary to satisfy Series B, C, and D notes, Series B mortgage bonds, preference stock, and certificates of beneficial interest, will of course benefit the common stockholders. Mr. Guest, the Trustees' investment advisor, has opined that the reorganized company may be able to pay modest dividends on the stock during the 1978–87 period and that it would be wise for the directors to declare such dividends.

The first Board of Directors will be selected from persons representing the Institutional Investors, the PCTC Indenture Trustees, the secured banks, the New Haven Trustee, unsecured creditors, the Penn Central Company and two designated officers of the reorganized company. As the staggered terms expire, the shareholders will elect replacements. Beginning on the sixth anniversary of the consummation of the Plan all directors will be elected for one-year terms by cumulative voting. Thus, the voting shareholders will have substantial control over the choices to be made by the reorganized company.

In sum, the Plan creates a set of securities which weave an intricate series of claims against the three asset groups. Cash and Asset Disposition Program proceeds are distributed to the United States, tax claimants, and secured creditors. Valuation Case proceeds are subject to the essentially same priority scheme, the United States, tax claimants, and the B bonds of secured creditors, and any remaining proceeds are available to satisfy the secured creditors preference stock, then the CBI's of the unsecured creditors, and ultimately the shareholders. The reorganized company is to be owned by the secured creditors, the unsecured creditors and Penn Central Company, but subject to all of the liens created by the Plan.

### 3. Scope of the Plan

The prior discussion has proceeded, for the purpose of clarity, as if there were only one debtor, Penn Central Transportation Company. This, of course, is not the case. Only about one-half of the rail lines of the Penn Central system were actually owned by Penn Central. The other half were leased to Penn Central under long-term leases by so-called leased line lessors. Fifteen of these lessor companies have filed § 77 petitions as part of the Penn Central proceedings and are referred to as the Secondary Debtors. For each of the Secondary Debtors, the Penn Central Trustees have proposed a Plan. Subject to a number of exceptions, the treatment of the bondholders of the Secondary Debtors is the same as

that of the bondholders of Penn Central. Stockholders are, however, treated quite differently. The respective leases between Penn Central and the Secondary Debtors require Penn Central to pay as rent certain dividends to the public stockholders of the Secondary Debtors. For the purposes of the Plan, the annual stock dividend payment is capitalized at a rate of 10 and the resultant amount is treated as a secured claim which receives the same distribution as other secured creditors, the 10-triple-30 securities package. Implementation of the Penn Central and Secondary Debtor Plans would have the effect of placing control of the Secondary Debtor's assets, including their subsidiaries, in the reorganized company. The cash forecast assumes that all of the Secondary Debtors' Plans will be effectuated. A major purpose of proposing Plans for the Secondary Debtors at this time is to achieve a substantial simplification of the debt and equity structure of Penn Central and its related lessor companies. Consummation of all the Plans would eliminate more than 50 separate mortgages of Penn Central and the Secondary Debtors, and the outstanding stock of Penn Central Company and the Secondary Debtors. In sum, the Plan would replace the complex debt and equity structure of Penn Central and the Secondary Debtors with the comparatively streamlined and simple debt and equity structure of the reorganized company which is described above.

There is another group of lessors which are not in bankruptcy. The Trustees originally appeared to be including these companies under the Plan and treating their debt and equity interests substantially the same as the Secondary Debtor bondholders and equity holders. Later, the Trustees clarified their position as being merely an offer by the Trustees to settle all outstanding accounts with the lessors on the terms mentioned. Failing prompt acceptance, settlement negotiations were to be initiated. To date, no such settlements have been presented to the Court. However, the cash forecast is predicated on the assumption that all of the non-bankrupt lessors accept the proposed settlements. Since the failure

to accept the Trustees' settlement proposal reduces the assets available to the reorganized company but also reduces the amount of securities to be issued, it does not appear that feasibility of the Plan would be impaired by the failure of the non-bankrupts to join in the Plan. The Trustees have offered evidence that the feasibility of the Plan would not adversely be affected by the failure to have these matters resolved before consummation, and no one has challenged that conclusion. It should be noted, however, that the eventual resolution of the disputes between the reorganized company and the non-bankrupt lessors may be either more or less favorable to the Trustees than the terms of the Plan.

## C. THE "COMPROMISE" FEATURES OF THE PLAN

In order to achieve this Plan, the Trustees have negotiated compromise settlements with the Federal Government; the group of banks holding the pledge of all of the stock of Pennco; the New Haven Trustee; and others. Unless these compromise settlement arrangements—particularly those with the Federal Government and the bank group—are approved as reasonable, there can be no Plan of Reorganization.

Before discussing the reasonableness of each of the major compromise proposals, it is well to have clearly in view the legal standards which must govern the Court's judgment in the matter. It is firmly settled that a Plan may be approved which embodies compromise resolution of conflicting contentions, if the approval is based upon an informed evaluation of the strengths and weaknesses of the respective contentions, the likelihood, duration and expense of litigation which would otherwise be necessary, and the range of probable litigation results. *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968). Where the Trustees and particular parties have in fact reached a compromise settlement of their conflicting contentions, those are the governing criteria.

Essentially the same criteria are applicable in instances where no actual compromise agreement has been reached, but the Plan nevertheless resolves the dispute, *i. e.,* where the Trustees have in effect proposed a compromise resolution of the controversy, and ask the Court to approve and implement it as being fair and reasonable.

In both situations, approval of the suggested resolution of the controversy may substantially affect the interests of others who are not direct parties to the compromise, or to the negotiations and discussions which produced the agreed-upon or suggested solution. It is therefore necessary that all affected parties have an opportunity to be heard.

A hypothetical example may be useful here. Assume creditor X asserts a claim for $1 million, but the Trustees contend that the estate's liability is only $500,000. Assume further that if creditor X is allowed more than $600,000 from the estate, there will not be enough left in the estate to pay creditor Y in full. The Trustees and creditor X agree to settle the claim for $750,000. Creditor Y is, of course, entitled to be heard on the fairness and reasonableness of the compromise. But if, after a full opportunity for all concerned to present both evidence and argument, the reorganization court is satisfied that the proposed compromise is fair and reasonable in light of the strengths and weaknesses of the contentions of creditor X, the Trustees, and creditor Y, the costs and delays litigation would involve, and the range of probable outcomes of litigation, the Court may approve a Plan which embodies that compromise resolution. The fact that creditor Y was not a party to the settlement, and did not participate in the negotiations which produced it, is immaterial. His rights are fully vindicated in the hearing process. The objective tests of fairness and reasonableness are controlling.

Ordinarily, if the only item in dispute is the correct amount of a claim, there would be no occasion for the Trustees to propose a compromise resolution which was not agreed to by the creditor directly involved; it would be simpler to have the claim sum-

marily adjudicated pursuant to the program for proofs of claim. But when more complicated disputes arise, as they inevitably do in any complex reorganization case, what amounts to a compromise resolution of a dispute must often be proposed in the absence of actual agreement between the parties directly involved. The words uttered by the Supreme Court a century ago still ring true today:

> Railroad mortgages . . . are peculiar in their character and affect peculiar interests. The amounts involved are generally large, and the rights of the parties oftentimes complicated and conflicting. It rarely happens that a foreclosure is carried through to the end without some concessions by some parties from their strict legal rights, in order to secure advantages that could not otherwise be attained, and which it is supposed will operate for the general good of all who are interested. This results almost as a matter of necessity from the peculiar circumstances which surround such litigation.

*Fosdick v. Schall,* 99 U.S. 235, 252, 25 L.Ed. 339 (1878).

The Plan now before the Court incorporates a host of compromises of various kinds. They include actual compromise settlement agreements; provisions of the Plan which carry out what the Trustees regard as a fair and reasonable adjustment of unresolved disputes; and underlying assumptions, concerning such matters as the Valuation Case, based upon judgments which have been arrived at through a process closely akin to compromise. The agreed-upon or proposed compromise settlements include disputes between the Trustees and particular claimants or classes of claimants regarding the amount or nature of the claims, and disputes between classes of creditors. Included in the former category is the important proposal that the complex relationships between Penn Central and the 15 Secondary Debtors be resolved by cancelling all mutual claims, paying off the public holders, and treating the Secondary Debtors' assets as assets of Penn Central. An illustration of the compromise resolution of

a dispute between classes is the treatment of tax claims. In such cases, each party to the dispute receives less favorable treatment than would be appropriate if all disputed issues were resolved in its favor, but more favorable treatment than would be appropriate if it should litigate and lose.

The distinction between settlement agreements and compromises which have not actually been agreed upon (a distinction which, as discussed above, is not crucial for present purposes) is sometimes difficult to draw. The compromises of the claims of the United States Government, the Pennco pledge dispute, the claims of the Secondary Debtors, and the claims of the New Haven Trustee have all been expressly agreed upon. On the other hand, there is not unanimous agreement by the taxing authorities concerning the treatment of state and local tax claims, although most such claimants who have participated actively in the Plan proceedings now support the Plan.

The compromise-like assumptions related to the Valuation Case problem stem from the fact that neither the amount to be received by the estate in exchange for the rail properties conveyed to ConRail, nor the timing of its receipt, is now known. Thus, any Plan proposed before the Valuation Case litigation is concluded must take these uncertainties into account; the assumptions must be within the reasonable range of probable litigation results. As discussed in detail in Section II–B, the Plan deals with the uncertainties of the Valuation Case through the issuance of a mix of securities designed to reflect both the risks and the potential rewards of the Valuation Case.

■ While each compromise settlement, compromise proposal and compromise-type assumption must be evaluated individually, the importance of viewing the Plan as a cohesive unit cannot be over-emphasized. All of the compromises are closely interrelated. In a very real sense, the Plan is the sum of all of its compromises. The fairness and equity of the treatment accorded to any class or member thereof must be evaluated in the context of the Plan as a whole.

To recapitulate, a reorganization court unquestionably has the power to approve a plan which embodies compromise resolutions of disputed issues notwithstanding the objections of persons directly or indirectly affected by the compromises. This does not mean that legitimate contentions may be disregarded. Rather, they must be taken into account in determining whether the Plan does or does not provide fair and equitable treatment. The issue is not merely whether there are objections to a particular compromise, but whether the objections are persuasive. No one creditor or group of creditors can be permitted to insist upon litigating every contention to finality, if that very process would frustrate a reorganization which is in the best interests of all creditors.

Perhaps the most striking feature of the Plan proceedings has been that, notwithstanding the welter of objections, counterproposals, charges and counter-charges, it appears that no one has consciously advocated abandoning the attempt to achieve a Plan of Reorganization at this time. And there is almost equally unanimous agreement on the proposition that retention of Pennco as the operating core of the reorganized company is essential. As an assessment of the economic realities of the situation, this business judgment is undoubtedly sound, as noted in the SEC Report. In view of the ramifications, intended or unintended, of some of the arguments presented, however, the Court must initially consider whether present approval of a Plan of Reorganization, with its attendant compromises, unfairly prejudices senior creditors whose claims might otherwise be more promptly satisfied. Arguably, if that were the case, the Plan should not be approved, no matter how globally beneficial it might be.

At first blush, it would seem theoretically possible to simply liquidate all retained assets immediately, pay the proceeds to top-ranking claimants in descending order of priority, await the outcome of the Valuation Case, and then complete the liquidation process by distributing the proceeds as far down the priority ladder as they would reach. While this course of action would undoubtedly produce less total benefit for the creditors than would a Reorganization Plan, it would theoretically produce more immediate payment to the senior creditors whose claims are entitled to priority treatment.

Upon analysis, however, it becomes immediately apparent that in the absence of compromise, even that simplistic and draconian result could not be achieved any more speedily than a Plan of Reorganization which provides greater benefits for all. The reason lies in the nature and complexity of the legal issues which, in the absence of compromise, would have to be litigated.

In their evidentiary submission, the Trustees have spelled out in some detail the major sources of potential litigation. These include the disputes concerning the relative priority of governmental claims, state, local and federal; the validity of the Pennco pledge agreement; a host of issues concerning the coverages of various mortgages and the correct application of marshalling principles; and what is perhaps the most significant but least understood problem, unraveling the intricate relationships between the Debtor and the Secondary Debtors. And even if these disputes could be finally resolved through litigation by the early 1980s, as the Trustees assume, there is another aspect of the matter which the Trustees appear to have somewhat underestimated. All of these disputes are interrelated. Generally speaking, the highest-priority claims must be finally resolved before distribution to lower classes could begin. For that reason, until the highest-priority claims are known, it is virtually impossible to determine correctly the treatment which lower classes of claims should receive. It is unlikely, therefore, that litigation of all of these major disputes could efficiently be pursued simultaneously. Stated otherwise, if the litigation proceeded simultaneously, it might well be necessary, upon completion of one round of litigation, to commence an entirely new round of litigation in order to determine how the results of the first round of litigation should be implemented (either in a Plan of Reorganization, or in the hypothetical liquidation distributions).

Until the validity and priority of the Government claims were finally determined through litigation, no distributions of any kind could be made. Until the issues surrounding the state and local tax claims were determined through litigation (Section II–F), distributions to bondholders would seem unlikely. Perhaps more importantly, until the amount of the recovery in the Valuation Case became known, it would be impossible intelligently to work through the problem of allocating unpaid administration claims among the various mortgages, rendering distribution impossible. And until the Secondary Debtor issues were resolved, those assets would not be available for Penn Central creditors.

Thus, achieving a Plan at this time would expedite, rather than delay, distributions to senior claimants as well as junior claimants, and there is no valid reason for rejecting the obvious overall economic advantages reorganization would entail.

The final, and equally obvious, point to be made is that there simply can be no reasonably prompt Reorganization Plan which does not embody compromise solutions of these litigable issues. The true choice, then, is among prompt achievement of a beneficial Plan which provides some immediate distributions to creditors and greater distributions in the long run, or holding matters in abeyance until all litigation, including the Valuation Case litigation, is concluded, and then attempting to achieve a Plan, or pursuing the economically wasteful course of a liquidation in which distributions to creditors would be withheld for many years. The choice is obvious.

Therefore, the issue is not whether the Plan should be disapproved because it embodies compromises which are objected to, but whether the proposed compromises are fair and reasonable.

## D. MAJOR COMPROMISES

### 1. United States Claims

The principal compromise settlement agreement embodied in the Plan deals with the major claims of the Federal Government. These include $50 million, plus interest, due on trustees certificates in default since 1976, and approximately $350 million due or to become due under the § 211(h) program. In addition, the Government has guaranteed the balance of $50 million in trustees certificates, which fall due in 1986.

On January 18, 1977, after hearing, I entered Order No. 2744, granting preliminary approval to the compromise arrangements which have now been embodied in the Plan. There were no significant objections to the proposed compromise at that time, and no actual objections to the terms of the compromise arrangements as such have been expressed at the present time. It is therefore unnecessary to spell out all of the details of the compromise agreement. The agreement resolves certain disputes between the Trustees and the Government concerning their respective rights and obligations under the § 211(h) program and the agency agreement with ConRail. For present purposes, the significant features are that payment of the $50 million in defaulted trustees certificates is deferred until the consummation date under the Plan, and all other claims are deferred until the conclusion of the Valuation Case; and the Government agrees to accept the distributions provided for in the Plan, and to support the Plan. Without such deferrals, there obviously could be no Plan of Reorganization, and no claims of other creditors could be paid until the Government's claims were satisfied in full.

The Government reserved the right to withdraw from the settlement agreement unless certain conditions were met. The Trustees were required to agree to pay pre-bankruptcy personal injury claims in cash, and to extend to state and local taxing authorities a proposal for immediate compromise settlement of tax claims (see Orders Nos. 2921, 2922 and 2929); and it was stipulated that the Reorganization Plan must provide for full cash payment of all claims under $1,000. The Trustees agreed to the arrangements for financing the Government claims which are now set forth in the Plan, and also agreed, *inter alia*, not to attempt to exercise a right of setoff

based upon the estate's claims for unconstitutional erosion. The latter agreement was, of course, without prejudice to the Trustees' right to pursue those claims before the Special Court or elsewhere.

I had no difficulty in approving this compromise settlement as reasonable when the issue was first before this Court, and my opinion remains the same. The primary reason is that there is no likelihood that a more favorable result could be achieved for the estate.

No doubt there are many arguments which could be raised against the validity of the Government's claims, or at least against the super-priority they have been accorded by statute.[33]

The range of possible litigation outcomes extends from full Government victory, the consequences of which are sketched above, and full victory for the estate, in which event conceivably the statutory prohibition against setoffs would be invalidated, and all of the Government's claims would be treated as part payment for the unconstitutional consequences of congressional treatment of the railroad, including the RRRA. Realistically, the likelihood of achieving that kind of result is not great, and the likelihood of achieving any favorable result of any kind within a reasonable span of time is simply non-existent. This was a negotiation in which the relative bargaining power of the adversaries was not exactly equal.

Apart from the timing question, some brief further discussion of the merits of the issues is perhaps justified, in view of the widespread feelings on these matters among Penn Central's creditors and stockholders.

I earlier expressed the view that requiring Penn Central to operate beyond October 1, 1973 would probably be unconstitutional. I followed very closely the development of the RRRA and, as one member of the three-judge court, agreed that it was unconstitutional in the absence of a Tucker Act remedy; and I further expressed the view that even a Tucker Act remedy would be too remote to satisfy constitutional requirements under these circumstances. The Supreme Court and the Special Court disagreed with this latter view. The RRRA, in tandem with the available Tucker Act remedy, is undoubtedly constitutional. The difficulty is that the statute as thereafter applied was quite different from the statute which was before the Supreme Court. It is conceivable that the consequences which, by amendment and other governmental actions and interpretations, have been permitted to flow from the present version of the statute, might not pass muster. But it must be recognized that constitutional challenges to governmental actions on the subject of bankruptcy have seldom been successful; the only authoritative judicial guidance as to the possible limitations of the bankruptcy power tends to include statements to the effect that whatever those limits may be, they have not been exceeded in the particular case under discussion.

Parties unimpressed by the Government compromise must also be cognizant of the stark fact that, rightly or wrongly, bondholders and stockholders of railroad enterprises simply are not objects of sympathy in the legislative halls of this nation. Hence, even a successful assault upon the validity of the Government claims and their priority would very likely merely lead to further legislation which might generate a further round of litigation.

Having said all of this, I hasten to add that I regard the compromise agreement with the Government as a generous one. It reflects a sincere effort on the part of the Government to rectify some of the rather harsh immediate consequences of the cash-flow crisis stemming from the conveyance. It has made possible the prompt pay-

---

**33.** It is unnecessary to consider what tribunals might have jurisdiction over such challenges. The SEC Report (pp. 82–83) after concluding that the Special Court would have exclusive jurisdiction over such matters, seems to assert that this also deprives the Reorganization Court of jurisdiction to assess the strengths and weaknesses of the competing arguments, and the range of reasonable litigation results, in passing upon the proposal to compromise these disputes. If that is the SEC's position, I believe it is incorrect.

ment of personal injury claims, and at least a beginning of payment of tax claims. Whatever may be the propriety of having required the Debtor to go deeper into debt in order to provide rail service to the public during the planning and implementation of the RRRA, there is undoubted merit in an agreement to postpone collection of that additional debt so that the company can reorganize.

### 2. Settlement of Pennco Pledge Dispute

During the period between the merger and the bankruptcy, the Debtor obtained much of its working capital by means of a short-term, revolving credit arrangement with a consortium of banks, for whom Citibank acted as agent. Plans to achieve long-term mortgage financing did not materialize, initially because of unfavorable market conditions, and later because of the Debtor's rapidly deteriorating financial condition.

A few months before bankruptcy, the revolving credit arrangement was increased and modified. The Debtor pledged its Pennco stock to the Citibank group as collateral for a $300 million revolving credit authorization. Closing was held April 1, 1969. $200 million was drawn at the time of closing; of this amount, $100 million was used to satisfy the amount outstanding under the previous revolving credit arrangement. The entire $300 million was drawn down before bankruptcy.

No payments have ever been made on account of this indebtedness. Treated as a fully secured claim, entitled to interest at the contract rate, the claim would now aggregate in excess of $470 million. It would be secured by the asset—Pennco—which is absolutely essential to the success of this reorganization.

Early in the reorganization proceedings, various parties mounted a substantial challenge to the validity of the pledge of the Pennco stock. Those issues were fully litigated in connection with an earlier proposal for an amicable settlement between the Trustees and the bank group. When the proposed settlement agreement was rejected by this Court, see In re Penn Central Transp. Co., 358 F.Supp. 154 (E.D.Pa.1973) the impetus for prompt resolution of these disputes was removed. Since such matters are normally adjudicated in connection with the Plan proceedings, I was content to withhold decision in the matter, upon being advised that, for various reasons the interested parties preferred to have the pledge issues remain in abeyance.[34]

The validity of the pledge was challenged by various parties, with varying degrees of intensity. The Trustees themselves remained neutral on the subject. Because many of the banks involved in the transaction were also Indenture Trustees for bondholders, it was necessary to appoint Special Representatives to look after the interests of the bondholders. These Special Representatives, and representatives of equity interests (commonly referred to as "the Robinson petitioners"), were the principal proponents of the view that the pledge was invalid, although they disagreed to some extent concerning the consequences which should flow from such invalidity.

The facts giving rise to the challenge were these: Section 10 of the Clayton Act prohibits a railroad from selling its securities to any corporation having one or more directors who are also directors of the railroad, except pursuant to competitive bidding. Moreover, apart from the common director problem, transactions such as the revolving credit and pledge agreement require the approval of the ICC under Section 20a of the Interstate Commerce Act.

The transactions were structured as loans made by a small number of "lender banks"; but these lenders would then simultaneous-

---

34. The Court was not made privy to the discussions, if any, which led to this informal understanding among counsel. It is fair to assume that each party considered the possible consequences of an adverse decision, the inevitability of appeals from even a favorable decision, the consequences of postponement of the decision, and the prospects for amicable resolution of the controversy. From the standpoint of the Court, the crucial consideration was the fact that preservation of the uncertain status quo would not be detrimental to any of the parties.

ly assign part of the transactions to a large number of "participating banks". While there may be some dispute as to the extent to which the banks regarded these arrangements as legally binding among themselves, it is clear that the proposed participants were informed by Citibank from time to time as to the status of the negotiations, and that the identity of the participating banks and the amounts of their respective participations were known to Penn Central when the credit agreement was signed.

A couple of months before the final revolving credit arrangement became effective, a director of one of the lender banks was nominated to the Penn Central Board, and was actually elected a few days before the closing, although he did not attend any directors meetings until after the closing. There was uncontradicted evidence to the effect that he was not aware of the pending loan transaction, and that the bank was not aware of his impending Penn Central directorship. He did not disclose his bank directorship to the railroad, because he misunderstood the questionnaire the railroad required him to fill out, and was not aware of the possible conflict.

In addition to this problem, it developed that five of the participating banks, who participated in the transaction to the extent of $57 million, had directors in common with the railroad throughout the relevant period. The parties were all aware of these interlocks, but assumed that they posed no problem because the participating banks were one step removed from the transactions between the Debtor and the lender banks; there were no direct negotiations or dealings between Debtor and the participating banks.

The arguments in support of the challenge may be summarized as follows: There was a clear, albeit unintentional, violation of § 10 with respect to one bank, and a violation of at least the spirit of the statute with respect to five additional banks. The Court should not countenance this transparent attempt to circumvent the competitive bidding requirements of § 10. Moreover, the failure to disclose any of these infirmities to the ICC amounted to a fraud against that agency, rendering its approval of the transaction nugatory. And, as a separate matter, the failure of the parties to disclose to the ICC the existence of "compensating balance" arrangements between the various banks and the Debtor (i. e., "gentlemen's agreements" to maintain deposits at specified levels the participating banks) further undercut the legitimacy of the transaction.

On behalf of the banks, the following arguments were presented: This was not a sale of "securities" subject to § 10. In any event, a transaction of this magnitude is not realistically susceptible to competitive bidding, hence Congress could not have intended that § 10 should be applied in this context. The terms of the loan transaction were unduly favorable to the railroad. The railroad obtained the full benefit of the loan transaction, and should now be required to comply with its terms. The banks had nothing to do with the proceedings whereby the approval of the ICC was obtained. Obtaining the approval of the ICC was clearly the responsibility of the railroad; it would be unthinkable to permit the railroad to avoid a $300 million obligation by reason of irregularities in its application to the ICC. Moreover, there were no such irregularities; the structuring of the direct transaction was appropriate; the ICC must have been aware of the common practice of using the "participation" device, and certainly was aware of the universal practice of compensating balances. The compensating balance arrangements were standard, were not lived up to by the railroad, and resulted in no detriment to the railroad. None of the parties was aware of the technical violation of § 20a in the one case, and the vast majority of the participating banks were not even aware of the interlocks which necessitated the participation arrangement. None of the interlock banks participated in any way in the negotiation of the terms of the credit agreement.

Having thus summarized the contentions of the parties with respect to liability issues, I now summarize briefly the range of possible litigation results. Assuming that

the debt obligations issued by the Debtor pursuant to the revolving credit arrangement were "securities" within the meaning of § 10 (an easy assumption), and that the magnitude of the transaction and arguable ineffectiveness of competitive bidding do not exempt this transaction from application of the statute, it might nevertheless be concluded that the role of the participating banks does not amount to a violation of the statute, and that the technical violation should be simply ignored. Or, it might be held that the criminal penalties provided by § 10 of the Clayton Act and § 20a of the Interstate Commerce Act are exclusive, and that there is no civil liability apart from that specified in § 20a. Section 20a(11) provides that securities issued without ICC approval are void, but that securities issued in accordance with the terms and conditions of an authorization shall not be rendered void because of the failure to comply with any provision of this section. The ICC did authorize the transaction. Its decision has not been challenged (and, arguably, could not be challenged in this Court); hence the securities are valid and enforceable. Acceptance of any of these arguments would fully vindicate the pledge.

If it were concluded that the Clayton Act was violated, and that a civil remedy should be fashioned, the remedy might include cancellation of the obligation; cancellation of the obligation, leaving the banks to an unsecured pre-bankruptcy claim for unjust enrichment; depriving the banks of the fruits of the transaction which occurred in technical violation of the Act, i. e., either voiding their secured position in its entirety, or voiding their secured position to the extent of $100 million (the amount by which previously unsecured obligations were satisfied from the initial proceeds and thus converted into secured obligations): invalidating only the notes held by the conflicted lender; invalidating only the notes held by conflicted participants; invalidating the notes held by the conflicted banks and Citibank; treating the claims of the conflicted lender bank, and/or the conflicted participating banks, and/or Citibank, as unsecured, but treating the remaining claim as secured; reducing the aggregate amount of the claim by offsetting provable damages; or a combination of the foregoing.

If offsetting damages were held to be the appropriate remedy, the burden of proof would be of particular importance. It might be held that, in the absence of evidence that more favorable loan terms could have been obtained elsewhere, and in the absence of evidence that the railroad suffered any loss by reason of the "compensating balances," no damages are recoverable. Or it might be permissible to presume damages in these circumstances. A middle ground might be to conclude that, since the purpose of the competitive bidding requirement is to prevent harm to the railroad from unduly generous terms, and since the entire transaction was intentionally structured so as to avoid the competitive bidding requirements of which all concerned were well aware, the proper remedy would be to preclude recovery for any interest in excess of the prime rate at that time.

A further issue, not involved in the earlier litigation, is the extent to which the bank's claim is secured. That is, assuming the pledge is fully valid, does the amount of the claim now exceed the value of the Pennco stock? If it does, then part of the claim should be treated as unsecured; but by the same token, this would strengthen the banks' argument that they should be permitted to foreclose on the pledge, and that the administration claims, including the Government's priority claims, may not invade their interest in Pennco.

The proposed Plan embodies a compromise resolution of all of these issues. The banks' total claim is fixed at $440 million. The banks further give up any rights they may have to assert a secured position by reason of the cash held on deposit when the bankruptcy petition was filed, or any priority arising from this Court's injunction against setoffs. With respect to the $440 million claim, the banks would receive the same treatment as other secured creditors. That is, the claim would be recognized as fully secured, but allocated as between retained and conveyed assets (61% retained, 39% conveyed).

■ I have no difficulty in concluding that the proposed compromise is fair. It is noteworthy that the compromise is accepted by the Special Representatives, as well as by the Robinson petitioners. The latter, of course, would have standing only if the $300 million obligation were to be voided in its entirety; that is, equity interests are affected by the totality of the debt recognized, and not by distinctions between secured and unsecured.

Because the pledge issues were fully litigated, and indeed were the subject of a lengthy adjudication prepared (but not filed) by this Court, the task of evaluating the compromise in light of the probable litigation results, at least at the district court level, is uniquely straightforward. Because the parties have resolved their differences, I do not propose to set forth in this Opinion the conclusions previously reached. It is sufficient to state that I regard it as extremely unlikely that the final outcome of the litigation would be total cancellation of the indebtedness, or total disregard of the pledge; that it would be improper simply to ignore the statutory requirements; and that the most likely outcome of litigation would have been some form of modified treatment in the Plan of Reorganization. In short, I am satisfied that the Plan provisions represent an entirely acceptable compromise of the various disputes.

### 3. New Haven Trustee Claims

The New Haven Trustee asserted a secured claim in the total amount of $208.5 million (Library Doc. J–20.1) stemming from the inclusion of the New Haven in the Penn Central merger on December 31, 1968. The price to be paid by Penn Central for the New Haven properties was finally adjudicated by the Supreme Court shortly after Penn Central filed its reorganization petition. *New Haven Inclusion Cases*, 399 U.S. 392, 90 S.Ct. 2054, 26 L.Ed.2d 691 (1970). The consideration was to have been principally composed of Penn Central common stock, but the New Haven reorganization court had included an underwriting provision embodying a guarantee by Penn Central that the stock would be worth $87.50 per share. No express lien was created to support that guarantee, but in view of Penn Central's bankruptcy, the Supreme Court remanded the case for reconsideration of "the form that Penn Central's consideration to New Haven should properly take and the status of the New Haven estate as a shareholder or creditor of Penn Central." 399 U.S. at 489, 90 S.Ct. at 2108.

The New Haven reorganization Court imposed an "equitable lien" upon all of the former New Haven assets in the hands of Penn Central, because of what it regarded as the compelling equities of the situation. This decision was later vacated on appeal for lack of jurisdiction. In light of that litigation, and for the purpose of clarifying the status of the New Haven as a participant in the Penn Central reorganization proceedings, I concluded that the New Haven estate should be treated tentatively as holding "a lien, indeterminate in amount, and indeterminate as to priority, upon all of the real property and readily identifiable tangible personal property (exclusive of rolling stock) . . . conveyed to Penn Central" by the New Haven Trustee. *In re Penn Central Transp. Co.*, 337 F.Supp. 779, 791 (E.D.Pa.1971). The New Haven Trustee also holds $34,025,800 of Penn Central Divisional First Mortgage Bonds secured by the properties previously owned by the New Haven, and the New Haven Trustee has also asserted various claims based upon alleged misrepresentation or fraud on the part of Penn Central's pre-bankruptcy management (Library Docs. J–20.28–29).

The extent to which any or all of these claims, even if secured claims, are secured by retained assets, is a further subject of controversy. They are at least secured by retained assets to the extent of slightly more than $48 million and, depending upon how certain disputes concerning the New Haven's relationship to the Park Avenue properties might be resolved, may be secured by retained assets to the extent of an additional $86 million.

■ Under the settlement agreement, all of these disputes are resolved by according to the New Haven Trustee a secured claim in the sum of $121 million and an unsecured claim in the sum of $53 million. The settlement is well within the range of reasonably likely litigation possibilities, and the litigation would obviously be lengthy and expensive. It is significant that no one has expressed any objection to the settlement arrangement. I conclude it is fair and reasonable, and should be incorporated in the Plan.

## E. THE VALUATION CASE

### 1. Status of the Valuation Case

Pursuant to the RRRA, the Final System Plan prepared by USRA designated the properties to be conveyed to ConRail and set forth USRA's findings concerning the value of the conveyed properties and the consideration to be given in exchange. The Valuation Case is simply a *de novo* adversary proceeding [35] in which the Special Court will decide whether the terms of the exchange proposed by USRA meet the constitutional minimum standards of fairness and equity and, if not, what the terms should be to comply with that standard.

For purposes of this Opinion, it suffices to review briefly what some of the major issues are, and what decisions have thus far been expressed by the Special Court. This limited review is essential to a clear understanding of the securities distributions proposed on the Plan, and is included only for that reason. Nothing in this Opinion should be interpreted as expressing or suggesting the views of this Court as to the merits of the Valuation Case litigation.

USRA based its initial findings in the Final System Plan upon the premise that the net liquidation value of the conveyed properties was the appropriate standard for compensation. Its definition of net liquidation value was rather complex,[36] but in essence was based on two assumptions (1)

that in the absence of the RRRA most of the Debtor's rail properties would have been sold to other carriers, and (2) the prices paid would have been established by the ICC at the levels which would have prevailed if there were no rail service in the Northeast at the time of the sale. On that premise, USRA assumed that the estate would be required to dismantle all rail-related physical structures and return the property to the condition it was in before dedication to rail service. For example, it assumed that all bridges and roadway electrification facilities would be removed, and all tunnels plugged. Thus, with the exception of rolling stock and salvageable rail and ties, all of the conveyed assets, in USRA's view, were to be valued at their prices for non-rail use.

USRA then constructed a Master Liquidation Plan hypothesizing that liquidation would have proceeded at the following pace: Year 1—18%; year 2—21%; year 3—18%; year 4—13%; year 5—10%; year 6—6%; year 7—2%; and subsequent years—10%. This projected rate of liquidation conformed to USRA's estimates of the time necessary to dismantle structures and otherwise prepare the properties for sale, and incorporated the prediction that the estate would wish to avoid saturating the market. By deducting the estimated expenses which would be incurred in the dismantling and liquidation process, USRA arrived at a net amount of proceeds to be received. The next step was to establish the date upon which such liquidation would have begun. USRA concluded that liquidation could not have commenced until after federal and state regulatory approvals were received, and fixed that date as January 1, 1979. On the assumption that the proceeds would be received over a period of more than seven years, commencing January 1, 1979, USRA then applied discount rates in order to reduce the future liquidation proceeds to their 1976 values. Applying these discounts (16% for land and 13% for other

---

**35.** Section 303(c) of the RRRA does require the Special Court to give "due consideration to the findings contained in the final system plan."

**36.** USRA's exposition of its approach is found in Chapter 5, and the appendix thereto, of the Final System Plan.

property) reduced the net proceeds by 57%. The end result of USRA's net liquidation analysis was that the appropriate value of Penn Central's conveyed assets was $485 million.

Section 303(b)(4) of the RRRA requires that "other benefits" to the estate from the exchange are to be considered in fixing the constitutional minimum standard. The statute does not define the term "other benefits." USRA set the value of "other benefits" to the Penn Central estate at $527 million.[37] Thus, when the Valuation Case litigation began, USRA's findings in the Final System Plan, if accepted by the Special Court, would have meant that the Penn Central estate should receive no recovery in that litigation.

After the Final System Plan was published, but before the conveyance, Congress enacted the Railroad Revitalization and Regulatory Reform Act of 1976, amending the RRRA. The statute now provides for Certificates of Value, which are new securities issued by USRA and backed by the full faith and credit of the United States, as a partial guarantee of the value of the Con-Rail securities the estates are to receive in exchange for their properties. Moreover, the amended statute requires the Special Court to make findings as to the amount, if any, of compensable unconstitutional erosion incurred by the estates and as to the net liquidation value of the conveyed properties. Compensable unconstitutional erosion is relevant in two contexts. The Special Court must take the amount of compensable unconstitutional erosion into account in determining whether the exchange meets the constitutional minimum standard of fairness and equity, and must include that amount, if any, in computing the redemption value of the Certificates of Value. The Certificates of Value represent an obligation on the part of the United States Government to pay in cash, not later than 1987, an amount equal to the net liquidation

value of the assets, less "other benefits," plus compensable unconstitutional erosion, plus interest on the sum thus calculated, at the rate of 8% compounded annually, less the aggregate of the actual value of the ConRail securities on the date of redemption and any dividends which may have been paid thereon.

The Special Court has rendered two decisions addressing the major legal issues upon which the eventual outcome of the litigation will probably depend. The first of these concerns the meaning of "compensable unconstitutional erosion" *In re Valuation Proceedings under §§ 303(c) and 306 of the Regional Rail Reorganization Act of 1973*, 439 F.Supp. 1351 (Special Ct.1977) *(Erosion Opinion)*; and the second concerns the definition of "net liquidation value" and "constitutional minimum value." *In re Valuation Proceedings Under §§ 303(c) and 306 of the Regional Rail Reorganization Act of 1973*, 445 F.Supp. 994 (Special Court, 1977) *(Valuation Opinion)*. The purpose of both opinions is to establish a framework of ground rules to guide the parties in their trial preparations, and to guide the masters who are to conduct the evidentiary hearings. For that reason, neither opinion purports to represent the final and unalterable views of the Special Court on these issues, but it would be reasonable to assume that any party seeking reconsideration would bear a significant burden of persuasion. Both decisions are, of course, subject to eventual review by the Supreme Court.

Judge Friendly's opinion for the Special Court in the *Erosion Opinion* expresses the view that "unconstitutional erosion arises only when a losing business has been required to continue to operate against its will for more than a reasonable period," and that the term "against its will" means "that some identifiable agency of government having power to do so should have thwarted its desires [to cease operations]." 439 F.Supp. 1351 at 1356.

---

**37.** The principal components of this figure were a projected savings of $287.7 million in additional administration expenses which would have accrued between 1976 and 1978, and the sum of $203.2 million representing

USRA's estimate of the deficiency between the liquidation value of the equipment conveyed to ConRail, and the outstanding debt on that equipment assumed by ConRail.

There are two kinds of erosion to be considered. Financial erosion refers to the creation of claims against the Debtor's estate which prime the claims of pre-bankruptcy creditors, both secured and unsecured; and physical erosion refers to the reduction in value of the physical assets, depletion of cash, etc. As the Special Court noted, the transferors' erosion claims are of great magnitude. For example, the Penn Central asserts that its claim for compensable unconstitutional erosion is approximately $900 million.

The Special Court fixed the date for the commencement of potential unconstitutional erosion at February 9, 1973, the date on which the President signed the Senate Joint Resolution which revoked the Trustees' work rule changes and mandated continued operation of the railroad. That was also the date on which Congress directed the Secretary of Transportation to devise a plan for the preservation of rail service in the Northeast; the Special Court regarded this direction to the Secretary of Transportation as an event which rendered futile any later applications for abandonment authority.

Establishing the February 9, 1973 date would have validated most of Penn Central's $900 million claim for unconstitutional erosion, except for the fact that the Special Court further concluded that, because of regulatory delays, Penn Central would not actually have been able to terminate rail operations until April 1, 1976. However, the Special Court added a caveat to this latter conclusion, namely, that the Trustees were free to try to prove that they could actually have terminated rail operations over some or all of the Penn Central system earlier than April 1, 1976.

The net effect of the *Erosion Opinion*, therefore, would seem to be that, unless the Trustees can persuade the Special Court that the ICC would have approved abandonment of portions of the system earlier than April 1, 1976, or that the federal courts would not have permitted abandonment

proceedings to drag on for 38 months in the circumstances then prevailing,[38] there will be no award for pre-conveyance erosion.

Be that as it may, the *Erosion Opinion* does make clear the Special Court's view that that 38-month period "cannot be taken into account a second time in determining when the proceeds of sales would come into hand." 439 F.Supp. at 1366 n.28. Thus, it would seem that, apart from any other flaws in the Master Liquidation Plan embodied in USRA's Final System Plan, a major portion of its projected "other benefits" would be eliminated, and its projected 57% net discount of the liquidation proceeds would be substantially reduced.

It now appears, however, that USRA is completely revising its Master Liquidation Plan (now designated a "retrieval model"), and is also reassessing all aspects of its real estate valuation effort and re-calculating all of its estimates of sales of scrap.[39] In short, it appears that USRA will attempt to substitute its new theory of valuation—the retrieval model—and apply to that model data other than that used in the Final System Plan. At the present time, the results of these revisions are not available, and whether they will survive the adversary proceedings before the Special Court is a matter of conjecture.

In its October 12, 1977 *Valuation Opinion*, the Special Court did not reveal its views on the "other benefits" issue. It should also be noted that USRA has apparently revised its approach to the "other benefits" issues by eliminating the 1976–1978 administration claims component but adding many other items. As noted by the Special Court, "all these claims are hotly disputed by the transferors." 445 F.Supp. at 1043.

The *Valuation Opinion* did provide some guidance to the parties on the valuation issues. The Court rejected USRA's contention that net liquidation value may be determined only on the assumption that all

---

**38.** *In re Central R.R. of New Jersey*, 485 F.2d 208 (3d Cir. 1973); *In re Penn Central Transp. Co.*, 355 F.Supp. 1343 (E.D.Pa.1973).

**39.** The Government, including USRA's position is contained in "Statement of Government Parties Concerning Changes in Dismantling Model Assumptions and Continuing Work Efforts." Corp.Reorg.Reporter 1675:658.

sales would be for non-rail use, and thus enabled the transferors to show what the properties would have sold for to other railroads. On the other hand, the Court excluded from consideration hypothetical sales to, or condemnations by, the United States Government, and also ruled out several of the more generous valuation theories espoused by the transferors (reproduction cost less depreciation, social value, etc.), and essentially concluded that fair market value and net liquidation value were synonymous.

While permitting the governmental parties to continue to assert that scrap value (the so-called "trash can" theory) is equivalent to net liquidation value, the Court also had this to say:

> While the cases previously reviewed [which used valuation approaches other than market value] do not carry the weight the transferors would give them, we cannot be wholly insensitive to the views that seem to underlie them. The courts rejected market value as the measure of just compensation in circumstances which made that measure suspect.
>
> Circumstances peculiar to this case make market value particularly hard to prove. The transferors face serious difficulties in proving alternative scenario sales [sales to profitable railroads or public entities other than the United States], and the amounts that would have been obtained from those sales. These difficulties are increased by the chilling effect, not disputed by the Government, that serious discussion of the Rail Act had on the prospect of such sales. The discussion and enactment of the Act eliminated any incentive other parties might have had to negotiate purchases.
>
> This does not mean that we should reject the role of market value in determining just compensation. Nor, however, should we bind a notion as fundamental as just compensation by the sterile logic of provable market value if a manifestly unfair result is produced. We may have such a situation here. It seems incredible that these 19,000 miles of railway and freight and passenger terminals, together with the equity in rolling stock, were worth only $685 million, the sum

arrived at in the revised [Master Liquidation Plan] of March 1, 1976. It is nearly as unbelievable as the zero award in *PATH*. Of course, the revision of [Master Liquidation Plan] now in progress or attacks on it by the transferors may considerably augment this figure. It may also be that the transferors will succeed in showing a higher value by proving the potential salability of some of the property for rail use. The Government parties might be well advised not to be overly finical in their attitude toward such proof.

It suffices now to note that if the transferors should not be able to establish a figure for [net liquidation value], which would square with our notions of what constitutes 'just compensation,' we may be obliged to consider some other method to arrive at [constitutional minimum value]. This would not be to deny the thesis of the Government that value to the taker should not be considered. However, if the unique circumstances of this case make it impossible to establish a market value which constitutes just compensation, it may be necessary to resort to some other rule.

. . . . .

If it should prove impossible to establish a market value which constitutes just compensation, the basis that now seems to us most deserving of serious consideration—whether as the sole basis or as one to be considered along with [net liquidation value] we need not now determine—is a basis related to original cost. In contrast to most condemnations, the property is not being converted to new uses; ConRail is being substituted for the transferors. In other words, ConRail has been put in roughly the same position it would have occupied had it made the transferors' original investment when they did and depreciated it at the proper rate. Thus, a figure related to original cost may have some relevance to the value of what is being transferred. We use the phrase 'related to' since not only must allowance be made for depreciation, but a

further deduction might be justified to reflect physical deterioration beyond the point provided by the normal depreciation allowances but not constituting [compensable unconstitutional erosion]. ConRail is being substituted as the operator of a deteriorated railroad. Since ConRail must pay for the deterioration when it rehabilitates the property, the Government should benefit through a deduction in its purchase price (except insofar as the deterioration constitutes [compensable unconstitutional erosion]).

At 1029.

To summarize, then, the governmental parties can take heart from the scrap value possibility and the exclusion of reproduction cost and social values, as well as from the exclusion of hypothetical sales to the Government as influencing fair market value; and the transferors can derive encouragement from the Court's apparent skepticism toward USRA's valuation figures, and from the references to depreciated original cost as a measure of value.

### 2. Relationship of the Valuation Case to the Plan Distributions

The ultimate outcome of the Valuation Case litigation will be based upon an objective application of legal and constitutional principles, without regard to the question of how various classes of creditors of Penn Central would be affected by a greater or lesser recovery.[40] Any discussion of the potential impact of various possible levels of recovery in the Valuation Case upon the likelihood of redemption of the various securities to be issued under the Plan involves a risk that it will be misunderstood as indicating what a satisfactory conclusion of the Valuation Case litigation would be. That is not my function, and it certainly is not my intention. But I believe that at least a general understanding of the relationship between the Valuation Case litigation and the Plan distributions is necessary to an evaluation of the fairness and equity of the proposed distributions in order to ascertain whether the Plan does or does not fairly allocate the risks and potential benefits that the Valuation Case entails.

The Plan contemplates that a substantial portion of the securities to be issued will be redeemed between consummation date and 1987, primarily from the proceeds of the Asset Disposition Program. The outcome of the Valuation Case will have no bearing upon those redemptions, and it is therefore appropriate for present purposes to consider only the securities which will remain outstanding in 1987. It is reasonable to suppose that by 1987, the principal amount of debt-type securities still outstanding will be approximately $1.487 billion, and that accrued but unpaid interest on those securities which are interest-bearing will aggregate approximately $481.3 million, for a total of $1.969 billion. Unless the net recovery from the Valuation Case is sufficient to pay off those securities, the Valuation Case will contribute nothing to the value of the common stock of the reorganized company. This does not mean that the common stock would have no value, but merely that its value would be dependent primarily upon the fortunes of Pennco.

At the risk of belaboring the obvious, it should also be pointed out that 90% of the common stock of the reorganized company is used to pay the claims of Penn Central's creditors; that is, a Valuation Case recovery sufficient to redeem the $1.969 billion in debt-type securities of the reorganized company would not translate into payment in full of Penn Central's creditors.

What level of Valuation Case recovery would be sufficient to provide for the redemption of that amount of debt-type securities by 1987? In attempting to answer

---

**40.** In its *Valuation Opinion*, the Special Court urged the parties to explore the possibilities of amicable settlement of the entire controversy. Presumably, any such settlement would also be in conformity with legal and constitutional principles, or at least within the reasonably foreseeable range of results which would be obtained from litigating those legal and consti- tutional issues. No doubt the impact upon various classes of creditors would be a factor in any such negotiations. For purposes of this Opinion, it is plainly necessary to proceed on the assumption that the Valuation Case will not be settled; but this should not, of course, be regarded as an expression of disagreement with the Special Court's suggestion.

that question, several factors must be kept in mind. The Certificates of Value, which will be the primary source of the cash to redeem these securities, bear interest at the rate of 8% compounded annually, from and after April 1, 1976. The base amount of the CVs (*i. e.*, the 1976 amount upon which interest is to be calculated) is geared to the outcome of the Valuation Case. While the base amount of the Certificates of Value therefore cannot be determined until the Valuation Case litigation is concluded, if that litigation terminates before 1987, USRA would have the right to pay off on the Certificates of Value before 1987.[41]

The Series B notes and Series C notes accrue interest, the Series D term notes and A and B bonds will not accrue interest if paid currently, preference stock and CBIs are non-interest-bearing. The rates of interest on some securities which accrue interest differ from the interest rate specified for the Certificates of Value. For that reason, payment of the Certificates of Value before 1987 would not have precisely the same consequences as would payment in 1987. By the same token, 1976 base values of the Certificates of Value would not translate into as large an amount of cash if the CVs are paid off earlier.

Subject to the foregoing variables, and assuming the cash forecast is accurate, it can be stated that a net recovery from the Valuation Case (*i. e.*, 1976 base value of the Certificates of Value) in the amount of approximately $797 million, with interest thereon compounded annually at the rate of 8%, should produce enough money to redeem the remaining Series B notes, Series C notes, Series D notes, B bonds, preference stock and Certificates of Beneficial Interest (CBI), if the Certificates of Value are paid in 1987.

In view of the nature of some of the objections originally pressed, for example, by state and local tax claimants, it may be helpful to illustrate how Valuation Case recoveries at lower levels would affect redemption of the various classes of securities:

| | (in Millions) Amount Outstanding As of 12/31/87 | | | |
| | Prin. | Int. | Total | Range of Base Values as of 4/1/76 |
| --- | --- | --- | --- | --- |
| Series B notes | $249.8 | $329.2 | $579 | 0 –234.4 |
| Series C1 notes | | 152.1 | 152.1 | 234.5–296 |
| | 131.2 | | 131.2 | 296 –349 |
| Series D | 121.6 | (2) | 121.6 | 349 –398.3 |
| B Bonds (1) | 204.6 | (2) | 204.6 | 398.4–481.1 |
| Preference Stock | 567.3 | (3) | 567.3 | 481.2–710.8 |
| CBI | 213.2 | (3) | 213.2 | 710.9–797.1 (4) |

(1) Includes $6.6 million in accrued interest.

(2) Interest paid currently.

(3) Non-interest-bearing.

(4) By Order No. 2922, this Court authorized the Trustees to offer taxing authorities a cash payment settlement equal to the larger of 50% of the principal of their post-petition claims or 44% of the principal of their pre- and post-petition claims. To the extent this offer is accepted, there will be a reduction in the amount of C1 and D notes issued under the Plan. If all tax authorities accepted the offer, a base value of $633.2 million would satisfy the CBI. The figures incorporated in the above table assumes $25 million will be paid out under the cash settlement option.

---

41. As explained in the preceding section of this Opinion, the Certificates of Value amount to a Government guarantee that the Valuation Case award will be paid in cash if the value of ConRail securities issued to the transferors is insufficient to pay the award. In order not to complicate the analysis unduly, this Court (like the parties to this proceeding) has assumed that the ConRail securities will be valueless. If that assumption proves incorrect, the net result should nevertheless be the same. There is, however, at least a theoretical potential risk that if the value of the ConRail securities is disputed, the arbitrators who will resolve the dispute may make an erroneous determination. It is necessary and, in my judgment, not unsettling, to disregard that risk.

It is difficult to quantify the impact of recoveries above the $797.1 million (1976 base value) level upon the value of the common stock of the reorganized company. The excess over what would be required to redeem the debt securities listed above would belong to the reorganized company and should have the effect of improving the quality of its securities, including common stock; but it would be somewhat misleading to suggest that any such recovery would increase the market value of the common stock dollar-for-dollar, or that it would necessarily be paid to the shareholders in dividends. About all that can be said on the subject at this juncture is that modest amounts recovered in excess of the amount needed to redeem the debt securities would presumably have little effect upon the value of the common stock; that recoveries at substantially higher levels would significantly enhance the value of the common stock; [42] and that the "reasonable range of litigation possibilities" in the Valuation Case is broad enough to encompass either eventuality.

## F. STATE AND LOCAL TAX CLAIMS

### 1. Description of Claims

Claims for unpaid taxes, asserted by various state and local taxing entities, total approximately $523 million, including interest to December 31, 1977. Approximately $73.3 million of this amount represents taxes which accrued before the bankruptcy petition was filed; the balance of $449.7 million represents unpaid taxes which accrued during reorganization, June 21, 1970 through December 31, 1976. All taxes accruing after January 1, 1977 are being paid on a current basis. Of the $523 million total, approximately $300 million is attributable to properties which were conveyed to ConRail free and clear of all liens and encumbrances; the balance of $223 million represents taxes assessed against retained assets. (In discussing the securities distrib-

uted to tax claimants, Section II–B, the total claim there referred to of $451.5 million was net of claims satisfied under the Alternative Settlement Program.)

These taxes are imposed under the local laws of the 17 American jurisdictions in which the Debtor conducted rail operations. These laws vary greatly, and there are corresponding variations in the precise characteristics of various tax claims. The totals set forth above include general corporate taxes and similar levies, as well as real estate taxes. Real estate taxes may be levied on a parcel-by-parcel basis, county-wide, or even statewide. In some jurisdictions, they represent a general *in personam* claim against the Debtor, as well as a charge against specific property, whereas in other jurisdictions they are solely *in rem*. Some jurisdictions exempt transportation property, others do not. There may also be procedural differences affecting such matters as whether or not a particular tax lien has been perfected.

For purposes of discussion, all of these variations may be ignored. It will be assumed that all claims for taxes related to the pre-bankruptcy period constitute valid liens against all of the physical assets of the Debtor, and that this lien is superior to the claims of general creditors, and at least arguably superior to the claims of all other pre-bankruptcy lien-holders except the Federal Government.

The post-bankruptcy taxes, on the other hand, are claims of administration. As such, they have priority over all pre-bankruptcy claims. The very existence of unpaid administrative claims of this magnitude ($449.7 million in unpaid taxes, plus about $350 million in unpaid operating expenses, represented by the Government's § 211(h) claims) is striking proof of the uniqueness of this reorganization, and of ·

---

42. It must be remembered, however, that, since we are talking about common stock, any enhancement in value by virtue of 1987 payments must be discounted back to the consummation date, for purposes of comparing the dollar amounts of the claims of Penn Central's creditors with the actual dollar values of the distributions they will receive under the Plan. ·

the corresponding novelty of the problems involved.

In ordinary corporate reorganizations, the continued operation of the Debtor while reorganization planning is taking place is conducted primarily for the benefit of its creditors. Any debtor which cannot even meet its current operating expenses while being temporarily relieved of the burden of pre-bankruptcy debt is not likely to remain in reorganization very long; it will be liquidated. Hence, the possibility of any significant amount of post-petition taxes remaining unpaid does not ordinarily arise.

Railroad reorganizations differ from ordinary corporate reorganizations because of the public interest in continued rail service. Bankruptcy liquidation is not available to railroads. A railroad debtor simply must continue to operate, without regard to the interests or desires of its creditors, at least until such time as the constitutional rights of secured creditors under the *Brooks-Scanlon* line of cases are clearly in jeopardy. Here again, however, inability to generate sufficient revenue to pay taxes accelerates the triggering of *Brooks-Scanlon* rights.[43]

With the enactment of the RRRA and the decision of the Supreme Court in the *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974), it was made clear that, in the case of the Northeastern railroads, including Penn Central, *Brooks-Scanlon* rights could be violated in the short run, so long as ultimate vindication of constitutional rights was assured.

The period of time covered by the post-bankruptcy taxes in this case extends from June 21, 1970 to December 31, 1976. During the first part of this period, from the filing of the bankruptcy petition until early 1973, the Trustees were attempting a private sector reorganization. This was based upon the assumption that substantial changes in the regulatory and labor relations climate, which the appropriate governmental authorities were being urged to effectuate, would take place within a reasonable time. During the second part of the period, from the Spring of 1973 until the end of that year, Congress was addressing itself to a possible legislative solution. The third phase covers the period required for implementation of the RRRA.

There was never any cash available for the payment of taxes during any of these phases. Operations until 1973 were made possible only because the Government guaranteed the Trustees' borrowings under trustees certificates, in the sum of $100 million. During the third phase, there would not have been even enough cash to meet payroll, if the Federal Government had not provided cash grants and loans to keep the railroad going. Unfortunately for the tax claimants, however, Congress did not see fit to provide cash for the payment of taxes; moreover, Congress insisted that the funds advanced (the Government's § 211(h) claim) would have the highest possible priority, both in lien and in payment, and would thus have priority over claims for post-petition taxes.

The impact of these developments upon the status of the claims for state and local taxes, and upon the relationship between those claims and the claims of other creditors, cannot be overemphasized. Because continuation of loss operations was mandated, the amount of unpaid tax claims and other unpaid administration claims was greatly increased, probably by more than half a billion dollars in the aggregate. At the same time, the rights which such claims would have on liquidation (which is the standard for assigning "value" to all claims

---

**43.** The term "*Brooks-Scanlon* rights" is intended to describe the constitutional right of the owners (and creditors) of a railroad not to be deprived of their property for public use without just compensation; protection against violation of that right would include termination of loss operations in the absence of adequate subsidy, and the eventual right to dispose of the property or use it for other purposes. *See Brooks-Scanlon Co. v. Railroad Comm'n*, 251 U.S. 396, 40 S.Ct. 183, 64 L.Ed. 323 (1920).

in the present context) were significantly altered; moreover, the nature and extent of this alteration could well provide the grist for many years of litigation.

While the hypothetical liquidation rights of tax claimants in the absence of the RRRA are of only academic interest, a brief review of that scenario provides a useful contrast. Presumably, any such wholesale liquidation of the Debtor's assets for the purpose of paying off its creditors would have been conducted on an orderly basis, under Court supervision, and thus would not have produced immediate cash payments for all. Nevertheless, it is reasonable to assume that, disregarding possible challenges to the amount and validity of particular tax claims, all tax claims would have been satisfied within a reasonable time, either by cash payments from sales of assets, or by acquisition of liened parcels through tax sale proceedings. The probability that in many instances mortgagees or other junior lienholders would pay or compromise tax claims to protect their own liquidation rights should not be overlooked.

The liquidation rights of the tax claimants in the present circumstances are quite different. In the first place, the properties against which roughly three-fifths of the tax claims are assessed have been conveyed to ConRail free and clear of all liens, including tax claims. With respect to pre-petition taxes, this means that the liens are transferred to the proceeds to be derived from the Valuation Case; but realization from that source is deferred and uncertain. With respect to post-petition taxes, the problem is one of the proper allocation of administration expenses. That is, it cannot be assumed that post-petition taxes, even though they are administration claims, would be satisfied promptly by retained assets, in the event of liquidation. Assuming the validity of the Government's super-priority, the tax claims would not have access to cash or other liquid assets, and could not be satisfied from sales of retained assets without doing violence to mortgage liens upon retained assets. The notion that tax

claims generated by conveyed assets would automatically be transferred to, and prime existing mortgages on, retained assets is one which would not likely be accepted by mortgagees without a struggle.

The mortgagees would have substantial arguments to present. Implementation of the Rail Act has made this proceeding more nearly like a standard Chapter X proceeding than it was before; and under Chapter X, the rights of secured creditors cannot be altered without their consent. Moreover, equitable principles would be applicable, even on liquidation; and pro rata allocation of administration expenses is equitable.

A second set of problems stemming from implementation of the RRRA has to do with ascertaining the appropriate amounts of tax claims. The values assigned to the conveyed properties in the Final System Plan (FSP) are only about 50% of the assessments upon which the tax claims are based. While no one takes these FSP valuations at face value, and indeed they have been referred to by the Special Court in its most recent Opinion as seemingly "incredible." *See In re Valuation Proceedings under §§ 303(c) and 306 of the Regional Rail Reorganization Act of 1973*, Misc. No. 76–1, 445 F.Supp. 994 at 1029 (Special Ct., Oct. 12, 1977), a persuasive argument can be made that, at the very least, final determination of the proper amounts of tax claims against conveyed property should await resolution of the valuation issues by the Special Court. Section 64(a)(4) of the Bankruptcy Act provides, in straight bankruptcy proceedings,

> that no order shall be made for the payment of a tax assessed against any property of the bankrupt in excess of the value of the interest of the bankrupt estate therein as determined by the court.

While not directly applicable in railroad reorganizations under § 77 or to ordinary reorganization under Chapter X, it does provide guidelines which the reorganization court may look to in exercising its equitable authority. Section 2(a)(2A) of the Bank-

ruptcy Act gives the reorganization court jurisdiction to "hear and determine . . . any question arising as to the amount or legality of any unpaid tax . . . "; this statute has been interpreted as conveying broad authority over tax assessments. *See Amarillo v. Eakens,* 399 F.2d 541 (5th Cir. 1968), *cert. denied,* 393 U.S. 1051, 89 S.Ct. 688, 21 L.Ed.2d 692 (1969).

A third problem area has to do with the direct impact of the RRRA implementation upon the nature of the administration claim represented by state and local taxes. It can be argued that, in prescribing the § 211(h) program, Congress effectively brought about a de facto classification of administration claims, by providing interim financing for claims which were required to be paid if rail operations were to continue, on the one hand, and failing to provide such financing for administration claims, such as taxes, non-payment of which would not result in cessation of rail service.[44]

In short, by (a) mandating continuance of loss operations until April 1, 1976, (b) providing cash loans and grants in the amounts necessary to prevent shutdown, but not for the payment of taxes, and (c) providing super-priority for the claims of the Federal Government, Congress seems to have gone a long way toward neutralizing the administration claim status of the post-petition tax claims, rendering them, at least arguably, not very different from claims for pre-bankruptcy taxes.

A final problem area attributable to implementation of the RRRA is less serious, but nevertheless significant enough to require brief mention. The arduous task of drafting the more than 2,000 conveyancing documents has not yet been completed; indeed, only a few of such documents have yet been recorded. The Court is advised that the entire process will not be completed for several months. Apparently, there

will be a separate deed for each county, with separate attachments containing detailed descriptions of what is included in, and what is excepted from, the conveyance. The task of actually collecting tax claims through foreclosure proceedings, in the event of liquidation, would no doubt be rendered more difficult and complicated by virtue of the need to reconcile these conveyancing documents with tax parcel records in order to obtain accurate information about the property remaining available for tax sale.

### 2. Treatment of State and Local Tax Claims Under the Plan

The Plan treats all state and local tax claims alike, without distinction between pre- and post-bankruptcy status. The amount of each claim includes the principal claim plus interest to December 31, 1977, exclusive of penalties. Of this amount, 44% would be paid in cash (26.4% on consummation date, 8.8% on December 31, 1978, and 8.8% on December 31, 1979). The deferred portion of these cash payments (*i. e.,* 17.6%) would bear interest at the rate of 7% per annum, from the consummation date, and would be evidenced by Series D serial notes bearing appropriate maturities.

The remaining 56% of each claim would be satisfied with Series C–1 notes or Series D term notes, depending upon whether the claim relates to conveyed or retained assets. For purposes of this allocation, all general corporate and similar tax claims would be treated as claims against retained assets; only real estate taxes would be assigned to the "conveyed asset" category.

The Series D term notes are general obligations of the reorganized company, and bear interest at the rate of 7% per annum payable semi-annually. They are secured obligations, having a lien on substantially

---

44. That Congress was aware of this problem cannot be doubted. The statute was amended in 1976 to mandate the "pass through" of taxes paid by tenants. 45 U.S.C. § 794. *See In re*

*Penn Central Transp. Co.,* 402 F.Supp. 106 (E.D.Pa.1975), *aff'd,* 538 F.2d 320 (3d Cir. 1976).

all of the assets of the reorganized company. With respect to retained assets, their position is second only to the claims of the Federal Government; with respect to the Valuation Case proceeds, their position is junior only to the claims of the Federal Government, and the Series C notes. Like all of the other secured notes, the Series D notes may be redeemed at any time. If not sooner paid, the Series D term notes originally issued will mature not later than December 31, 1987, but that maturity date may be extended up to five years if the Valuation Case proceeds prove insufficient to pay them off in full. Under certain circumstances, Series C–1 notes may later be converted into Series D term notes; any Series D term notes later issued for that purpose will mature with the original D notes.

The deferred portion (56%) of tax claims attributable to conveyed assets would be satisfied by the issuance of Series C–1 notes. These are not general obligations of the reorganized company, but have the first claim, after the Federal Government claim, to the proceeds of the Valuation Case. Series C notes bear interest at the rate of 8%, compounded annually. The proceeds of the Valuation Case would be credited first to interest, then to principal. At the conclusion of the Valuation Case, the principal amount (but not interest) of any unpaid Series C–1 notes would automatically be converted into Series D term notes, described above, unless some of the Series B notes (representing claims of the Federal Government) remained unpaid, in which case, that amount would be converted into Series E notes. Series E notes would be general obligations of the reorganized company, but would not bear interest. They would mature December 31, 1993, or six years after conclusion of the Valuation Case, whichever was later; and this maturity might be extended for an additional 10 years. In any year in which the consolidated net earnings of the reorganized company exceeded $50 million, the company would be required to redeem up to $30 million in Series E notes.

On liquidation, Series E notes would be junior to all other debt obligations.

These complex provisions are designed to ensure that the balance of all taxes attributable to retained assets will be paid fairly promptly from the Asset Disposition Program if possible, from the Valuation Case if necessary, and, as to both principal and interest, by the reorganized company in any event; and that the balance of taxes attributable to conveyed property will be paid from the Valuation Case, that interest to the end of the Valuation Case will be paid first, and that any remaining principal will be paid by the reorganized company, and that interest will be paid also, unless the outcome of the Valuation Case is disastrous.

### 3. The Alternative Settlement Program

Independently of the Plan of Reorganization, pursuant to arrangements between the Federal Government and the Trustees, which were approved by this Court in Orders Nos. 2922 and 2929, any taxing entity which wishes to do so is at liberty to accept, in full settlement of its tax claims, either 44% of the principal amount of all taxes, or 50% of post-bankruptcy taxes, whichever is greater. Moreover, under this program individual tax claims aggregating less than $10,000 (or which the claimant is willing to compromise for $10,000) would be paid in full. Claimants accepting the compromise would not, of course, share in the distributions under the Plan; but, on the other hand, they would be paid immediately, without regard to the final outcome of the Plan proceedings.

### 4. Objections to the Plan by State and Local Tax Claimants

As originally proposed, the Plan accorded less favorable treatment to tax claimants than does the Plan now before the Court. A great many objections were filed on behalf of taxing entities, and these objections were extensively briefed and argued. Thereafter, the Trustees modified the Plan,

so that it now stands as outlined above. At the hearing on this modified Plan, most of the objecting tax claimants withdrew their objections, and now support the Plan. A few tax claimants, most notably the State of New York and the City of Jersey City, continue to press the objections initially asserted by themselves or others; and it is reasonable to suppose that other tax claimants, who did not participate in either hearing, may still be dissatisfied with the Plan. It is therefore necessary to deal with all of the objections which have been expressed, at least to the extent that they have not plainly been rendered moot by the changes in the Plan.

### a. Exclusion of Penalties

A few of the taxing entities originally asserted that their claims should include not only principal and interest, but also statutory penalties. It is not clear that this objection is being pressed by any of the present objectors. In any event, it is without merit.

The lack of merit in this contention is clearest with respect to pre-bankruptcy taxes. Section 57(j) of the Bankruptcy Act expressly provides

> debts owing . . . to any state or any subdivision thereof as a penalty or forfeiture shall not be allowed.

This section is applicable to reorganizations under § 77. *In re Tennessee Central Ry.*, 316 F.Supp. 1103, 1116 (M.D.Tenn.1970), *vacated*, 463 F.2d 73 (6th Cir.), *cert. denied*, 409 U.S. 893, 93 S.Ct. 119, 34 L.Ed.2d 150 (1972); and *see In re N.Y., N.H. & H. R.R.*, 304 F.Supp. 1121, 1135 (D.Conn.1969).

I am satisfied that the same result is applicable to post-reorganization taxes as well. The purpose of penalties is punitive. *United States v. Childs*, 266 U.S. 304, 307 (1924). In deferring the payment of state and local taxes during reorganization in the present case, the Trustees were acting pursuant to an express Order of this Court, duly affirmed on appeal. *In re Penn Central Transp. Co.*, 325 F.Supp. 294 (E.D.Pa.

1970), *aff'd*, 452 F.2d 1107 (3d Cir. 1971), *cert. denied*, 406 U.S. 944, 92 S.Ct. 2040, 32 L.Ed.2d 331 (1972). To hold that the estate should be punished for continuing to provide rail service despite its lack of funds, and for complying with an Order of this Court, would be the height of injustice.

Penalties may be imposed for blameworthy failures to comply with legal requirements which impose no insurmountable burden upon the estate. In the case of *Boteler v. Ingels*, 308 U.S. 57, 60 S.Ct. 29, 84 L.Ed. 78 (1939), a trustee who willfully failed to pay a motor vehicle license tax was held properly subject to a penalty. And in *Nicholas v. United States*, 384 U.S. 678, 86 S.Ct. 1674, 16 L.Ed.2d 853 (1966), a penalty was upheld for a trustee's failure to file required federal tax returns. But I have not been made aware of any case in which the imposition of penalties was upheld in circumstances remotely resembling the present case.

It is argued that the Act of June 18, 1934, 28 U.S.C. § 960, mandates a different conclusion. It provides:

> Any officers and agents conducting any business under authority of a United States court shall be subject to all Federal, State and local taxes applicable to such business to the same extent as if it were conducted by an individual or corporation.

This statute, which was intended to lay to rest the notion that court-appointed trustees and receivers were exempt from taxes, simply does not address the question of the collectability of post-bankruptcy penalties.

In my view, recognition of the full amount of state and local tax claims, plus interest, but excluding penalties, reflects the balance between federal and state interests which Congress, in the exercise of its bankruptcy and commerce powers, intended to strike.

### b. Payment in Full in Cash

Section 77(e) of the Bankruptcy Act, provides that a plan may be approved if, *inter alia*,

(3) the plan provides for the payment of all costs of administration and all other allowances made or to be made by the judge, except that allowances provided for in section (c) paragraph (12) of this section may be paid in securities provided for in the plan if those entitled thereto will accept such payment, and the judge is hereby given power to approve the same.

The objectors argue that post-bankruptcy taxes are "costs of administration," and that the Plan cannot be approved unless it provides for their payment in cash. In my view, however, the quoted language does not mean that every item of operating expenses incurred in conducting business operations during bankruptcy is a "cost of administration." That section deals with "costs of administration and *all other allowances made or to be made by the judge.*" Applying the familiar *ejusdem generis* maxim, I believe that the quoted language refers only to the costs incurred in the reorganization process itself, which must be allowed by the judge, and not with the ordinary business expenses of the Debtor.

In equity receiverships, which preceded § 77, taxes were regarded as an expense of operation, to be paid with other expenses, *Michigan v. Michigan Trust Co.,* 286 U.S. 334, 52 S.Ct. 512, 76 L.Ed. 1136 (1932); *Southern Ry. v. United States,* 306 F.2d 119, 127 (5th Cir. 1962), but after receivers' expenses, *id.;* 2 *Clark on Receivers* § 627, at 1052–53 (3d ed. 1939).

The Supreme Court has held that there must be flexibility in the manner in which tax claims are satisfied. *See, e. g., Gardner v. New Jersey,* 329 U.S. 565, 574, 67 S.Ct. 467, 91 L.Ed. 504 (1947). In the *New Haven* reorganization, a plan was approved which did not provide for the payment of post-petition taxes in cash. *In re N.Y., N.H. & H. R.R.,* 304 F.Supp. 1121, 1134 (D.Conn.1969).

I recognize that my colleague, Chief Judge Whipple in *In re Central R.R. of N.J.,* 425 F.Supp. 1055 (D.N.J.1977), *appeal docketed,* No. 77–1960 (3d Cir., July 25, 1977) (*CNJ* case) has expressed the view that post-petition taxes must be paid in cash in full. Because of the peculiar features of the "plan" under consideration in that case (administration claims were to be paid in ConRail stock, while the accompanying Certificates of Value and all other assets of the estate would have gone to junior creditors), it is doubtful that the New Jersey court intended its "cash only" holding to be absolute and universal, or that it fully considered all of the possible ramifications of such a sweeping declaration.

Section 77B(b)(3), the predecessor of Chapter X, formerly required that costs of administration be paid "in cash." Chapter X requires merely that "costs and expenses of administration" be paid. Even under § 77B(b)(3), however, the cash requirement was not regarded as an absolute. Thus, in *In re Parker-Young Co.,* 15 F.Supp. 965 (D.N.H.1936), it was held that, so long as there was assurance of eventual payment, securities could be used. In *In re Janson Steel & Iron Co.,* 47 F.Supp. 652 (E.D.Pa. 1942), a plan was approved which contemplated payment of administration expenses, including taxes, 10% in cash, and 60% within five years. The case of *In re New Era Housing Corp.,* 117 F.2d 569 (3d Cir. 1941), relied upon in the *CNJ* case, did not require that administration claims be paid in cash. The court merely held

that such allowances as are made in a 77B proceeding must be paid at the time of reorganization either in cash or by the delivery of securities which themselves evidence an indebtedness or obligation of or interest in the reorganized company.

117 F.2d at 572. Under present Chapter X, of course, the "in cash" requirement has been eliminated.

■ I am satisfied that approval of this Plan need not be withheld merely because it does not provide for payment of state and local tax claims in cash, or provide for full payment immediately. I therefore proceed

to consider whether the Plan should be approved as fair and equitable in its treatment of these tax claims.

### 5. Fairness to Tax Claimants

As noted earlier in this Opinion (II–B–1 *supra*), reorganization of the Debtor has obvious advantages over liquidation in that, by reason of the growth potential of Pennco and other circumstances, reorganization will undoubtedly produce a greater total of values for distribution than would liquidation. That conclusion is of less importance to senior creditors (such as the tax claimants) who are to receive debt securities, than it is to creditors scheduled to receive some equity participation, or to junior creditors whose claims might be lost altogether in a liquidation proceeding. But the tax claimants, too, have an interest in the continuation of the business enterprises constituting the Debtor's estate.

To the extent that tax claims can properly be relegated to the proceeds of the Valuation Case (and this is clearly true with respect to taxes in jurisdictions where only an *in rem* remedy is available, with respect to about $42 million of pre-reorganization taxes, and, as discussed above, quite possibly true with respect to three-fifths of the post-petition taxes) tax claimants have a vital stake in the continuation of the business enterprise consisting of the conduct of the Valuation Case litigation. This is not just the low-threshold interest in seeing to it that the recovery is adequate to pay off tax claims, but also to make sure that the results of the valuation process do not provide reasons for challenge to the underlying tax assessments. In a more general sense, the taxing entities have an interest in avoiding the economic upheavals which would accompany liquidation of so vast an enterprise, and in the preservation of rateables. While these factors are not susceptible to precise measurement, and are much less pronounced now that possible cessation of rail services has been removed from the equation, these intangible benefits of reorganization as opposed to liquidation are nevertheless real.

In short, it would be inaccurate to characterize this as a situation in which tax claims are being deferred in order to produce a reorganization which will only benefit others.

Nevertheless, this Plan cannot be approved by the Court if the proposed treatment of tax claims in relation to other claims does not accurately reflect their relative priority. This requires an analysis of how tax claims would fare on liquidation, compared to other claims. As discussed above in Subsection 1, Description of Tax Claims, this analysis is complicated—perhaps obfuscated would be a better word—by reason of the interposition of the RRRA.

Unless the tax claimants could succeed in challenging the super-priority asserted by the Federal Government, they could not expect to have access to the cash or other liquid assets of the Debtor's estate. No basis for such a challenge has been suggested, except on constitutional grounds. Granted that such a constitutional attack might have merit (although other creditors would undoubtedly assert that they have stronger constitutional arguments than do the tax claimants), the tax claimants could hardly anticipate a prompt victory. It is apparent, therefore, that the tax claimants are primary beneficiaries of the Government compromise embodied in the Plan. In essence, 44% of their total claims will be accorded better treatment than the higher-ranking claims of the Federal Government.

I am also satisfied that the Plan treats tax claims fairly in comparison to the treatment of the claims of pre-bankruptcy secured creditors. It must be remembered that the absolute priority rule does not require sequential distributions (*i. e.*, cash payment in full to senior creditors before any distribution is made to junior creditors), but merely that the values represented by the higher-ranking claims are fully satisfied by the values distributed under the Plan. Those related sets of values are properly reflected in this Plan. The tax claimants receive a much greater percentage in cash

and receive all debt securities, with no equity participation. Unlike the secured creditors (Class J), the tax claimants are virtually insulated from entrepreneurial risks.

Because of the undesirability of now predicting what the Valuation Case will produce, the Trustees have presented a Plan which would "fly" even if there should be no recovery at all in the Valuation Case. By virtue of the recent modifications to the Plan, tax claims are, for the most part, protected against even that dire eventuality. It is possible to conjure up a series of catastrophes which would jeopardize payment of a portion of the principal of the tax claims against conveyed assets (disregard of constitutional limitations by the courts, resulting in a near-zero recovery in the Valuation Case, coupled with bankruptcy of the reorganized company after piling up huge amounts of new debt), but assessments of the fairness of reorganization plans must be based upon real-world assumptions. It is virtually certain that all tax claims will be paid in full by the end of the Valuation Case.

In considering the relative treatment of tax claims and the claims of Class J creditors, it must be emphasized that the compromise with the Government, which makes possible the payment in cash of 44% of all tax claims at or shortly after consummation, is itself dependent upon concessions made by Class J creditors with respect to the Pennco pledge and the uses of Pennco income. It must also be remembered that the Plan removes all questions concerning the amount, validity, and collectability of all tax claims, a not insignificant concession. And the tax claimants, like other parties to the reorganization proceeding, would be relieved of the burdens of protracted litigation of a multiplicity of issues.

To summarize, I have concluded that the proposed treatment of tax claims is fair and equitable.

### 6. Objections of Taxing Entities in the State of Ohio

Representatives of taxing entities in the State of Ohio, while they now strongly support the Plan, have again raised the contention that Order No. 3012, which requires current payment of all taxes accruing after January 1, 1977, should be broadened to require the Trustees to pay Ohio taxes for the year 1976. This contention is relevant to the Plan proceedings only insofar as granting the request would remove 1976 taxes from Plan treatment, and have them paid on a current basis in cash. These contentions were previously rejected. Order No. 3012 was affirmed on appeal, *In re Penn Central Transp. Co.*, No. 77–2063, 573 F.2d 1302 (3d Cir., filed Mar. 1, 1978). Moreover, it is appropriate to point out that the problem arises because of the manner in which Ohio taxes are levied and billed. Although this peculiarity somewhat defers, for Ohio taxing entities, the benefits of the Order No. 3012 payment program, the Plan's treatment of pre-bankruptcy taxes in precisely the same fashion as post-bankruptcy taxes confers a somewhat greater benefit upon Ohio taxing entities than those in other states. On balance, I believe the Ohio districts are being fairly treated.

### G. CLASS J—SECURED CREDITORS

#### 1. The Distribution to Class J Creditors

Pre-bankruptcy secured creditors are classified in Class J. Included within this class are the holders of bonds issued under the various mortgages of Penn Central and the Secondary Debtors, certain public shareholders of the Secondary Debtors, the New Haven Trustee, and the secured bank group (whose claims are secured by a pledge of the Pennco stock).[45] Excluding claims held by Penn Central and its subsidiaries, the claims of secured creditors of Class J aggregate $1,910,729,000. Of this amount, $1,418,733,000 is attributable to the Penn Central system, and $491,996,000 is attributable to the Secondary Debtors.

In a conventional, going-concern, reorganization a first step is to determine the extent to which creditors claiming secured status are in fact secured. That portion of the claim which is in excess of the value of

---

45. SEC Report, Table VI–A, at p. 33.

the assets securing the claim is then treated as unsecured for the purposes of the Plan. Because the Penn Central estate has been partitioned into "conveyed" and "retained" assets, and because the value of the conveyed assets (in the sense of the benefits they will provide to the reorganized company), cannot now be determined, the conventional analysis cannot be fully carried out in this case.[46] Instead, the Plan treats all secured creditors as fully secured, both as to principal and accrued interest. But because the value of the retained assets (*i. e.,* what they can be expected to contribute to the reorganized company, and when this contribution will be realized) can now be determined, claims secured by retained assets receive somewhat different treatment in the Plan than do claims secured by conveyed assets. In short, all secured creditors are treated as fully secured, but the distributions under the Plan vary in ways intended to reflect the differences in the nature of the assets securing the claims.

With few exceptions, Class J claimants receive what is referred to as a 10-triple-30 security package: 10% of the total claim in cash; 30% in preference stock; 30% in common stock; and the remaining 30% in general mortgage bonds allocated between A and B bonds according to the proportion in which the claim is secured by retained assets. For example, if a mortgage is 60%-secured by retained assets, the distribution per $1,000 of claim would be as follows:

$100 in cash, $180 in A bonds, $120 in B bonds, 15 shares of preference stock, and 6.7 shares of common stock.[47]

The allocations of A and B bonds proposed in the Plan are based upon the Trustees' determinations of asset values, and their analysis of the impact of a hypothetical application of marshalling principles.[48] In general, the Trustees identified the assets available, estimated the present and future marketability of the assets, and then appraised the value of the asset for sale within a particular time frame. The resulting values were then credited to the appropriate mortgages. Values in excess of the full amount of the senior claim were marshalled down to junior lienholders, if any, or treated as unencumbered. The net result of the process is a determination of the amount of retained assets available to each mortgage or other secured obligation.

Table I–A below shows the distribution of securities to Class J creditors under the Plans of Penn Central and the Secondary Debtors. Distributions to equity interests of the Secondary Debtors are shown on Table I–B. Also included on both are the proposed distributions to holders of interests in certain non-bankrupt leased lines. (*See* Section II–B–3 *supra.*) For convenience, the distributions shown are those which result from the adjustments in the retained asset analysis required by this Opinion.

Tables to follow.

---

**46.** *See* Section II–B *supra.*

**47.** Total of all claims to receive common stock, divided by the number of shares available, equals the amount of claim relinquished per share. Amount of claim to be satisfied by common stock, divided by the cost per share,

equals the number of shares to be distributed. Calculation: $567,270,000 / 12,734,562 = $44.55 per share; $300 / $44.55 = 6.7 shares.

**48.** Application of the marshalling principles is hypothetical in the sense that *only* retained assets are considered.

TABLE I-A

## DISTRIBUTION TO CLASS J CREDITORS UNDER APPROVED PLAN

(Dollars in Thousands)

| Mortgage # | Issue | Rate | Year of Maturity | Claim Principal | Claim Interest | Claim Total | Percent Secured by Retained Assets | Cash | Series A Bonds | Series B Bonds | Preference Stock | New Common Stock |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Penn Central Transportation Company** | | | | | | | | | | | | |
| 027 | Boston & Albany Imp. | 4¾% | 1978 | $ 2,720 | $ 1,232 | $ 3,952 | 100.0% | $ 395 | $ 1,185 | $ — | $ 1,186 | $ 1,186 |
| 001 | Carthage & Adirondack 1st | 4% | 1981 | 799 | 255 | 1,054 | 28.2 | 105 | 90 | 227 | 316 | 316 |
| 053 | Kanawha & Michigan 1st | 4% | 1990 | 1,539 | 479 | 2,018 | 100.0 | 202 | 606 | — | 605 | 605 |
| 008 | Lake Shore & Michigan So. Gold | 3½% | 1997 | 43,357 | 11,536 | 54,893 | 58.3 | 5,489 | 9,601 | 6,867 | 16,468 | 16,468 |
| 011 | Mohawk & Malone 1st | 4% | 1991 | 1,489 | 478 | 1,967 | 100.0 | 197 | 590 | — | 590(4) | 590 |
| 012 | Mohawk & Malone Consolidated | 3½% | 2002 | 2,794 | 777 | 3,571 | 87.2 | 357 | 935 | 137 | 1,071 | 1,071 |
| 065 | New Jersey Junction 1st | 4% | 1986 | 1,178 | 373 | 1,551 | 8.4 | 155 | 40 | 426 | 465 | 465 |
| 017 | New York & Putnam 1st | 4% | 1993 | 1,574 | 498 | 2,072 | 11.3 | 207 | 70 | 551 | 622 | 622 |
| 014 | N.Y.C. & Hudson River Consolidation | | | | | | | | | | | |
| | Series A | 4% | 1998 | 62,785 | 20,022 | 82,807 | 100.0 | 8,281 | 24,842 | — | 24,842 | 24,842 |
| | Lake Shore Collateral | 3½% | 1998 | 15,505 | 4,310 | 19,815 | 100.0 | 1,981 | 5,944 | — | 5,945 | 5,945 |
| | Michigan Central Collateral | 3½% | 1998 | 17,101 | 4,755 | 21,856 | 100.0 | 2,186 | 6,556 | — | 6,557 | 6,557 |
| 013 | N.Y.C. & Hudson River—Gold | 3½% | 1997 | 75,762 | 21,243 | 97,005 | 100.0 | 9,701 | 29,100 | — | 29,102(4) | 29,102 |
| 015 | N.Y.C. & Hudson River—R&I | | | | | | | | | | | |
| | Series A | 4½% | 2013 | 92,658 | 32,693 | 125,351 | 31.9 | 12,535 | 11,996 | 25,610 | 37,605 | 37,605 |
| | Series C | 5% | 2013 | 63,966 | 25,153 | 89,119 | 31.9 | 8,912 | 8,528 | 18,207 | 26,736 | 26,736 |
| 301 | N.Y., N.H., & Hartford HR Div. 1st | 4¾% | 1973 | 8,014(1) | 3,506 | 11,520 | 90.2 | 1,152 | 3,117 | 339 | 3,456 | 3,456 |
| 211 | P.R.R. General | | | | | | | | | | | |
| | Series D | 4½% | 1981 | 43,641 | 14,451 | 58,092 | 43.2 | 5,809 | 7,528 | 9,899 | 17,428 | 17,428 |
| | Series E | 4¾% | 1984 | 36,143 | 12,317 | 48,460 | 43.2 | 4,846 | 6,280 | 8,258 | 14,538 | 14,538 |
| | Series F | 3⅝% | 1985 | 43,029 | 10,764 | 53,793 | 43.2 | 5,379 | 6,972 | 9,166 | 16,138 | 16,138 |
| | Series G | 3% | 1985 | 42,002 | 9,660 | 51,662 | 43.2 | 5,166 | 6,695 | 8,803 | 15,499 | 15,499 |
| 019 | Sturgis, Goshen & St. Louis | 3% | 1989 | 4 | 1 | 5 | 100.0 | 5 | — | — | — | — |
| 078 | West Shore R.R. 1st | 4% | 2361 | 33,017 | 10,627 | 43,644 | 33.1 | 4,364 | 4,335 | 8,759 | 13,093 | 13,093 |
| | Total Mortgage Bonds | | | 589,077 | 185,130 | 774,207 | | 77,424 | 135,010 | 97,249 | 232,262 | 232,262 |
| | **Collateral Trust Bonds** | | | | | | | | | | | |
| | New York Central Bonds | 5¼% | 1980 | 173 | 75 | 248 | 100.0 | 25 | 75 | — | 74 | 74 |
| | New York Central Bonds | 5¾% | 1980 | 454 | 213 | 667 | 86.1 | 67 | 172 | 28 | 200 | 200 |
| | New York Central Bonds | 6% | 1980 | 18,298 | 8,669 | 26,967 | 62.7 | 2,697 | 5,072 | 3,018 | 8,090 | 8,090 |
| | New York Central Notes | 5% | 1974 | 16,900 | 7,352 | 24,252 | 98.1 | 2,425 | 7,137 | 138 | 7,276 | 7,276 |
| | New York Central Bonds | 6% | 1990 | 7,180 | 306 | 7,486 | 100.0 | 749 | 2,245 | — | 2,246(4) | 2,246 |
| | P.C. Bonds | 6¼% | 1993 | 7,642 | 353 | 7,995 | 100.0 | 799 | 2,398 | — | 2,399(4) | 2,399 |
| | Total Collateral Trust Bonds | | | 50,647 | 16,968 | 67,615 | | 6,762 | 17,099 | 3,184 | 20,285 | 20,285 |
| 109 | Chicago River and Indiana(3) | | | 12,056 | 2,287 | 14,343 | 100.0 | 4,000 | 4,303 | — | 3,020 | 3,020 |
| | Total Mortgage and Collateral Trust Bonds | | | 651,780 | 204,385 | 856,165 | | 88,186 | 156,412 | 100,433 | 255,567 | 255,567 |
| | New Haven Claim | | | —Not Applicable— | | 121,000 | 79.3(2) | 12,100 | 28,800 | 7,500 | 36,300 | 36,300 |
| | Claims of Secured Bank Creditors | | | 300,000 | 140,000 | 440,000 | (2) | 44,000 | 82,200 | 49,764 | 132,000 | 132,000 |
| | Total Penn Central Transportation Co. | | | $951,780 | $344,385 | $1,417,165 | | $144,286 | $267,448 | $157,697 | $423,867 | $423,867 |

(1) Original principal of $6,647 increased by interest accrued during New Haven case.
(2) Settlement agreements which specify allocation of General Mortgage Bonds.
(3) Guaranteed by PCT and secured by deposit of PCTC bonds. The distribution is part of a settlement approved by the Court in Order No. 3420.
(4) These bondholders are to receive Series A Preference Stock which is entitled to priority.

**TABLE I-A (cont'd)**

| Mortgage # | Issue | Rate | Year of Maturity | Claim Principal | Claim Interest | Claim Total | Percent Secured by Retained Assets | Cash | Distribution Series A Bonds | Distribution Series B Bonds | Preference Stock | New Common Stock |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Secondary Debtors** | | | | | | | | | | | | |
| *Cleveland & Pittsburgh* | | | | | | | | | | | | |
| 216 | Gen. & Ref. Mtg., Series C | 3% | 1974 | $ 5,164 | $ 1,201 | $ 6,365 | 100.0% | $ 5,285 | $ 360 | — | $ 360 | $ 360 |
| *C.C.C. & St. Louis* | | | | | | | | | | | | |
| 040 | Cin., Wabash, & Mich. Div. | 4% | 1991 | 2,744 | 879 | 3,623 | 94.4 | 362 | 1,026 | $ 61 | 1,087 | 1,087 |
| 033 | General Gold, Series A | 4% | 1993 | 27,293 | 8,279 | 35,572 | 95.8 | 3,557 | 10,223 | 449 | 10,672 | 10,671 |
| 033 | General, Series B | 5% | 1993 | 4,102 | 1,555 | 5,657 | 95.8 | 566 | 1,626 | 71 | 1,697 | 1,697 |
| 042 | Ref. & Imp., Series E | 4½% | 1977 | 34,645 | 11,693 | 46,338 | 91.7 | 4,634 | 12,748 | 1,154 | 13,901 | 13,901 |
| 038 | St. L. Div. 1st Col. Tr. | 4% | 1990 | 791 | 243 | 1,034 | 99.9 | 103 | 310 | — | 310 | 311 |
| | Total C.C.C. & St. Louis | | | 69,575 | 22,649 | 92,224 | | 9,222 | 25,933 | 1,735 | 27,667 | 27,667 |
| *Connecting* | | | | | | | | | | | | |
| 202 | 1st, Series A | 3½% | 1976 | 6,951 | 1,702 | 8,653 | 17.4 | 865 | 451 | 2,144 | 2,596 | 2,597 |
| 217 | P. O. D. 1st Ref., Series E | 2⅞% | 1975 | 24,357 | 5,426 | 29,783 | 92.9 | 2,978 | 8,300 | 635 | 8,935 | 8,935 |
| | Total Connecting | | | 31,308 | 7,128 | 38,436 | | 3,843 | 8,751 | 2,779 | 11,531 | 11,532 |
| *Michigan Central* | | | | | | | | | | | | |
| 058 | Ref. & Imp., Series C | 4½% | 1979 | 9,337 | 3,350 | 12,687 | 100.0 | 12,687 | — | — | — | — |
| *Northern Central* | | | | | | | | | | | | |
| 209 | 1st Mortgage | 6% | | 1,500 | 690 | 2,190 | 82.9 | 219 | 545 | 112 | 657 | 657 |
| 210 | Gen. & Ref., Series A | 5% | 1974 | 8,300 | 3,251 | 11,551 | 53.8 | 1,155 | 1,865 | 1,601 | 3,465 | 3,465 |
| 210 | Gen. & Ref., Series A | 4½% | 1974 | 6,431 | 2,267 | 8,698 | 53.8 | 870 | 1,404 | 1,206 | 2,609 | 2,609 |
| | Total Northern Central | | | 16,231 | 6,208 | 22,439 | | 2,244 | 3,814 | 2,919 | 6,731 | 6,731 |
| *Penndel* | | | | | | | | | | | | |
| 204 | Battle Creek & Sturgis 1st Mtg. | 3% | 1989 | 15 | — | 15 | 100.0 | 15 | — | — | — | — |
| | E. & W. Income Mtg. | 5% | 2862 | 155 | 60 | 215 | 100.0 | 215 | — | — | — | — |
| | Total Penndel | | | 170 | 60 | 230 | | 230 | — | — | — | — |
| *Pitts, Youngstown & Ashtabula* | | | | | | | | | | | | |
| 219 | 1st Gen., Series C | 5% | 1974 | 1,171 | 468 | 1,639 | 98.0(1) | 226 | 983 | — | 215 | 215 |
| 219 | 1st Gen., Series D | 4½% | 1977 | 1,485 | 507 | 1,992 | 98.0(1) | 274 | 1,195 | — | 262 | 261 |
| | Total P, Y, & A. | | | 2,656 | 975 | 3,631 | | 500 | 2,178 | — | 477 | 476 |
| *Philadelphia, Baltimore & Washington* | | | | | | | | | | | | |
| 213 | Gen., Series B | 5% | 1974 | 10,000 | 3,958 | 13,958 | 29.7 | 1,396 | 1,246 | 2,942 | 4,187 | 4,187 |
| 213 | Gen., Series C | 4½% | 1977 | 11,286 | 4,047 | 15,333 | 29.7 | 1,533 | 1,367 | 3,233 | 4,600 | 4,600 |
| 213 | Gen., Series E | 3% | 1978 | 9,549 | 2,220 | 11,769 | 29.7 | 1,177 | 1,049 | 2,482 | 3,531 | 3,530 |
| 213 | Gen., Series F | 3½% | 1979 | 13,792 | 3,701 | 17,493 | 29.7 | 1,749 | 1,559 | 3,689 | 5,248 | 5,248 |
| 218 | PCC & St. L. Gen., Series A | 5% | 1970 | 813 | 29 | 842 | 50.7 | 84 | 128 | 125 | 253 | 252 |
| 218 | PCC & St. L. Gen., Series B | 5% | 1975 | 25,665 | 9,945 | 35,610 | 50.7 | 3,561 | 5,422 | 5,261 | 10,683 | 10,683 |
| 218 | PCC & St. L. Gen., Series E | 3% | 1975 | 16,520 | 4,320 | 20,840 | 50.7 | 2,084 | 3,173 | 3,079 | 6,252 | 6,252 |
| | Total P. B. & W. | | | 87,625 | 28,220 | 115,845 | | 11,584 | 13,944 | 20,811 | 34,754 | 34,752 |

(1) Settlement agreements which specify allocation of General Mortgage Bonds.

TABLE 1-A (cont'd)

| Mortgage # | Issue | Rate | Year of Maturity | Claim | | | Percent Secured by Retained Assets | Cash | Distribution | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | Principal | Interest | Total | | | Series A Bonds | Series B Bonds | Preference Stock | New Common Stock |
| *United New Jersey R.R. & Canal* | | | | | | | | | | | | |
| 214 | Gen. Mortg. | 2¾% | 1976 | $ 5,669 | $ 1,559 | $ 7,228 | 72.7% | $ 723 | $ 1,577 | $ 592 | $ 2,168 | $ 2,168 |
| 214 | Gen. Mortg. | 4½% | 1979 | 6,020 | 2,122 | 8,142 | 72.7 | 814 | 1,776 | 666 | 2,443 | 2,443 |
| 214 | Gen. Mortg. | 4½% | 1973 | 1,824 | 784 | 2,608 | 72.7 | 261 | 568 | 215 | 782 | 782 |
| 214 | Gen. Mortg. | 3% | 1973 | 6,487 | 2,335 | 8,822 | 72.7 | 882 | 1,924 | 722 | 2,647 | 2,647 |
| 207 | NYB R.R. 1st, Series A | 3¾% | 1973 | 8,310 | 2,415 | 10,725 | 100.0 | 1,073 | 3,218 | — | 3,217 | 3,217 |
| | Total United New Jersey R.R. & Canal | | | 28,310 | 9,215 | 37,525 | | 3,753 | 9,063 | 2,195 | 11,257 | 11,257 |
| | Total Secondary Debtors | | | $ 250,376 | $ 79,006 | $ 329,382 | | $ 49,348 | $ 64,043 | $ 30,439 | $ 92,777 | $ 92,775 |
| **Other Leased Lines** | | | | | | | | | | | | |
| *New York Connecting* | | | | | | | | | | | | |
| 208 | 1st, Series B | 2⅞% | 1975 | $ 17,793 | $ 3,965 | $ 21,758 | 0.1 | $ 2,176 | $ 6 | $ 6,522 | $ 6,527 | $ 6,527 |
| *Pennsylvania Tunnel & Terminal* | | | | | | | | | | | | |
| 212 | Notes | 4.9% | 1991 | 47,000 | 6,163 | 53,163 | 41.0 | 5,316 | 6,534 | 9,415 | 15,949 | 15,949 |
| *Peoria & Eastern* | | | | | | | | | | | | |
| 086 | Income Mortg. | 4% | 1990 | 2,445 | 685 | 3,130 | 42.2 | 313 | 396 | 543 | 939 | 939 |
| | Total Other Leased Lines | | | $ 67,238 | $ 10,813 | $ 78,051 | | $ 7,805 | $ 6,936 | $ 16,480 | $ 23,415 | $ 23,415 |
| | Total PCTC, Secondary Debtors, & Other Leased Lines | | | $1,269,394 | $484,204 | $1,824,598 | | $201,439 | $338,427 | $204,616 | $540,059 | $540,057 |

* Distribution dependent upon reaching agreement with interested parties and approval by the Court.

## TABLE I-B
### DISTRIBUTIONS TO CLASS O STOCKHOLDERS OF LEASED LINES
(Dollars in Thousands)

| | Held by Public Stockholders | | | Distribution | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Shares | Percent | Total Claim | Cash | Series A Bonds | Series B Bonds | Series B Preference Stock or Series C-2 notes, as indicated | CBI's | New Common Stock |
| **Treated As Secured Creditors:** | | | | | | | | | |
| **Secondary Debtors** | | | | | | | | | |
| Cleveland & Pittsburgh R.R. Co. Guaranteed 7% | 161,297 | 71.82% | $16,280 | $1,860 | $5,062 | — | $4,679 | — | $4,679 |
| Special Betterment | 97,217 | 17.47 | 8,720 | 640 | 2,438 | — | 2,821 | — | 2,821 |
| Delaware R.R. Co. | 30,642 | 15.08 | 1,072 | 107 | 276 | $45 | 322 | — | 322 |
| Erie & Pittsburgh R.R. Co. | 12,473 | 31.18 | 1,000 | 100 | 300 | — | 300 | — | 300 |
| Michigan Central R.R. Co. | 218 | 0.11 | 191 | 191 | — | — | — | — | — |
| Philadelphia & Trenton R.R. Co. | 2,637 | 20.95 | 461 | 47 | 74 | 64 | 138 | — | 138 |
| Pitts. Ft. Wayne & Chicago Ry. Common | 2,268 | 0.20 | 278 | 28 | — | 84 | 83 | — | 83 |
| Preferred | 149,880 | 76.12 | 23,119 | 3,555 | 5,692 | — | 6,936(1) | — | 6,936 |
| Original Guaranteed | 180 | 100.00 | 28 | 4 | 7 | — | 8(1) | — | 9 |
| Guaranteed Special | 1,810 | 100.00 | 222 | 22 | — | 66 | 67 | — | 67 |
| Pitts. Youngstown & Ashtabula Ry. | 22,200 | 24.42 | 3,200 | 320 | 960 | — | 960 | — | 960 |
| United New Jersey R.R. & Canal Co. | 97,440 | 45.87 | 17,052 | 1,705 | | 5,116 | 5,116 | — | 5,115 |
| Total Secondary Debtors | | | $71,623 | $8,579 | $14,809 | $5,375 | $21,430 | | $21,430 |
| **Other Leased Lines** | | | | | | | | | |
| * Detroit Manufacturers' R.R. | 556 | 18.53 | 49 | 5 | — | 14 | 15 | — | 15 |
| * Little Miami R.R. Co. Capital | 49,426 | 37.31 | 3,806 | 740 | 1,022 | — | 1,022 | — | 1,022 |
| Special Betterment | 29,847 | 19.07 | 1,045 | 447 | 200 | — | 199 | — | 199 |
| * Mahoning Coal R.R. Co. Common | 5,621 | 18.74 | 6,880 | 1,472 | 148 | 1,655 | 1,802 | — | 1,803 |
| Preferred | 2,119 | 16.02 | 145 | 145 | — | — | — | — | — |
| * Peoria & Eastern Ry. Co. | 19,914 | 19.93 | 1,564 | 157 | — | 469 | 469 | — | 469 |
| Total Other Leased Lines | | | $13,489 | $2,966 | $1,370 | $2,138 | $3,507 | — | $3,508 |
| Total Treated as Secured Creditors | | | $85,112 | $11,545 | $16,179 | $7,513 | $24,987 | — | $24,938 |
| **Treated As Unsecured Creditors:** | | | | | | | | | |
| Beech Creek R.R. Co. | 23,990 | 19.99 | $852 | — | — | — | — | $256 | $852 |
| C.C.C. & St. Louis R.R. Co. Common | 2,481 | 0.53 | 440 | — | — | — | — | 132 | 440 |
| Preferred | 9,659 | 9.66 | 845 | — | — | — | — | 254 | 845 |
| Northern Central Ry. Co. | 125,014 | 19.88 | 8,751 | — | — | — | — | 2,625 | 8,751 |
| Total Treated as Unsecured Creditors | | | $10,888 | | | | | $3,267 | $10,888 |
| Total Claims of Public Stockholders of Leased Lines | | | $96,000 | $11,545 | $16,179 | $7,513 | $24,937 | $3,267 | $35,826 |

* Distributions dependent upon reaching agreements with interested parties and approval by the Court.

(1) Amounts reflect Series C-2 Notes, Not Series B Preference Stock

Both A and B bonds are general obligations of the reorganized company, but the A bonds are scheduled to be paid off more quickly. Under the Plan, it is anticipated that $304.9 million of the $344 million in A bonds will be redeemed by 1980, and the balance will be paid by 1983; whereas, only about $25.1 million of the $223.1 million of B bonds (11.25% of those issued) will be paid in 1983. No additional redemptions are projected until the conclusion of the Valuation Case.

There appears to be general agreement that the differing characteristics of the A and B bonds, *i. e.*, their design features, are a reasonable reflection of the differences between retained and conveyed assets. But there is sharp disagreement as to whether the distributions proposed to be made to Class J creditors (the 10-triple-30 distribution scheme itself, and the allocation of A and B bonds within that scheme) adequately recognize the differences as between claimants secured by various percentages of retained assets.

The Trustees and the SEC are, of the view that the Plan properly and fairly takes into account the extent to which particular claims are secured by retained assets. A group of Indenture Trustees and individual bondholders contend, however, that the Plan does not treat fairly those creditors whose claims are more than fully secured by retained assets. These objectors, who have come to be known as the "super secured" creditors, challenge the fairness and equity of the proposed 10-triple-30 distribution on two distinct grounds: (1) that the Plan does not accord fair and equitable treatment to the Class J claimants in relation to each other; and (2) that the Plan violates the absolute priority rule, since unsecured creditors and equity interests are allegedly permitted to participate even though the secured creditors will not have received the full equivalent of their senior rights.

### 2. "Super Secureds" Objections.

#### a. Identifying the "Super Secured" Claims.

These objectors assert that a claim is entitled to the "super secured" label if it is secured by retained assets substantially in excess of 100% of the amount of the claim.[49] While this definition is easily stated, the complexities of the Penn Central debt structure are such that the definition is not easily applied. For one thing, the precise impact of marshalling concepts may be difficult to ascertain. For another, the relevance of the marshalling doctrine may fluctuate according to the context. Generally speaking, no creditor could expect to receive more than 100% of his claim on liquidation; thus, for purposes of the absolute priority rule, junior claimants are entitled to the benefits of marshalling principles. But when the issue is the relative treatment of secured creditors within the same class, and the focus is solely upon the extent to which one creditor's security happens to be retained assets, while another's happens to be conveyed assets, the applicability of marshalling principles in assessing their relative positions is less clear. If a creditor secured by retained assets is entitled to better treatment than one secured by conveyed assets, even though both are fully secured creditors, is not a claim which is 200% secured by retained assets relatively better off than a claim 110%-secured by retained assets?

Perhaps the easiest example of a "super secured" claim is the Mohawk & Malone 011 mortgage, which has retained assets coverage of 275% (a total claim of $1.967 million, secured by $4.535 million in escrowed cash and an additional $.85 million in retained physical assets).[50] Others in the "super secured" category are the 027 Boston & Alba-

---

49. Claim in this context is principal plus interest through December 31, 1977.

50. Actually the 019 Sturgis, Goshen & St. Louis is the most super secured. The total claim is $5,000 and is secured by $749,000 in retained assets. (14,980% secured). As a matter of administrative convenience, this mortgage should be paid in full.

ny mortgage, with 116% retained asset coverage. Two collateral trust issues, the New York Central 6% bonds of 1990 (approximately 113% to 119% retained asset coverage) and the Penn Central 6½% bonds of 1993 (approximately 123% to 131% retained asset coverage), also have "super secured" status. In both cases, stock of the Pittsburgh & Lake Erie Railroad is the primary security.[51]

The situation is more complicated with respect to the New York Central mortgage chain of the 013, 014 and 015 mortgages. The amount of the 013 mortgage (the New York Central & Hudson Gold Bond Mortgage) is $97 million, but its total retained assets are approximately $236 million. Under the Trustees' analysis, the $139 million excess is marshalled down to the second level, the 014 New York Central & Hudson Consolidation Mortgage. Within the Consolidated Mortgage, the Lake Shore and the Michigan Central Collateral Indentures have first liens upon, and share *pari passu* this excess asset value from the Gold Bond Mortgage, while the Series A and C bonds under the Consolidation Mortgage come next, *pari passu*. The $139 million excess security from the Gold Bond Mortgage is adequate to render all four of the issues under the Consolidation Mortgage fully secured.[52] Thus, under the Plan, the Gold Bond and Consolidation Mortgages receive their full 30% in A bonds. The Michigan Central Collateral Indenture also has a lien on $25.195 million in Michigan Central stock, but since it is already fully secured by the excess Gold Bond asset values, the stock is passed down to the next level in the chain, the 015 New York Central & Hudson R & I Mortgage.

The Indenture Trustees of the Lake Shore and the Michigan Central Collateral Indentures claim that the retained asset security coverage for their issues is approximately 394%[53] in retained assets. They arrive at this figure by accepting the excess security values marshalled down from the Gold Bond Mortgage, and adding those values to the value of the Michigan Central stock; they do not, however, marshall down to the Series A and C bonds of the Consolidation Mortgage retained asset values in excess of the combined claims, $41.67 million, of the Lake Shore & Michigan Central Collateral Indentures. In other words, they wish to have the benefit of marshalling, while rejecting its burdens. That approach must be rejected.

■ In my view, for purposes of determining "super secured" status, only the assets directly attributable to a particular mortgage should be considered. Therefore, the 013 Gold Bond Mortgage should have the benefit of the entire $236 million in retained assets. It is therefore entitled to claim retained asset coverage of 243%. Under this approach, the Michigan Central Collateral Indenture would have the benefit of the pledged Michigan Central collateral stock, and thus would have retained asset coverage of 115%. But the Lake Shore collateral trust would have no retained coverage.

b. The Alleged Disparities in Treatment.

In order to understand and evaluate the "super secured" claimants' challenges to the fairness and equity of the relative treatment of secured creditors under the Plan, it is necessary to analyze precisely how the 10-triple-30 formula works out. Table 2

---

**51.** The lower percentages of retained assets are based on the Trustees' valuation of the P&LE stock and the higher percentages on the Indenture Trustees' estimates of the value of the stock.

**52.** Vol. II at 35, as amended by the Trustees' Brief at 190–96. *See* Section II–G–3–a–ii *infra*, for a discussion of the treatment of the Harlem leasehold.

**53.** Under the revised marshalling analysis $139 million is passed down from the Gold Bond Mortgage to the Consolidation Mortgage. The Lake Shore and the Michigan Central Collaterals have the first lien on this $139 million. In addition, the Michigan Central Collateral has a first lien on Michigan Central stock valued at $25.195 million. Thus, the Lake Shore and the Michigan Collaterals have a first lien on $164.21 million in retained assets, but the combined claims of the two collaterals is only $41.67 million ($164.21/41.67 # 394%).

below sets forth hypothetical examples showing how the proposed distribution scheme operates.[54] (The B bond distribu-

tions are shown as of consummation date, and do not reflect the fact that 11.25% are expected to be redeemed in 1983.)

TABLE 2

| Mtg. | Claim | Retained Assets as a Percentage of Claim | Distribution | | | | Cash & A Bonds as a Percentage Of | | Percentage of Retained Assets not Recovered |
|------|-------|------|------|------|------|------|------|------|------|
| | | | Cash | A Bonds | B Bonds | Cash & A Bonds | Claim | Retained Assets | |
| A | $100 | 275% | $10 | $30 | | $40 | 40 % | 14.54% | 85.46% |
| B | 100 | 243 | 10 | 30 | | 40 | 40 | 16.46 | 83.54 |
| C | 100 | 120 | 10 | 30 | | 40 | 40 | 33 | 67 |
| D | 100 | 100 | 10 | 30 | | 40 | 40 | 40 | 60 |
| E | 100 | 75 | 10 | 22.5 | $ 7.5 | 32.5 | 32.5 | 43 | 57 |
| F | 100 | 50 | 10 | 15 | 15 | 25 | 25 | 50 | 50 |
| G | 100 | 25 | 10 | 7.5 | 22.5 | 17.5 | 17.5 | 70 | 30 |
| H | 100 | 15 | 10 | 4.5 | 25.5 | 14.5 | 14.5 | 97 | 3 |
| I | 100 | 10 | 10 | 3 | 27 | 13 | 13 | 130 | 0 |

Several comments may be made about the conclusions to be derived from the foregoing table. Unquestionably, the preferred distributions of cash and A bonds do not precisely reflect the differences in retained asset coverage, whether the distributions be considered in terms of percentage of the claim, or in terms of percentage of retained assets securing the claim. A mortgage secured 50% by retained assets receives $25 in cash and A bonds per $100 of claim ($26.69 if the 1983 redemption of B bonds is included), whereas a mortgage 100%-secured by retained assets receives $40 per $100 of claim. Thus, the 50%-secured mortgage receives 62.5%, rather than 50%, of what the 100%-secured mortgage receives. Moreover, all mortgages with retained asset coverage of 100% or better are treated exactly the same.

Columns 8 and 9 of Table 2 show that the more a claim is secured by retained assets, the greater the percentage of the claim which is to be satisfied in cash and A bonds. On the other hand, the less a claim is secured by retained assets, the greater will be its percentage of retained asset security recovered. The final column expresses the same point in different terms: The higher the retained asset coverage, the higher the percentage of retained assets used to satisfy other claimants.

Table 2 demonstrates the impact of disregarding retained assets in excess of 100% of the claim. But it can also be contended that the proposal to pay all Class J creditors 10% of their claims in cash has adverse consequences for the "super secured" claimants. This impact is not easy to quantify,

**54.** Tables 2 through 6 are based on the same hypothetical facts: the claims of secured creditors total $900, retained assets have a total value of $913, and there is $172.50 in A bonds

and $90 in cash to be distributed. These tables are used for the purpose of illustrating the ten-triple-30 distribution under the Plan, and the Alternate Distribution Scheme.

but it is helpful to analyze the distributions of A bonds alone, without regard to the cash distribution. Table 3 below illustrates this analysis:

TABLE 3

| Mtg. | Claim | Retained Assets as a Percentage of Claim | A Bonds | A Bonds as a Percentage of Claim | Percentage of Retained Assets Recovered | Percentage of Retained Assets not Recovered |
|---|---|---|---|---|---|---|
| A | $100 | 275% | $30 | 30 % | 11 % | 89 % |
| B | 100 | 243 | 30 | 30 | 12.3 | 87.7 |
| C | 100 | 120 | 30 | 30 | 25 | 75 |
| D | 100 | 100 | 30 | 30 | 30 | 70 |
| E | 100 | 75 | 22.5 | 22.5 | 30 | 70 |
| F | 100 | 50 | 15 | 15 | 30 | 70 |
| G | 100 | 25 | 7.5 | 7.5 | 30 | 70 |
| H | 100 | 15 | 4.5 | 4.5 | 30 | 70 |
| I | 100 | 10 | 3 | 3 | 30 | 70 |

By comparing the "percentage of retained assets recovered" as shown on Tables 2 and 3, the impact of the 10% cash payment is highlighted. In the allocation of A bonds, as shown on Table 3 the difference between the 50%-secured mortgage and the 275%-secured mortgage is 19 percentage points in recovered assets, whereas the difference is 35.5 percentage points when the cash distribution is included, as shown on Table 2.

Table 3 is a clear reflection of the concepts underlying the A–B bond allocations. The methodology is that of the conventional going-concern reorganization, i. e., determine who is secured in what amount by valuing the assets and marshalling excess values, and then proportionately distribute debt securities in amounts consistent with a sound capital structure. All mortgages secured 100% or better are treated equally. The disparity in percentages of retained assets recovered is attributable to the application of marshalling principles.

It is apparent, therefore, that the distributions under the Plan which are based on retained assets will not correspond to the amount of retained assets securing a particular claim, and that the disparity is attributable in part to the 10% cash distribution to all Class J creditors, and in part to the A–B bond allocation formula.

c. The Proposed Alternate Distribution Scheme.

The fundamental contention of the "super secured" claimants is that the Plan should allocate cash and A bonds so as to give direct and complete recognition to the fact that their claims are secured by retained assets in excess of the amount of the claim. Tables 4 and 5 illustrate how such a distribution scheme might work (the Alternate Distribution Scheme). Simply stated, the total of retained asset security is compared to the total amount of A bonds or A bonds plus cash to be distributed. The percentage of the total retained assets attributable to a particular mortgage is then obtained, and applied to the amount to be distributed.

Another method of achieving the same result is to divide the fund to be distributed (A bonds, or cash plus A bonds) by the total retained assets. The percentage thus obtained is then applied to dollars of retained assets attributable to each mortgage. This latter method is more convenient when the amounts of the respective mortgage claims differ.

Table 4 shows the distribution of A bonds under the Alternate Distribution Scheme; Table 5 shows the distribution of cash and A bonds under the Alternate Distribution Scheme; and Table 6 compares these Alternate Distribution Scheme distributions with that proposed in the Plan (Table 2).

TABLE 4

A Bond Distribution Under the Alternative Distribution Scheme

| Mtg. | Claim | Retained Assets as Percentage of Claim | Retained Assets as a Percentage of All Retained | Distribution of A Bonds | Distribution as a Percentage of Claim | Percentage of Retained Assets Recovered | Percentage of Retained Assets not Recovered |
|---|---|---|---|---|---|---|---|
| A | $100 | 275% | 30.00% | $51.75 | 51.75% | 19% | 81% |
| B | 100 | 243 | 26.60 | 46.00 | 46.00 | 19 | 81 |
| C | 100 | 120 | 13.00 | 22.42 | 22.42 | 19 | 81 |
| D | 100 | 100 | 11.00 | 19.00 | 19.00 | 19 | 81 |
| E | 100 | 75 | 8.21 | 14.20 | 14.20 | 19 | 81 |
| F | 100 | 50 | 5.48 | 9.50 | 9.50 | 19 | 81 |
| G | 100 | 25 | 2.74 | 4.72 | 4.72 | 19 | 81 |
| H | 100 | 15 | 1.64 | 2.82 | 2.82 | 19 | 81 |
| I | 100 | 10 | 1.10 | 1.89 | 1.89 | 19 | 81 |

TABLE 5

Distribution of Cash and A Bonds Under the Alternate Distribution Scheme

| Mtg. | Claim | Retained Assets as a Percentage of Claim | Retained Assets as a Percentage of All Retained | Distribution of Cash & A Bonds | Distribution as a Percentage of Claim | Percentage of Retained Assets Recovered | Percentage of Retained Assets not Recovered |
|---|---|---|---|---|---|---|---|
| A | $100 | 275% | 30.00% | $78.75 | 78.75% | 28.75% | 71.25% |
| B | 100 | 243 | 26.60 | 69.82 | 69.82 | 28.75 | 71.25 |
| C | 100 | 120 | 13.00 | 34.10 | 34.10 | 28.75 | 71.25 |
| D | 100 | 100 | 11.00 | 28.75 | 28.75 | 28.75 | 71.25 |
| E | 100 | 75 | 8.21 | 21.55 | 21.55 | 28.75 | 71.25 |
| F | 100 | 50 | 5.48 | 14.39 | 14.39 | 28.75 | 71.25 |
| G | 100 | 25 | 2.74 | 7.20 | 7.20 | 28.75 | 71.25 |
| H | 100 | 15 | 1.64 | 4.31 | 4.31 | 28.75 | 71.25 |
| I | 100 | 10 | 1.10 | 2.80 | 2.80 | 28.75 | 71.25 |

TABLE 6

Comparison of Cash and A Bonds Distribution Under the Plan and
Under the Alternate Distribution Scheme

| Mtg. | Claim | Retained Assets as a Percentage of Claim | Plan Distribution of Cash & A Bonds as a Percentage of Claim | Alternative Distribution Scheme Cash & A Bonds as a Percentage of Claim | Increase or Decrease in Percentage of Claim Satisfied in Cash and A Bonds |
|---|---|---|---|---|---|
| A | $100 | 275% | 40.00% | 78.75% | 38.75% |
| B | 100 | 243 | 40.00 | 69.82 | 29.82 |
| C | 100 | 120 | 40.00 | 34.10 | (5.9) |
| D | 100 | 100 | 40.00 | 28.75 | (11.25) |
| E | 100 | 75 | 32.50 | 21.55 | (10.95) |
| F | 100 | 50 | 25.00 | 14.39 | (10.61) |
| G | 100 | 25 | 17.50 | 7.20 | (10.3) |
| H | 100 | 15 | 14.50 | 4.31 | (10.19) |
| I | 100 | 10 | 13.00 | 2.80 | (10.2) |

The foregoing tables (2 though 6) show retained asset coverage without regard to marshalling. The distributions under the Plan, on the other hand, are based upon the Trustees' marshalling analysis. If marshalling were eliminated in calculating the distribution under the Plan, the percentage of retained asset security of the following Penn Central mortgages would be substantially affected:

**(000's omitted)**

| Mortgage | Claim | % Secured Under The Plan | % Secured Under Alternate Distribution Scheme |
|---|---|---|---|
| 012 Mohawk & Malone | $ 3,920 | 87% | 0% |
| 014 Lake Shore Collateral | 19,815 | 100 | 0 |
| 014 Series A 4% | 82,939 | 100 | 0 |
| 014 Series C 4% | 14,496 | 100 | 0 |
| 015 NYC & Hudson R & I | 271,000 | 36 | 27 |

Moreover, various collateral trusts secured by these bonds would also be affected. Elimination of marshalling would leave approximately $146.36 million in retained assets for application to higher lien levels. Since the Alternate Distribution Scheme would be used to distribute a combined total of cash and A bonds, mortgages with no retained assets would receive only B bonds. It is important to note also that, because the Alternate Distribution Scheme would distribute to some claimants cash and A bonds in excess of 40% of their claims, the distribution of preferred and common stock would have to be adjusted, and a related adjustment would have to be made for all other B bond recipients, because the total of B bonds available would be substantially less than the dollar amounts of claims to be satisfied.

It is manifest, therefore, that this Alternate Distribution Scheme cannot be implemented as merely an adjustment to the 10-triple-30 formula of the existing Plan. Rather, an entire new Plan would be required.

d. Tracing Retained Asset Values.

It is argued that the Plan is unfair because funds which should go to pay the claims of the "super secured" creditors will be used instead to pay mortgages less well secured. This would be true only if it can be shown that some mortgage creditors would receive cash and A bonds in excess of the value of the retained assets securing

their particular mortgages. But the instances in which this result can be said to occur are rare, and the amounts involved negligible. As shown in Table 2 above, a mortgage 15% secured by retained assets would receive cash and A bonds totaling $14.5 per $100 of claim; even reflecting the early redemption of 11.25% of the B bonds, the total distribution would barely exceed the retained assets.

There appear to be only three mortgages as to which the Plan proposes distribution of cash, A bonds, plus 11.25% of the B bonds having a combined total in excess of the amount of retained assets securing the mortgages. These are the New Jersey Junction First Mortgage, where the excess is approximately $112,650; the New York & Putnam, where the excess is $104,600, and the Connecting Railway, where the excess is $89,360. The problem arises only with respect to mortgages which are less than about 18% secured by retained assets. The total amount by which cash, A bond, and early B bond redemption distributions to mortgagees would exceed the retained assets securing these mortgages would be only $306,610, an amount which, in this context, may be disregarded as *de minimis*.

Since the retained asset values which justify the "super secured" label are not being distributed to other mortgage claimants, the question naturally arises, to whom will these values be distributed? For the most part, as noted above, retained asset proceeds will be used to fund the Plan provisions for the claims of the United States and the claims of state and local taxing authorities. The super secured claimants, as pre-bankruptcy creditors, cannot successfully object to that use of retained asset values. But the use of retained assets to satisfy the claims of the New Haven Trustee and of the secured bank group would raise additional issues, and it is therefore necessary to determine whether the Plan would have that effect.

I have concluded that the distributions proposed in the Plan would not result in the use of retained assets securing the mortgages of the "super secured" claimants to satisfy the claims of the New Haven Trustee. Under the settlement with the New Haven Trustee, that claim is liquidated as a secured claim in the amount of $121 million, and as an unsecured claim in the amount of $53 million. Moreover, the $121 million secured portion of the claim is to be treated as if it were secured by $96 million in retained assets (*i. e.*, 79% secured by retained assets). The actual retained assets securing the New Haven Trustee's divisional mortgage is $48.17 million.

Under the Plan, the New Haven Trustee would receive the following distribution: $12.1 million in cash; $28.8 million in A bonds; $7.5 million in B bonds; $36.3 million in preference stock; and $36.3 million in common stock. The total of cash and A bonds is $40.9 million. Assuming 11.25% of the B bonds are redeemed on schedule, the total of the relatively immediate distribution would be $41.75 million, which is still about $6.4 million less than the retained assets securing the divisional mortgage.

The claim of the secured banks stands on a different footing; in a sense, satisfaction of their claims does involve use of retained assets of the super secured claimants. The security for the banks' claims is the pledge of the Pennco stock. Pursuant to the compromise settlement, the secured banks' claim is liquidated as a secured claim in the amount of $440 million, but the agreed-upon distribution under the Plan is based upon retained asset coverage of 61%. Thus, the distribution would be $44 million in cash; $80.52 million in A bonds; $51.48 million in B bonds; $132 million in preferred stock; and $132 million in common stock. The total of cash and A bonds is $124.5 million, and with the addition of 11.25% of the B bonds, the total comes to $130.3 million. Since the retention of Pennco as the core of the reorganized company is essential to reorganization, and since the appraised value of Pennco is greater than the $440 million claim of the secured banks, the proposed treatment is appropriate. But since Pennco is to be retained, the banks' collateral will not be sold. Therefore, the money to fund the cash and A bond distribution to the banks must come from available assets. In these circumstances, it is preferable to assume, for ana-

lytical purposes, that this distribution to the secured banks involves the use of retained assets (even though there is actually unencumbered cash on hand in excess of the immediate distribution to the banks).

Of course, as Table 2 demonstrates, the retained assets of all secured creditors rather than just those of the super secureds, are being used in the Plan to satisfy other claimants. The secured banks' distribution is simply a portion of the claims which are satisfied by retained assets of others. It is true, however, that the percentage contribution of retained assets is not uniform—the higher the retained asset coverage, the higher the percentage of retained assets used to satisfy other claims.

At first blush, the Alternate Distribution Scheme appears to be correct because each mortgage recovers a uniform percentage of its retained assets and also contributes a uniform percentage for other purposes under the Plan. However, there is a fundamental fallacy in the super secureds' position. Implicit in their argument is the assumption that application of the uniform percentage arrangement would produce a fund adequate to satisfy these priority claims. As the SEC has pointed out, that assumption is simply wrong.

Under the Plan, $667.9 million of administration claims would be paid from cash on hand or the proceeds of the Asset Distribution Program.[55] Claims of the United States and the taxing authorities totaling $502.6 million would be deferred until the conclusion of the Valuation Case, and would be paid from the proceeds of that litigation, ahead of the B bonds which are distributed to those not fully secured by retained assets. During the deferral period, $481.3 million in interest would accrue on these claims. The Alternate Distribution Scheme totally disregards the deferral of $502.6 million in principal and also, in effect, charges the $481.3 million in accrued interest

against the B bond recovery. However, it is clear that the super secured claimants benefit from this deferral, and that the Alternate Distribution Scheme would provide them this benefit without any cost. What the Plan does, on the other hand, is to compensate the lesser-secured mortgages for the subordination of their claims to almost $1 billion in administration expenses by providing the 10% cash distribution plus some portion of 30% of their claim in A bonds.[56] I am satisfied that such treatment of the lesser-secured mortgages is fair and equitable.

### e. Liquidation Analogy.

Some of the super secured claimants have presented additional arguments in an attempt to demonstrate that the Plan allocation of administration expenses between retained and conveyed assets is unfair. They contend that, even if there is no recovery at all in the Valuation Case, their mortgages would nevertheless be paid in full on liquidation. I have concluded, however, that the tendered liquidation analysis is not entirely correct, and that the Plan would not be unfair even if it were correct.

The most complete liquidation analysis has been presented by the Manufacturers National Bank of Detroit (hereinafter Detroit Bank), the Indenture Trustee of the Lake Shore Collateral Trust Mortgage.[57] As noted above, the Lake Shore Collateral Trust Mortgage is not actually "super secured" if the excess collateral of the 013 Gold Bond Mortgage is retained at the Gold Bond Mortgage level. But if marshalling principles are applied, the Lake Shore Collateral Trust Mortgage is super secured. Marshalling would be appropriate in the event of liquidation, and the Detroit Bank's assumption that the Lake Shore collateral is super secured is a valid assumption for purposes of the liquidation analysis.

---

**55.** Figure includes principal and interest payments on securities issued to administration claimants. Total cash expended under Plan through 1987 is $1,345.6 million, but of this amount, $677.7 million is paid to Class J secured creditors and the balance of $667.9 million is paid to administration claimants.

**56.** "Lesser secured" in the sense that their security is other than retained assets.

**57.** Document No. 14220.

The Detroit Bank's liquidation analysis proceeds as follows: First, all leased line assets and all leased line claims against the Penn Central estate are disregarded. Next, the $498 million of unencumbered assets are applied to the payment of administration expenses, leaving a balance of $615.1 million unpaid. Then, the crucial assumption is made that $299.7 million of the unpaid administration claims, representing tax claims against conveyed assets, would have no claim against retained assets, and can therefore be eliminated from consideration. On this assumption, the amount of administration claims chargeable against retained assets would be reduced to $315.4 million, or about 34% of the total retained assets. Each mortgage is then charged with its 34% share of the shortfall.

For the 013–014 mortgage chain, this works out to $104.2 million, leaving $201.3 million in retained assets available for that mortgage chain (assuming the validity of the Detroit Bank's $44.29 million increase in the assets of the 013–014 mortgage chain [58]). Since the amount needed to satisfy the Gold Bond Mortgage, as well as the Michigan Central and the Lake Shore Collaterals, is $138.7 million, there would be a balance of $62 million in retained assets.

But if the tax claims against conveyed assets cannot be simply relegated to the proceeds of the Valuation Case (that is, if they, too, can look to retained assets on liquidation) then the balance of administration claims would represent 66% of the total retained assets. This would be $201.63 million in the case of the 013–014 mortgage chain, and would leave only $103.87 million in retained assets for that chain, well short of the $38.7 million needed to satisfy all of the mortgages in full. Moreover, if the Trustees' figure of $236 million in retained assets is used, only $80.24 million would be available for the satisfaction of the 013 Gold Bond Mortgage, and nothing would pass down to the 014 Consolidation Mortgage level.

Thus, the Detroit Bank, like so many other creditors in this proceeding, has staked out a legal position based upon the assumption that all disputed issues should be resolved in its favor. While there is nothing wrong with considering what the possible results of a liquidation might be on a "best case" basis, it is also necessary to take into account "worst case" assumptions before deciding whether the adjustments represented by the Plan are fair and equitable.

A further weakness in much of the liquidation analysis is that the significance of time is reflected only by discounting the projected sale value of the retained assets, whereas time has several other important consequences. Apparently recognizing this deficiency, the Detroit Bank has submitted what it calls a "Cash Flow Scenario as of December 31, 1980." [59] This purports to show that, by December 31, 1980, $124.7 million of the claims represented by the 013–014 mortgage chain could be paid in cash. The analysis proceeds as follows: By the end of 1980, there would be $286 million in unencumbered cash. After exclusion of the $299.7 million in taxes on conveyed assets, the administration expenses would be $753.1 million, leaving an aggregate shortfall of $467.1 million. But there would be $845.1 million derived from the sales of retained assets during this period, so that a total of $378 million would be available for distribution to secured creditors. The proportionate share of this fund available for the 013–014 mortgage chain, on a percentage basis, would be $124.7 million.

One rather obvious flaw in this reasoning is that the running of the interest on claims during the three-year period is ignored. For example, even if low rates of interest are assumed administration claims would increase by about $130 million. This alone would reduce the potential distribution to the 013–014 mortgage chain to about $81 million, without allowing for the additional $8 million in interest which would have

---

**58.** The increment is produced by crediting to the 013 Gold Bond Mortgage with a substantially larger amount for its lien on the Harlem leasehold. *See* Section II–G–3–a–ii *supra*.

**59.** Appendix E to Doc. No. 14220.

accrued on the 013 Gold Bond Mortgage.[60] (It is not clear whether the Detroit Bank's projected asset disposition proceeds include interest which would be earned by those proceeds pending distribution at the end of 1980. If not, the foregoing disparity would be reduced to the aggregate of the differential between interest earned on the proceeds and interest accruing on the administration claims).[61]

There are additional reasons for not taking this cash flow analysis too seriously. Exclusion of the $299.7 million in taxes on conveyed assets is subject to the same criticisms discussed in connection with the liquidation analysis. If these taxes must be included, additional interest during the three-year period would increase this claim by at least $67.45 million.[62]

Aside from the merits of the exclusion of the tax claims on conveyed property, there is another equally important consideration. There is no justification for proceeding on the assumption that the propriety of the exclusion of the taxes on conveyed assets would be finally litigated by the end of 1980. In the event of actual liquidation, it is at least highly doubtful that these legal issues could be decided before the final outcome of the Valuation Case. Needless to say, it is precisely this kind of delay that the Plan is designed to avoid.

Detroit Bank's cash flow analysis also overlooks the very real problems of determining the proper allocation to each mortgage of its appropriate share of administration expenses. The analysis applies across-the-board percentages. But the parties affected would have the right to contend, as indeed some of the super secured claimants themselves have argued, that the proper allocation should reflect differences in the extent to which particular mortgages did or did not benefit from the operation of the estate during the period in which the administration claims accrued. Implementation of this concept would require extremely complicated segregation studies, and would be protracted.

In addition to these problems of possible delay in achieving a distribution, the cash flow analysis contains a rather obvious and fatal flaw in its revenue assumptions. The projections assume that Pennco would be sold for $483 million, and that the proceeds would be available for the satisfaction of administration claims. (If either of these assumptions is invalid, there would be only $362.1 million in cash by December 31, 1980, to satisfy $467.1 million in administration claims). As noted in discussing the claims of taxing authorities (Section II–F), the secured banks could certainly be expected to argue that administration expenses may not be allocated against non-operating collateral such as the Pennco stock; and that the Debtor had no equity in the pledged collateral. They would no doubt also make the somewhat related argument that they could properly look to their own collateral, and not be forced to commingle it (as the cash flow scenario assumes).

If Detroit Bank's cash flow analysis is considered on a "worst case" basis, a very different picture emerges. If the tax claims against conveyed assets must be recognized (either by payment, or by setting up reserves to guard against deficiencies in the Valuation Case recovery) and if proceeds from the sale of the Pennco stock could not be made available, there would be $766 million in unpaid administration ex-

---

60. After applying all unencumbered cash, $136 million, the balance of the administration claims is $617.1 million. If interest is accrued on the $617.1 million at 7.5% compounded annually and the Detroit Bank's forecasted additional unencumbered assets from the Asset Disposition Program, $150 million, are credited at the early date of July 1, 1979, the resulting amount of administration claims as of December 31, 1980, is about $600 million. After the forecasted available Asset Disposition Proceeds of $845.1 million are applied, $245 million in cash is available. Using Detroit Bank's allocation of 33% to the 013 Gold Bond Mortgage, $81 million would be available.

61. In the Trustees' cash forecast earnings are calculated at a 6% rate. On the other hand, the § 211(h) claim interest rate is assumed to be approximately 7.5%, and tax claim interest varies from 6% to 12%.

62. Assume a low interest rate of 7% compounded annually for three years.

penses[63], against $362 million in retained asset proceeds[64], or a shortfall of $404 million; and this without reflecting the increases in administration claims caused by delay in payment. But according to all of the projections, the total, undiscounted, proceeds from the Asset Disposition Program from 1981 through 1987 would be slightly more than $142.5 million.[65]

The Irving Trust Company, Indenture Trustee for the two collateral trust issues, the New York Central 6% Bonds of 1990 and the Penn Central 6½% Bonds of 1993, is in a somewhat different position from that of the other "super secured" claimants, and has presented a slightly different liquidation-analogy argument. Its primary collateral is a block of stock in an operating railroad, the Pittsburgh & Lake Erie. The relationship between the P&LE and Penn Central is, of course, somewhat different from the relationship between Pennco and Penn Central (the fortunes of P&LE being more directly intertwined with the rail operations of Penn Central), but in many ways the two collateral trust issues and the claim of the Secured Banks based upon the Pennco pledge are similarly situated. In both cases, the collateral consists of non-operating property, and there is thus some basis for arguing that the collateral may not be invaded to pay administration expenses. In effect, Irving Trust Company adopts this argument, by allocating all tax claims to the various properties against which the taxes were assessed, and by showing that the Government's § 211(h) claims ($349 million), the trustees certificates and other administration expenses could probably be met from unencumbered assets.

Here again, however, timing is a factor. The Trustees' cash forecast contemplates that all of the P&LE stock, both pledged and unpledged, will be sold by 1983. This may or may not occur. But even assuming that the pledged stock could be sold immediately, it would not necessarily follow that the proceeds would immediately be available for satisfaction of the collateral trust obligations. Not only would litigation concerning their vulnerability to administration expenses be likely, but even assuming that only the Government's § 211(h) claims were held to prime the collateral trust claims, actual payment of the latter might have to come from later sales of other retained assets.

Although these and other difficulties render Irving Trust's arguments less than fully persuasive, it must nevertheless be acknowledged that the collateral trusts do stand in a somewhat better position than other creditors whose claims are secured, in the same or lesser percentages, by retained operating assets.

### f. Comparison with General Creditors and Equity Interests.

Under the Plan, general unsecured creditors would receive certificates of beneficial interest in amounts equal to 30% of their claims, plus a pro rata allocation of 35% of the shares of common stock of the reorganized company. Ten percent of the common stock of the reorganized company would be distributed to the equity holder (i. e., Penn Central Company); no other distribution would be made to equity interests. Some of the "super secured" claimants argue that the Plan is unfair because these junior claimants are permitted to participate even though the secured claimants will not have received satisfaction in full.

As a preliminary matter, it should be noted that the participation of junior debt and equity interests is limited to contingent

---

**63.** Add back to the $467.1 million in administration claims (after application of all unencumbered assets) the $299.7 million in tax claims for a total of $766.8 million.

**64.** Reduce Detroit Bank's projected available cash from sale of retained assets, $845.1 million, by $483 million, the projected proceeds of the sale of the Pennco stock.

**65.** Over $64 million of the $142.5 million is projected to be from the sale of the stock of the Pittsburgh & Lake Erie Railroad Company. Twenty-five percent of that stock is pledged under two collateral trusts. Irving Trust Company, Trustee for both issues, has asserted arguments similar to those of the Secured Banks outlined in the text above. Thus, on worst case assumptions, the $142.5 million would be overstated by about $16 million.

debt securities and equity interests; that is, no cash would be diverted to these junior claimants, nor would they receive higher-ranking securities than the senior claimants.

There can be no quarrel with the general proposition that a plan of reorganization cannot provide for participation by unsecured creditors and equity interests unless it provides to secured creditors full compensation for the rights discharged pursuant to the Plan. *Consolidated Rock Prods. Co. v. DuBois,* 312 U.S. 510, 61 S.Ct. 675, 85 L.Ed. 982 (1941); *Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific R.R.,* 318 U.S. 523, 63 S.Ct. 727, 87 L.Ed. 959 (1943). The passage of the RRRA did not abrogate the absolute priority rule. But it clearly has made it difficult to apply traditional methods of valuing the earning power of the reorganized enterprise and hence to determine whether what the secured creditors receive is equivalent to what they give up. The actual dollar value of the securities of the new company could not be fixed with even the minimal degree of precision encountered in ordinary reorganization plans until the Valuation Case litigation is concluded. Moreover, the unprecedented accumulation of unpaid administration claims, caused by the RRRA process, casts a pall of doubt over all pre-bankruptcy claims of creditors. In short, the RRRA has made it difficult to determine both the "value" of the securities to be distributed to creditors under the Plan, and the "value" of what each creditor would be surrendering in exchange for those securities.

In attempting to show that the Plan is unfair to them, the super secured claimants have mounted an extensive argument which focuses upon the uncertain value of the proposed new securities, but which assumes that their own claims are unassailable. This results in a distorted comparison between the claims surrendered and the benefits which would be received. Each claim is valued at its face value, principal plus interest. The 10-triple-30 securities package is valued as follows: cash at face value; A bonds at 75.6% of face value because of the delay in payment; common stock at $6 per share; and preference stock at $5 per share —$1 for the conversion feature and $4 for the redemption feature. Assuming the securities will have those values, each secured creditor will receive only $44.23 in present value for every $100 of claim surrendered. (If the preference stock is valued at its discounted value on the assumption that it will be redeemed in 1987, the value of the securities package increases to $50.53 per $100 of claim.) It is argued that because the value of the securities to be issued is less than the amount of the claim surrendered, it is impermissible to allow unsecured and equity interests to participate. This argument assumes all of the benefits of the Plan (the compromises with the Government, the bank group, the New Haven Trustee, and the taxing authorities) for purposes of valuing the claims at full value, but assumes that the Valuation Case will make no contribution whatever to the value of the common stock of the reorganized company (the $6 per share is arrived at by capitalizing 1978 earnings of the reorganized company).

This argument proves only that which was already obvious, namely, that if it must be assumed that there will be no recovery in the Valuation Case litigation, aspects of this Plan could not be approved. But it is also perfectly clear that no court could rationally make a finding, on this record, that the claims being litigated in the Special Court are without value. It is therefore impossible to conclude that the estate is insolvent, and that unsecured creditors and equity interests are not entitled to participate at all.

That being so, it is clear that the super secured claimants' argument merely again presents the same question under a different guise, namely, should a plan be attempted now, or should the results of the Valuation Case be awaited? This is perhaps the only question as to which there appears to be unanimous agreement: Everyone, including the super secured claimants, recognizes the desirability of achieving a

plan now, rather than awaiting further developments.

Thus, the immediate issue is whether the risks, uncertainties and possible benefits of the Valuation Case litigation, and the consequences of the RRRA process, are being fairly apportioned in the distributions proposed in the Plan. I am satisfied that the allocations are fair and equitable.

Using the approach adopted by the super secured claimants, if the common stock of the reorganized company (ignoring the Valuation Case) is worth $6 per share, this means that the total value being distributed to unsecured claimants and equity interests aggregates only $62.5 million. It means that unsecured creditors would be paying about $88.90 of claim for each share of common stock, whereas the secured creditors would be paying about $44.55 of claim per share of stock, without regard to conversion of B bonds and preference stock.

Admittedly, if the results of the Valuation Case litigation are disastrously low, it will appear in retrospect that the unsecured creditors and equity holders will have received somewhat better treatment than they should have received. But on any reasonable assessment of the probable Valuation Case recovery, the balance between secured interests and unsecured/equity interests will be approximately correct. And if the recovery is sufficient to fund the CBIs and contribute additional value to the common stock, the secured creditors, as holders of 55% of the common stock, will surely have no grounds for complaint.

The foregoing discussion leads to the conclusion that, generally speaking, the "super secured" creditors as a group receive appropriate allocations of retained assets for purposes of the A–B bond distributions under the Plan. All have retained asset coverage in excess of 100% of the amounts of their claims, and the Plan accords the same treatment to all of these creditors. But while all of these creditors are on an equal footing, there is some merit in the suggestion that, in the vernacular, some are more equal than others. The Mohawk & Malone (011) mortgage has 275% retained asset coverage, and the Gold Bond Mortgage has 243% retained asset coverage. The New York Central 6% bonds of 1990 and the Penn Central 6½% bonds of 1993 have retained asset coverage of approximately 119% and 131% respectively, and they have the further advantage of the pledge of the Pittsburgh & Lake Erie stock. In my judgment, it would be preferable to accord claimants under these four mortgages somewhat better treatment than the Plan provides, if that can be accomplished within the contours of the present Plan.

For the reasons discussed above, I am satisfied that no "super secured" claimant can properly lay claim to more cash or A bonds than the Plan provides. The alternative distribution scheme is invalid, and would not work. But within the framework of the present Plan, there is some room for flexibility in the handling of preference stock. Under the Plan, the selection of preference stock to be redeemed first is to be made by lot. While this is eminently fair as among holders similarly situated, it could, in actual operation, allow holders less favorably situated than the bondholders of these four mortgages to receive satisfaction of their claims before these more favorably situated bondholders. To prevent such an eventuality, in my judgment the solution is simply to include provisions guaranteeing that the holders of preference stock issued in exchange for the surrender of claims under the four mortgages listed above will have rights of redemption *pari passu* which take precedence over the redemption rights of other preference shares.

### 3. Disputes Involving the Retained Asset Analysis

Although each mortgage is treated as fully secured, the amount of A and B bonds to be distributed to the bondholders depends on the retained asset coverage of each mortgage. A number of the indenture

trustees contend that their bondholders are entitled to a greater portion of A bonds because the Trustees' retained asset analysis incorrectly understates the amount of retained assets subject to the respective mortgage.

### a. The R & I Mortgage

The Indenture Trustee of the R & I Mortgage contends that retained assets in six separate categories are either improperly omitted, or inadequately reflected, in the analysis of the retained asset coverage of the R & I Mortgage: (a) chargebacks for operating losses against Michigan Central and the Big Four; (b) the Harlem leasehold; (c) rents from Park Avenue properties and dividends on the Harlem stock; (d) interest on the Beech Creek, Harlem and Big Four bonds; (e) prebankruptcy sales; and (f) lien rights of matured bonds. Each of these categories must now be considered.

### i. Chargeback against Michigan Central and Big Four for Operating Losses

Railroad leases are executory contracts which may be either adopted or rejected in the course of reorganization, and which, in any event, may be rejected in the Plan. When a lease is rejected, the rejection dates back to the filing of the petition in bankruptcy. In such circumstances, the lessee ordinarily operates the line "for the account of" the lessor. See § 77(c)(6). If the operation of the line for the account of the lessor produces operating losses (the usual case, else the lease would not be rejected) the lessee has a claim against the lessor for the amount of these losses. That claim (referred to herein as the "chargeback"), in the case of a bankrupt lessor, ranks as a claim of administration, having priority over all other claims against the estate, secured or unsecured. (By contrast, the lessor's claim against the lessee for the breach of contract which rejection of the lease entails is merely an unsecured prebankruptcy claim against the lessee's estate.) *See generally Warren v. Palmer,* 310 U.S. 132, 60 S.Ct. 865, 84 L.Ed. 1118 (1940); *Palmer v. Palmer,* 104 F.2d 161 (2d Cir.), *cert. denied,* 308 U.S. 590, 60 S.Ct. 120, 84 L.Ed. 494 (1939). *See also* Meck & Masten, *Railroad Leases and Reorganization: I,* 49 Yale L.J. 626 (1940); Meck, *Railroad Leases and Reorganization: II,* 49 Yale L.J. 1401 (1940).

More than half of the Penn Central system was leased from some 40-odd lessor companies. Fifteen of these lessors are also in bankruptcy, as Secondary Debtors in these proceedings. In the case of these 15 Secondary Debtors, Penn Central itself owns most of the stock and in some cases a portion of the outstanding debt. During the course of the proceedings, the Trustees neither adopted nor rejected the leases. Nor is there provision in the Plan for the adoption or rejection of the leases. Rather, the Plan takes the relatively simple and straightforward approach of cancelling out the mutual claims of the lessor and lessee companies, distributing to the public holders of bonds of the lessor companies the security package which is distributed to the public holders of Penn Central bonds, and quantifying the value of the dividend income to the public shareholders and with respect to the value of the stock, treating them as secured creditors. Satisfaction of the debt and equity holders of the Secondary Debtors and consummation of their respective Plans will result in the reorganized company having effective control of the reorganized Secondary Debtors. The Plan assumes this result and also assumes the assets of the Secondary Debtors will be available to the reorganized company to service its securities.

In effect, the R & I Indenture Trustee contends that for the purposes of the retained asset analysis the R & I Mortgage has a claim to the retained assets of the Michigan Central Railroad Company (MC) and Cleveland, Cincinnati, Chicago & St. Louis Railroad Company (Big Four), which preempts the claims of the public debt and equity holders of those two Secondary Debtor lessors.

This claim arises because, as to both of these railroads, stock owned by Penn Central, is pledged to the R & I Indenture

Trustee as security for the R & I Mortgage. Article 7, § 9 of the R & I Mortgage provides that if the mortgagor has pledged the majority of the stock of another company under the R & I Mortgage, and if the mortgagor thereafter acquires any "indebtedness, lien, or charge" by or against said company, the mortgagor shall, at the request of the R & I Indenture Trustee, assign such indebtedness, lien or charge to the R & I Indenture Trustee. Ninety-nine percent of the MC common and 97% of the Big Four common and 84% of the Big Four preferred shares are pledged under the R & I Mortgage [66]. The R & I Indenture Trustee contends that operations over the MC's lines during reorganization produced operating losses of $104.5 million, and that operations over the Big Four lines during reorganization produced operating losses of $84.4 million. If both leases were rejected in the Plan, the Penn Central estate would be entitled to "charge back" those amounts against the lessors; this charge-back would be an "indebtedness, lien or charge" within the meaning of the after-acquired property clause referred to above, assignable to the R & I Indenture Trustee; hence, the R & I's retained asset security should be increased.

If this argument is accepted in its entirety, the effect would be approximately as follows: All of the retained assets of MC ($41 million) and of the Big Four ($79.95 million) would be added to the retained-asset security of the R & I Mortgage.[67] In that event, the $27.8 million value assigned to MC stock pledged under the R & I Mortgage would be eliminated from the security of the mortgage. The net increase in retained assets of the R & I Mortgage would be $93.081 million, its retained asset coverage would increase from 29.7% [68] to 62.8% [69],

66. The Michigan Central Collateral Indenture has the first lien on 168,143 shares of the MC common. However, the value attributable to these shares is marshalled down to the R & I Mortgage. Another 17,848 shares are pledged under the R & I Mortgage. The value attributable to the total shares is $27.8 million. No value is attributed to the Big Four stock because the Big Four's outstanding public debt exceeds the amount of its retained assets.

67. Volume II, 122, 151.

68. Collateral Trust Bonds—015 Mortgage

| Mtg. # | Description | | Net Claim | Claim on 015 Assets | Underlying Security | Versus Net Claim | | Distribution of Excess | Total Distribution |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Deficiency | Excess | | |
| CTB | PC 6½ | 1993 | $ 140 | $ 4,185 | $ 1,226 | | $1,086 | | $ 140 |
| CTB | NYC 6 | 1980 | 26,967 | 53,043 | 15,542 | $ 11,425 | | $ 113 | 15,655 |
| CTB | NYC 5¼ | 1980 | 248 | 903 | 265 | | 17 | | 248 |
| CTB | NYC 5¾ | 1980 | 685 | 1,843 | 540 | 145 | | 3 | 543 |
| CTB | NYC 6 | 1990 | 1,117 | 3,900 | 1,143 | | 26 | | 1,117 |
| CTN | NYC 5 | 1974 | 14,012 | 29,199 | 8,555 | 5,457 | | 59 | 8,614 |
| 109 | CR&I | | 13,001 | 26,100 | 7,647 | 5,354 | | 55 | 7,702 |
| | Total | | 56,170 | 119,173 | 34,917 | 22,381 | 1,129 | 230 | 34,019 |
| 015—1 | R&I A | 2013 | 125,689 | 125,689 | 36,827 | 88,862 | | 528 | 37,355 |
| 015—3 | R&I C | 2013 | 89,119 | 89,119 | 26,112 | 63,007 | | 374 | 26,486 |
| | Total 015 Bonds | | 214,808† | 214,808 | 62,939 | 151,869 | | 902 | 63,841† |
| | Grand Total | | $270,978 | $333,981 | 97,856* | 174,250 | 1,129 | 1,132* | 97,860* |

STEP 1. To allocate retained assets first determine the percentage that total retained assets are of all claims on 015 assets ($97,801/$333,981 = 29.3%). The amount of 015 assets available to satisfy a claim is computed by multiplying the claim by the percentage. (E.g., NYC 6s of 1980: 29.3% of $53,043 equals $15,542 available).

STEP 2. To allocate the excess of 015 assets first determine the net claim unsatisfied by subtracting from the total net claim the net claim of collateral indentures which have excess 015 assets ($270,978 — $1,505 = $269,473). Divide the excess by the net claim unsatisfied to give the percentage excess assets are of the net claim unsatisfied ($1,146/$269,473 = .42%), and multiply each unsatisfied claim by that percentage.

† Retained asset coverage of public holders of R & I bonds: $63,841/$214,808 = 29.7%.

* Discrepancy due to rounding.

69. See note 69 on page 1305.

and the A bond distribution would be increased from $19.1 million to $40.4 million. There would be no A bond distribution to the Big Four bondholders, and the 100% cash distribution to the MC bondholders would have to be reconsidered and no doubt adjusted.

I have concluded that the position asserted by the R & I Indenture Trustee is untenable, and that its arguments must be rejected, because even if chargeback claims for operating losses could be established and quantified, they would not be within the ambit of the after-acquired property clause of the R & I Mortgage.

In the first place, any such chargeback claim would belong to the Trustees of the Penn Central estate, and not to the Penn Central as mortgagor under the R & I Mortgage. While it is not often necessary to engage in fine distinctions between pre-bankruptcy Penn Central, as a "successor corporation" to the original mortgagor (Article 6, § 2 of the R & I Mortgage), Penn Central as a Debtor under § 77 of the Bankruptcy Act, and the Trustees of the Penn Central, the distinctions are real

enough.[70] And in these circumstances, it is particularly necessary to observe them. If there were operating losses on the MC and Big Four lines, giving rise to chargeback claims, they were made possible because the operations were sustained by cash generated by the Penn Central estate as a whole. To say that this detriment suffered by the estate as a unit should now be redressed, but only for the benefit of the R & I Mortgage, is to express a strange view of the appropriate exercise of the equitable powers of a federal court.

Second, the true intent of the parties to the R & I Mortgage Indenture would be frustrated if such chargeback claims were picked up by the after-acquired property clause. The mortgage instrument was carefully drafted in order to make clear that it was not intended to prime or displace existing mortgages of the MC and Big Four. Chargeback claims do prime the existing mortgages, and to include such claims within the lien of the R & I Mortgage would produce a result plainly not contemplated by the parties. Moreover, it would be anomalous indeed, where stock is

**69.** Collateral Trust Bonds—015 Mortgage

| Mtg. # | Description | | Net Claim | Claim on 015 Assets | Underlying Security | Underlying Security Versus Net Claim | | Distribution of Excess | Total Distribution |
|--------|-------------|---|-----------|---------------------|---------------------|-----------|-----------|------------------------|--------------------|
| | | | | | | Deficiency | Excess | | |
| CTB | PC 6½ | 1993 | $ 140 | $ 4,185 | $ 2,394 | | $ 2,254 | | $ 140 |
| CTB | NYC 6 | 1980 | 26,967 | 53,043 | 30,340 | | 3,373 | | 26,967 |
| CTB | NYC 5¼ | 1980 | 248 | 903 | 516 | | 268 | | 248 |
| CTB | NYC 5¾ | 1980 | 685 | 1,843 | 1,054 | | 369 | | 685 |
| CTB | NYC 6 | 1990 | 1,117 | 3,900 | 2,231 | | 1,114 | | 1,117 |
| CTN | NYC 5 | 1974 | 14,012 | 29,199 | 16,702 | | 2,690 | | 14,012 |
| 109 | CR&I | | 13,001 | 26,100 | 14,929 | | 1,928 | | 13,001 |
| | Total | 015 | 56,170 | 119,173 | 68,166 | | 11,996 | | 56,170 |
| 015-1 | R&I A | 2013 | 125,689 | 125,689 | 71,894 | $53,795 | | 7,038 | 78,932 |
| 015-3 | R&I C | 2013 | 89,119 | 89,119 | 50,976 | 38,143 | | 4,958 | 55,934 |
| | Total 015 Bonds | | 214,808† | 214,808 | 122,870 | 91,938 | | 11,996 | 134,866† |
| | Grand Total | | $270,978 | $333,981 | 191,036 | 91,938 | 11,996 | 11,996 | 191,036 |

STEP 1. To allocate retained assets first determine the percentage that total retained assets are of all claims on 015 assets ($191,081/$333,981 = 57.2%). The amount of 015 assets available to satisfy a claim is computed by multiplying the claim by the percentage. (*E.g.*, NYC 6s of 1980: 57.2% of $53,043 equals $30,340 available).

STEP 2. To allocate the excess of 015 assets first determine the net claim unsatisfied by subtracting from the total net claim the net claim of collateral indentures which have excess 015 assets ($270,978 — $56,170 = $214,808). Divide the excess by the net claim unsatisfied to give the percentage excess assets are of the net claim unsatisfied ($11,996/$214,808 = 5.6%), and multiply each unsatisfied claim by that percentage.

† Retained asset coverage of public holders of R & I bonds: $134,914/$214,088 = 62.8%.

---

**70.** *Cf. In re Sequential Information Systems,* Transfer Binder, CCH Sec. Trans Guide ¶ 51479, in which Bankruptcy Judge Herzog held that inventory acquired by a Chapter XI debtor in possession was not subject to a valid lien on the debtor's inventory, despite its "after-acquired" features.

pledged as collateral for a loan, for the lender's security to increase as the direct result of the unprofitability of the corporation whose stock is pledged.

■ I am satisfied that the essential purpose of the after-acquired property clause in the R & I Indenture was to insure that the mortgagor, which was in a position to control the MC and Big Four, would not be able to dilute the value of the pledged stock by creating additional debt obligations, and that any acquisition by the mortgagor of existing debt obligations of MC or the Big Four would inure to the benefit of the R & I Mortgage. Consistently with this interpretation, if in their retained asset analysis, the Trustees reduced the value of the pledged MC and Big Four stock because of the existence of actual or potential chargeback claims for operating losses, the R & I Indenture Trustee would have valid grounds to assert that to the extent the chargeback claim reduced the value of the pledged stock the after-acquired property clause should be interpreted as applying to the chargeback claim. But that has not been attempted here; the Trustees' analysis accords full value to the pledged collateral.

What has been stated thus far serves to dispose of the contention that the R & I Mortgage should be credited with a greater amount of retained assets because of possible chargeback claims available to the Trustees. But the conclusion that potential chargeback claims are not within the reach of the R & I Mortgage does not automatically mean that such claims should not be asserted by the Trustees; the propriety of the compromise disposition of these claims by mutual cancellation is an issue which should be addressed at this time because, regardless of its impact upon the retained asset security of the R & I Mortgage, the non-assertion of chargeback claims against lessors does have an impact upon the structure of the Plan and its proposed distribu-

tions. Moreover, in view of the arguments presented, I believe it is helpful to assess the strengths and weaknesses of the potential chargeback claims because, in my view, the proposed compromise cancellation of such claims is eminently fair and reasonable, and should be approved over the objections of the R & I Indenture Trustee even if such claims were within the reach of the after-acquired property clause of the R & I Mortgage.

The task of actually establishing the existence and amount of operating losses over the MC and Big Four lines would be formidable indeed. The Penn Central system was operated as a single unit. In order to determine the operating results over a particular segment of the system, segregation studies must be relied upon; and segregation studies are necessarily inexact, and subject to legitimate controversy. The segregation studies prepared by the Trustees' consultants for the years 1972 and 1973,[71] upon which the R & I Indenture Trustee's projected operating loss figures are based, are no exception. For example, the study attributes revenues to the MC and Big Four lines on a "normal route" basis (it apparently being now impossible to establish the actual routings); and expenses were allocated to these lines on the basis of system-wide unit costs. Because of the Trustees' proposal that mutual debt be cancelled, this particular segregation study has not, of course, been the subject of an adversarial examination by the MC and Big Four Trustees. An earlier segregation study employing the same methodology (in connection with the § 207(b) hearings) was sharply challenged by expert witnesses testifying on behalf of the MC and Big Four Trustees.[72]

In the case of the Big Four particularly, relatively slight adjustments in either the revenue or expense allocations made in the

---

**71.** Affidavit of Edward R. Jennison, Volume I, 33.

**72.** Affidavit of Mr. Simat, Doc. No. 7432, and affidavit of Mr. Seibert, Doc. No. 70 in No. 70–347–H. While there are technical differences between the two segregation studies and

the studies were made for different purposes, the affidavits in the § 207(b) proceedings are relevant for the limited purpose of pointing up the possible issues that would arise in litigation over the existence and amount of any chargeback claim.

segregation study would produce a very different result. The study itself shows 1972 losses on the Big Four as only 7.8% of revenues, and 1973 losses as only 3.5% of revenues. It is not without significance that notwithstanding the similar results of the earlier segregation study, this Court concluded, in connection with the § 207(b) proceedings, that the Big Four had not been shown to be incapable of independent reorganization. *See In re Penn Central Transp. Co. (Proceedings pursuant to § 207(b) of the RRRA)*, 382 F.Supp. 821 (E.D.Pa.1974); and *In re Penn Central Transp. Co.*, 382 F.Supp. 851 (E.D.Pa.1974).

It should also be noted that the R & I Indenture Trustee's assumption that the average of the 1972 and 1973 operating results can safely be projected to the other years involved may or may not be valid, and would no doubt be challenged by parties opposed to an attempted chargeback.

More fundamentally, there are serious questions as to whether the chargeback doctrine of *Palmer v. Palmer,* and *Warren v. Palmer,* can be applied at all in the unique context of this case. It is arguable, for example, that the mandated conveyance to ConRail, which has rendered it impossible for either the lessor or the lessee to operate over the lines, simply terminated the leases at that point, and that the Trustees are precluded from exercising their normal right of rejection of the lease. Assuming the power to reject remains unimpaired, it can be argued that any chargeback claim should be satisfied, at least in substantial measure, out of the proceeds of the Valuation Case; the issues here parallel those involved in the state and local tax claims (Section II F *supra* ).

And finally, lessors faced with chargeback claims would undoubtedly attempt to establish that operating losses would not have been sustained, or would have been greatly reduced, if Penn Central's operating decisions had not resulted in "diversion" of

traffic from their respective leased lines. The complexities of the Penn Central rail network render it more than usually susceptible to such challenges. And there is the further complicating factor that (for reasons of economy primarily) independent Trustees for the bankrupt lessors were not appointed until after the RRRA was enacted.[73] Thus, during most of the relevant period, Penn Central and its Trustees occupied a position vis-a-vis the bankrupt lessors that can be regarded as involving fiduciary responsibilities which, though not altogether precluding lease rejection and chargeback, would at least call for very close scrutiny of their stewardship of leased line operations.

### ii. The Harlem Leasehold

All of the property of the New York & Harlem Railroad Company is leased to the Debtor; the lease expires in the year 2274. The Debtor owns 95% of the stock of the Harlem, which owes $10.25 million on publicly held debt.[74] Penn Central's leasehold interest is subject to the lien of the Gold Bond Mortgage, the Consolidation, and the R & I Mortgage, in that order. Penn Central's stock interest in the Harlem is pledged as collateral under the R & I Mortgage.

The problem addressed by the Trustees in their analysis underlying the distributions proposed in the Plan is the proper allocation of the Harlem's retained asset values as among the various interests. The correct conceptual approach to this problem is not self-evident. As a general proposition, it can be said that the value of Penn Central's leasehold is the aggregate value of the properties (after deducting a relatively nominal sum as the value of the reversion), less the present value of Penn Central's obligations under the lease. It can also be said that the interest of the Harlem (and hence, for present purposes, the value of the Harlem stock) consists of a relatively

---

**73.** The history of the Secondary Debtors' proceedings is outlined briefly in *Penn Central Transp. Co. (Proceeding Pursuant to § 207(b) of the RRRA)*, 382 F.Supp. 821 (E.D.Pa.1974).

**74.** The Harlem lease is discussed in detail in *In re Penn Central Transp. Co. (Sale of Park Avenue Properties)*, 354 F.Supp. 717 (E.D.Pa.1972); *In re Penn Central Transp. Co.*, 354 F.Supp. 759 (E.D.Pa.1972).

nominal sum representing the reversionary interest, plus the present value of the payments to be made under the lease. There are at least two sets of complications encountered in making allocations of retained assets to the various mortgages by applying this general approach to valuation. The Penn Central's obligations under the lease cover not only a set amount per share of Harlem stock, but also amortization of Harlem's publicly held debt. And there is the question whether the calculation should assume that Penn Central would be paying the required dividends on the Harlem stock owned by Penn Central. Different answers to the latter question might be appropriate, depending upon whether one is considering Penn Central's obligations to the Harlem as lessor, or its obligations to the R & I mortgagee as pledgee of the Harlem stock.

In formulating the Plan, the Trustees initially adopted the principle that no value should be assigned to leasehold interests. Thus, the Plan as originally proposed did not credit any of the Harlem's retained assets to the 013–015 mortgage chain. Instead, these retained asset values were allocated first to the publicly held debt of the Harlem, $10.25 million, and certain intercompany obligations of the Harlem, $.38 million. The balance of the retained asset values, $81.21 million, was then credited to the outstanding stock of the Harlem. Approximately $4 million was assigned to the publicly held stock, and since almost all of the remaining outstanding stock held by Penn Central is pledged under the R & I Mortgage, $77.2 million was credited to the R & I Mortgage.

In light of objections presented at the hearings to this treatment, however, the Trustees amended the Plan by crediting $29 million to the 013–015 mortgage chain.[75] This was the amount necessary to render both the Gold Bond and Consolidation Mortgages fully secured by retained assets. The Trustees concluded that since the leasehold was worth at least $29 million, there was no need to do a complete valuation of the Harlem leasehold to determine its exact value.

The amended treatment of the Harlem's retained assets reduced the retained assets available for the Harlem's equity, and as a result the value of the Harlem stock pledged under the R & I Mortgage was reduced by $29 million to $48.2 million.

In summary, the Trustees have allocated $10.25 million to the publicly held debt of the Harlem, $29 million to the 013–015 mortgage chain, and $48.2 million to the R & I Mortgage.

If the Harlem's publicly held debt has first call on the Harlem's retained assets, increasing the amount allocated to the leasehold does not benefit the R & I Mortgage. The Gold Bond and Consolidation Mortgages are both fully secured by retained assets and, therefore, an increase in the amount assigned to the leasehold would simply be marshalled down to the R & I Mortgage.

The R & I Indenture Trustee argues that under a proper analysis of the value of the leasehold interest, none of the Harlem's retained assets would be allocated to the Harlem's public debt. Of course, if this is correct,, the $10.25 million would eventually reach the R & I Mortgage in one way or another. Quite correctly, the R & I Indenture Trustee argues that if the leasehold interest were actually valued, the retained assets would be allocated between the Trustees' leasehold interest and the Harlem's reversionary interest, and the public debt of the Harlem would have a claim against only the retained assets allocated to the reversion. It is also correctly asserted that since the Harlem lease was affirmed during the course of the proceedings and is not rejected in the Plan, the reorganized company is obligated to comply with the Harlem lease, and that includes servicing the publicly held debt and stock of the Harlem. It does not follow, however, that the full amount of the Harlem's retained assets should be allocated to the leasehold interest.

It is clear that the maximum value of the leasehold is the value of the retained assets less the cost of performing the leases. All

75. Trustees' Brief, pp. 190–98.

agree that the cost of maintaining the lease is at least $624,000 per year (interest on publicly held debt plus stock dividends). Assuming a 6% yield rate on investment, the present value of the cost of paying $624,000 per annum over the next century is $10.4 million. If the intercompany obligations are also properly charged against the leasehold value, the combined deduction of lease maintenance and intercompany obligations is $10.76 million, which is substantially equivalent to the $10.6 million deduction for public debt and intercompany obligations embodied in the Trustees' analysis.

Moreover, the Trustees have asserted that there are additional lease maintenance costs: $700,000 arising from the Trustees' arrangements with the Metropolitan Transportation Authority covering certain of the Harlem's properties and $.5 million in taxes. Neither suggestion is clearly spelled out in the record, and the taxes would presumably have been already netted out in a rough way in the Asset Disposition Program analysis which generated the total asset values. If these two items later become relevant, they can be clarified further.

In any event, it is clear that the R & I Mortgage comes out basically the same under the Trustees' approach or under the Alternative method of valuing the costs of the lease. Therefore, no change in the Trustees amended allocations of the Harlem's retained assets is warranted.

The method of handling the Harlem leasehold also affects the Gold Bond and Consolidation Mortgages. If more than $29 million were allocated to the leasehold, the Gold Bond retained asset coverage would increase accordingly. For the reasons stated in Section II–G–2, for the purposes of the so-called super secured argument, the Lake Shore and Michigan Central Collaterals would not benefit from the additional amounts credited to the 013 Gold Bond Mortgage. In connection with the Detroit Bank's liquidation and cash flow scenario arguments, the discussion took account of the possibility that an upward adjustment might be appropriate. Thus, while theoretical problems do exist concerning the "right way" to treat the Trustees' Harlem lease-

hold interest, in the context of the Plan the proposed allocation is satisfactory.

iii. Rents from the Park Avenue Properties; Dividends on the Harlem Stock

Under the terms of the Harlem lease, Penn Central is required to pay, as rent, $5 per share annually to the holders of Harlem stock. However, the third supplemental contract of the Harlem lease provides that this per share rental need not be paid on these shares of Harlem stock owned by Penn Central itself, unless such payment is required in order to comply with the terms of the R & I Mortgage (Penn Central's Harlem shares being pledged as security under that mortgage). The R & I Mortgage Indenture provides that, in the event of default, the Indenture Trustee is entitled to receive the dividends on the Harlem stock and apply them to the mortgage debt.

In approving the Trustees' decision to affirm the Harlem lease, this Court held, over objection by the R & I Indenture Trustee, that the dividends on the pledged stock need not be paid as a condition of affirmance. *In re Penn Central Transp. Co. (Sale of Park Avenue Properties)*, 354 F.Supp. 717, 736–37 (E.D.Pa.1972), *aff'd in part and rev'd in part*, 484 F.2d 323 (3d Cir.), *cert. denied*, 414 U.S. 1079, 94 S.Ct. 598, 38 L.Ed.2d 485 (1973). I left open the question of how this suspension of the mortgagee's right to receive dividends should be treated in the Plan of Reorganization. The unpaid dividend-rental on the pledged Harlem stock to date amounts to approximately $7.1 million.

The properties covered by the Harlem lease have generated rental income to the Debtor's estate in the amount of approximately $70 million. The R & I Indenture Trustee earlier sought to have these rents sequestered, but this request, too, was rejected, 354 F.Supp. at 741. Thus, as a result of this Court's earlier decisions, funds which on default the R & I Indenture Trustee was entitled to claim as additional security for the R & I Mortgage were expended by the Trustees to support current operations.

The R & I Indenture Trustee now argues that both the $7.1 million in unpaid dividends and the $76 million in rent diversions should be added to the retained asset coverage of the R & I Mortgage, for purposes of determining the A–B bond distributions. The principal contention made is that, as a matter of bankruptcy law, and as a matter of constitutional doctrine, use of pledged income for the payment of operating expenses constitutes an impairment of security which must be rectified by restoring to the secured creditor an amount equal to the pledged funds used. However that may be, since the R & I Mortgage is being treated in the Plan as fully secured, the problem of possible impairment of security does not arise.

The issues addressed by the argument of the R & I Indenture Trustee generally arise at either of two levels: First, whether it is legally permissible to use liened assets, or the income generated thereby, to meet expenses of current operations; and, second, where impairment of security does occur, whether it is necessary in the Plan to accord to the affected creditor an administration claim or other high-priority claim in the amount of the impairment. *See generally* Countryman, *Treatment of Secured Claims in Chapter Cases,* 1977 Comm.L.J. 349 (1977). In the present case, however, this Court and the Court of Appeals approved the use of the money for operating expenses, so the first issue is behind us; and the Plan treats the R & I Mortgage as fully secured, so the problem of restoration does not arise.

What is involved here is a much narrower issue, namely, what kinds of securities should be used to discharge this admittedly fully secured claim. The answer to that question depends not upon theories brought into play by past happenings, but upon the nature of the assets actually securing the claim. The issuance of a greater or lesser amount of A bonds under the Plan reflects a greater or lesser proportion, in the assets securing the particular claim, of assets which can be liquidated or otherwise realized upon in the near future. Obviously, the rents and dividends previously spent by the Trustees to support rail operations, or even the hypothetical right to restoration of these funds, are not the kinds of assets which would justify the issuance of A bonds.

■ Indeed, the same conclusion would follow even if the R & I Mortgage were not treated as fully secured, and even if the controversial issue of security restoration were then resolved in favor of the R & I position. That is, the fact that part of the security for the R & I Mortgage would then consist of a high-priority right to have the previously spent cash replaced would not necessarily justify or require the issuance of liquidity-oriented securities in payment. To say that cash should be restored as security for a mortgage does not automatically produce the cash. The true consequence of any such restoration decree would be to ensure that the full amount of the mortgagee's claim would have to be dealt with before junior lienholders could participate, and not to mandate the issuance of a particular kind of security. The nature of the securities to be used in payment of the claim secured by the "restored" assets would depend upon whether, as a result of marshalling, the actual assets assignable to the restoration were, or were not, relatively liquid.

Perhaps another way of expressing the reasons for rejecting the arguments of the R & I Indenture Trustee is to point out that, even assuming it were necessary to replace the previously expended rents and dividends in order to secure the R & I Mortgage in full, and even assuming that the mortgagee would have a constitutional right to such restoration, it would not necessarily be inappropriate to "trace" the expended funds to the rail operations which received them, and to look to railroad assets for their replacement. In the present context, of course, "the railroad" means essentially the proceeds of the Valuation Case, represented by B bonds, not A bonds.

A final point to be dealt with is the assertion that the Plan's allocations of A and B bonds are unfair because, in instances where mortgaged property was sold during reorganization, those mortgages are

credited with retained asset security in amounts which include the accumulated interest on the deposited sale proceeds, whereas the rentals earned by properties which have not been sold are not so credited to the respective mortgages. There is a surface appeal to this argument; if particular properties had not been sold, presumably the rent received from those properties would also have been expended in the course of the reorganization, and would not now be available to support a greater allocation of A bonds. By the same token, if some of the retained properties had been sold, and the proceeds deposited, the accumulated interest on those deposits would now be available for credit to the retained asset security of the mortgages.

■■■■ Upon further analysis, however, I am persuaded that the approach adopted by the Trustees in the Plan is fair and reasonable. In the first place, all mortgages are treated alike in this respect. Rental income which has been spent and is not now available is not included in the retained asset allocations, whereas accumulated interest on sale proceeds, which is available, is so credited. This pragmatic approach clearly reflects the realities of the situation. There is no discrimination between mortgages. Any differential impact is attributable to earlier decisions by the Trustees, made in good faith and acquiesced in by all parties, that it was in the best interests of the estate to sell certain properties while retaining others. There is ample precedent for the proposition that rental income during reorganization is properly treated like any other income from operations. *In re Philadelphia & Reading Coal & Iron Co.,* 117 F.2d 976 (3d Cir. 1941).

More fundamentally, we are dealing here with the present market value of the assets securing the mortgages. The present market value of retained real estate is based in large part upon capitalization of its earning power, but most assuredly does not include the amount of rentals heretofore produced, as such. If the properties had been sold earlier, in all probability the sale price would have been lower than the present market value. The present value of the escrowed proceeds, on the other hand, does

properly include the accumulated interest on the deposits. Sales of particular properties have been made pursuant to a business judgment that the sale was advantageous to the estate, that is, that the sale would preserve values which might otherwise be lost, either through excessive maintenance costs, threatened decline in market value, or similar considerations. Comparison between the net income produced by the real estate, and the interest which could be earned by the proceeds, was a key ingredient of these business judgments. In a very real sense, therefore, the escrowed proceeds, including accrued interest, stand in substitution for what otherwise would be the present market value of the real estate. I do not believe that the R & I Indenture Trustee, or any other secured creditor, can justly complain because, in appropriate instances, the value of assets was preserved through sale.

### iv. Interest on Beech Creek, Harlem and Big Four Bonds

The Trustees' retained asset analysis credits to the R & I Mortgage $.5 million in principal amount of matured but uncancelled second mortgage bonds of the Beech Creek Railroad. It appears to be conceded that, under New York law, matured bonds continue to bear interest at the legal rate, and that under the terms of the R & I Mortgage, interest on deposited bonds accrues to the benefit of the mortgage. The Trustees now concede, further, that pursuant to Article 7, § 9 of the R & I Mortgage Indenture, $3.839 million (principal) in bonds of the Big Four and $.78 million (principal) in bonds of the New York & Harlem Railroad Company are subject to the lien of the R & I Mortgage and should be added to the R & I retained asset credit. The R & I Indenture Trustee complains because the accrued interest on these bonds has not been included in the retained assets assigned to the R & I Mortgage.

■■■ As explained in Document J–3 in the Reorganization Library, the Trustees' analysis disregards bonds held by Penn Central, unless they are pledged as collateral

security. Of course, bonds held by others than Penn Central are calculated at their face amount plus accrued interest. In the case of pledged bonds owned by Penn Central, accrued interest is omitted. There is no unfairness in this approach, so long as all pledges (*i. e.,* mortgages and collateral trusts) are treated uniformly in this regard. As it happens, application of a uniform policy of including interest on pledged bonds would actually reduce the A bonds distributed to the public holders of R & I bonds, because of the large amount of Penn Central-owned R & I bonds which are pledged as collateral under other mortgages. Section II–G–3–d. There is no merit in this objection.

### v. Pre-bankruptcy Sales

Because of the lengthy terms of railroad mortgages and the business necessities of railroad operations, railroad mortgages usually contain provisions permitting the railroad to dispose of portions of the mortgaged property no longer needed for rail service, so long as the mortgage security is not thereby impaired. So long as the purchase price is reasonable, the railroad can generally require the mortgagee to release a particular property from the lien of the mortgage either by depositing the net sale proceeds with the mortgagee as security, or, as is more generally the case, by satisfying the mortgagee (through certification) that "additions and betterments" have been made to the mortgaged property which are of equal or greater value than the sale proceeds.

Over the years, Penn Central and many of its indenture trustees were less than punctilious in carrying out the formal requirements of such transactions. Penn Central would sell property and obtain the sale proceeds on the strength of a letter stating that releases from the mortgage would be forthcoming, and agreeing to indemnify the purchaser and/or title insurance company against loss by reason of the lien of the blanket mortgage. Days, weeks, or even months later, the necessary documentation of additions and betterments would be furnished to the indenture trustee, and the required release of mortgage would be executed and delivered. Since everyone concerned was fully aware, at least in most cases, that Penn Central was entitled to credits for additions and betterments vastly in excess of the sale proceeds, it is perhaps understandable that a certain amount of laxity crept into the proceedings.

When the bankruptcy petition was filed, it developed that Penn Central had made various sales before bankruptcy, for prices aggregating some $2.135 million, for which no releases of mortgage had yet been obtained. Penn Central had, of course, already spent the money. Many of the purchasers had already undertaken substantial improvements on the purchased real estate, assuming they had clear title. When apprised of the situation, the Penn Central Trustees sought to obtain releases from the mortgages, but without success; the Indenture Trustees contended that the mortgage default represented by the filing of the bankruptcy petition terminated their obligation to recognize additions and betterments.

One of the purchasers, the New York Urban Development Corporation, which had undertaken a large-scale housing project on the parcel it purchased from Penn Central, petitioned this Court for relief. On the basis of a finding that pre-bankruptcy additions and betterments greatly in excess of the sale price had been made to the mortgaged property as a whole by Penn Central (including, for example, the "Selkirk Yard" costing in excess of $30 million), I entered an Order directing the Indenture Trustee to execute and deliver the required releases. *In re Penn Central Transp. Co.,* 346 F.Supp. 1323 (E.D.Pa.1972). On appeal, however, this Order was vacated. The Court of Appeals held that the present value of the additions and betterments, rather than their original cost, was the appropriate standard, and that the evidence submitted at that particular hearing was not addressed to the present value issue, and was not sufficiently specific to support a possible alternative ruling based upon the invasion-of-security standards set forth in *Central R.R. of New Jersey v. Manufacturers Hanover Trust Co.,* 421 F.2d 604 (3d Cir.

1970). The matter was remanded to this Court. *In Penn Central Transp. Co.,* 468 F.2d 1222 (3d Cir. 1972). Since that time, individual problems have apparently been resolved as they may have arisen.

The Plan (Section 11.1) clears up this situation, confirming the purchasers' titles free and clear of the mortgages which should have been released before bankruptcy. The R & I Indenture Trustee now contends that its right to proceed against the properties in the hands of the purchasers, which right has been frustrated, should be reflected in the "retained asset" coverage of the R & I Mortgage. Indeed, the assertion is made that the correct measure of the value of this security interest is not merely the sale price of the land sold, but the present market value of the land and all improvements thereon.

Many, probably most, of the properties have been greatly improved by their purchasers. For example, the New York Urban Development Corporation has invested some $13 million in improvements (Doc. No. 1500), and the City of Indianapolis has added about $20 million to its property (Doc. No. 10,616). The notion that any court, state or federal, would be likely to enforce the lien of the R & I Mortgage against these improvements appears farfetched.[76]

Since equitable principles must be applied in this proceeding, and undoubtedly would also be recognized in state court foreclosure proceedings, I am satisfied that the most that could be involved here is the net sale price, plus interest. If the analysis set forth in the Trustees' Reply Brief is correct, which it appears to be, the benefit which might accrue to the R & I Mortgage (after taking prior liens into account) would be about $.75 million, plus interest. Making

the generous assumption that interest should be calculated at the rate of 8%, compounded annually, the potential credit to the R & I Mortgage would be approximately $1.31 million. Thus, the Trustees could perhaps remove this particular objection of the R & I Indenture Trustee by either crediting that additional amount to the R & I Mortgage retained assets, or by formalizing of record what is well known to all of the parties, namely, that the actual present value of the additions and betterments to the mortgaged property, not previously reflected in the certifications pursuant to the betterment accounting under the mortgage, is in excess of that sum.

The reason the Court of Appeals vacated this Court's earlier Order requiring the Indenture Trustee to release the sold parcels from the lien of the mortgage was that the record did not then establish that the mortgagee's security would not thereby be impaired. Admittedly, Section 11.1 of the Plan now achieves the same result that this Court's earlier Order would have produced, but this is now perfectly proper, since the Plan treats the mortgage as fully secured. Thus, the Plan also supplies the key ingredient—non-impairment of security—absence of which flawed this Court's earlier Order.

It is unnecessary to reach a definitive conclusion concerning an alternative line of argument advanced by the Trustees, namely, that the A–B bond allocations reflect the nature of the assets available to the mortgages as security, and that there are no assets in the estate to support a greater allocation of A bonds.[77] It should be noted, however, that the cash received from these pre-bankruptcy sales was expended before bankruptcy, in support of rail operations. A post-bankruptcy obligation to replace that cash (*i. e.,* even assuming the value of

**76.** *See* Glenn, *Mortgages* § 202 (1941).

**77.** The mortgagee's right, if any, to foreclose against the properties in the hands of their purchasers is not a claim against assets of the Debtor's estate. Presumably, if foreclosure were successfully pursued, the Penn Central estate would be liable to the purchasers or their title companies under the indemnification arrangements, but this might well be merely an unsecured general claim against the estate. Barring the exercise of the alleged foreclosure right aids the purchasers, but benefits the Debtor's estate only by protecting it against this indemnification claim. Preventing the assertion of that kind of claim does not free up any assets which can now be made available to the R & I Mortgage.

**1314**

additions and betterments could not be established) would not necessarily rank ahead of claims of other secured creditors.

 When all is said and done, however, the Plan does preclude the R & I Mortgagee from pursuing litigation against the purchasers which might have produced prompt cash settlements. That potential cash payment would have been as valuable to the mortgagee as a like amount of retained assets. I believe the fairest approach is to credit the R & I Mortgage with a further sum of $1.3 million in retained asset security.

### vi. Lien Rights of Matured Bonds

There are deposited under the R & I Mortgage $16.3 million in matured and cancelled bonds of a number of smaller railroads which were refunded through the R & I Mortgage. The mortgage purports to preserve for the benefit of the R & I Mortgage the first lien of these bonds. The Trustees apparently concede the validity of the R & I Indenture Trustee's conclusion that the property subject to the liens of the refunded bonds should be credited to the R & I Mortgage as retained assets. In their own analysis $3.9 million of the $16.3 million in matured and cancelled bonds is credited to the R & I Mortgage. The remaining $12.4 million in cancelled bonds is credited to the prior lienholder, the 014 Consolidation Mortgage. Because the Consolidation mortgage is oversecured by $25.195 million in retained assets, the R & I Mortgage will in no way benefit from having the $12.4 million credited to it because a countervailing reduction in the retained assets of the Consolidation Mortgage would be necessary and an equal amount would then be subtracted from the excess security which now passes down to the R & I Mortgage. In sum, no net change would result from acceptance of the R & I Indenture Trustee's theory.

### b. Pennsylvania Railroad General Mortgage

 The Trustees' leasehold interests in the United New Jersey Railroad & Canal Company, Philadelphia & Trenton Railroad Company, Connecting Railway Company, and the Northern Central Railway Company are subject to the lien of the Pennsylvania Railroad General Mortgage of 1915 (the PRR General). (For convenience, the four companies owning these leased lines will be referred to as the Pennsylvania lessors.) Each of the Pennsylvania lessors is a Secondary Debtor in these proceedings and under the respective Plans the mutual debts of Penn Central and the Secondary Debtors are cancelled. Girard Bank, the Indenture Trustee of the PRR General, contends that the operations of each of the Pennsylvania lessors gave rise to chargeback or operating loss claims, and that under the after-acquired property clause of the PRR General these obligations of the Pennsylvania lessors are subject to the lien of the PRR General. In pertinent part, the PRR General provides:

> Rights and things, of every kind and description, now or hereinafter appurtenant to or used for in the operation of the said demised premises of railroad and canals, and all the corporate and other rights, including trackage rights, powers, privileges and franchises now owned or hereinafter acquired, connected with or relating to the use or operation of said demised lines of railroad and canals, [are subject to this mortgage].

Girard reads "all the corporate and other rights" to include all causes of action. In my view, however, this after-acquired property clause does not apply to the chargeback claims, if any, which the Trustees may have. While it may be that causes of action under the leases themselves would be subject to the PRR General Mortgage, the chargeback claims are akin to advances in the ordinary course of business. The money lent was not subject to the PRR General's lien, and there is no reason why the obligation to repay should be subject to the lien. In any event, for the reasons stated in Section II–G–3–a–i, chargeback claims are not claims of the mortgagor under the PRR

General Mortgage but are claims of the Trustees and, therefore, are not covered by the after-acquired property clause.

Girard also makes the related contention that the proposed mutual cancellation of debts between the Penn Central and the four Pennsylvania lessors is overly generous to the Secondary Debtors. The thrust of this argument is that there are substantial chargeback claims against the Pennsylvania lessors and that the Trustees failed to bargain adequately with the Pennsylvania lessors. Girard suggests that the Court substitute for the actual compromise proposed by the Trustees what Girard believes the results would have been in arms-length bargaining: allocation of 50% of the retained assets of the Pennsylvania lessors to the lessee, Penn Central. Girard, of course, assumes that the retained assets would then become available to the PRR General. There are a number of problems with this approach.

First, since the chargeback claims, the asserted bargaining weapons of the Trustees, are claims of the estate, the benefit of any compromise similar to that suggested by Girard would flow to the estate as a whole. Second, but more importantly, there is no basis the Court is aware of for concluding that the proposed settlement is not the combined product of arms-length bargaining and the Trustees' best business judgment. Throughout these proceedings, and in particular in connection with the Plan, the Secondary Debtor Trustees and the Penn Central Trustees have represented their respective interests vigorously and have conducted their litigation and negotiations as adversaries.

Moreover, I have considered the same questions, although in a somewhat different context, in connection with the Michigan Central Collateral Trust Indenture, Section II–G–3–a–i, and have concluded that the mutual cancellation of claims between Penn Central and the Secondary Debtors is fair and equitable. Girard has presented nothing which undermines that conclusion.

Finally, we should not overlook the fact that in most instances the Secondary Debtors are releasing very substantial portions of their retained assets for use for other purposes in the Plan. The four Pennsylvania lessors, for example, are releasing $36.238 million in retained assets in excess of the cash and A bonds distributed to their respective claimants under the Plan.

Girard's final contention also implicates the after-acquired property clause, which subjects to the lien of the PRR mortgage branches of and extensions to the mortgaged rail properties, as well as those originally mortgaged. When the PRR General Mortgage was created in 1915, the PRR owned controlling stock interests in three independently constructed and operated railroads which connected with the PRR's main line. This stock, however, was not subjected to the lien of the PRR General. Later, the three companies were merged into the Pennsylvania. The question is simply whether the merger of the three lines constitutes an acquisition of branches for the purpose of the after-acquired property clause. It is apparent that if these lines had been built by the Pennsylvania, they would be covered by the after-acquired property clause. The Trustees argue that the mortgage is ambiguous as to whether or not independently constructed rail lines such as those in question are within the scope of the mortgage, and that since after-acquired property clauses are to be construed narrowly, it follows that the clause does not apply to these three lines. The failure of the parties to subject the PRR stock interests in the three lines to the lien of the mortgage tends to support this interpretation. On the other hand, if the parties had intended that the lines should never be security for the PRR General, it would have been simple enough to exclude them.

*In re Wisconsin Central Ry.*, 68 F.Supp. 320 (D.Minn.1946), relied on by both sides, provides an interesting contrast to the present situation. There the after-acquired property clause was similar to that of the PRR General, but the mortgage also provided

. . . that nothing in this indenture contained shall be construed to limit the right or power of the Railway Company, hereby expressly reserved, to own and hold, or in any manner except by use of bonds secured by this indenture, to acquire by construction, purchase, or lease, other lines of railway, branches, or extensions, or equipment or interest therein, or new or additional terminals, and to hold and to dispose of any property so acquired, and to retain the proceeds thereof free from the lien of this indenture.

*Id.* at 326. The railroad later acquired an independently constructed rail line which connected with the mortgaged lines. The Court reconciled the above-quoted limitation with the after-acquired property clause by holding that since the independently constructed line was not a branch before acquisition it was not a branch for the purposes of the after-acquired property clause. The PRR General does not contain a comparable limitation. Failure to subject the stock interests to the mortgage, while a relevant fact, is not the equivalent of a specific limitation.

The nub of the issue then comes down to whether or not the clause is ambiguous. Its ambiguity, if any, lies in the failure to specify whether the word "acquire" includes acquisition by merger. "Acquire" is a broad term which in the absence of limiting language, should be given a meaning most consistent with the terms of the mortgage as a whole. I am satisfied that the three lines in question were operated as branches after their acquisition through merger, and that since they were acquired by merger after the creation of the PRR General, the branches are within the scope of the after-acquired clause.

### c. Michigan Central Collateral Indenture Claim to Michigan Central Assets

Of the Michigan Central's 187,380 outstanding shares of stock, Penn Central owns 187,146, of which 168,143 shares are pledged under the Michigan Central Collateral Indenture. Article 3, § 5 of that Indenture provides that upon consolidation, merger with, or sale of Michigan Central to, the Debtor or its successor, the lien of the Collateral Indenture attaches to the Michigan Central's physical assets. The Collateral Indenture Trustee argues that this provision became effective upon the conveyance of Michigan Central's properties to ConRail, or will become effective upon consummation of the Plans of Reorganization. I reject both contentions.

Preliminarily, it may be observed that even if the arguments were accepted, the benefit to the Collateral Indenture would be negligible. The result of treating the Collateral Indenture as constituting a lien upon the physical assets of the Michigan Central would be to increase the retained asset coverage from 115% to 125%, thus rendering it slightly more "super secured" than it already is.[78] But this would have no effect on the treatment of the Collateral Indenture under the Plan.

It seems obvious, however, that ConRail is in no sense a successor of the Debtor, as that term is used in the Collateral Indenture. And the Plan clearly does not achieve a consolidation or merger, as those terms are used in the Indenture. Under the Plan, both Penn Central and Michigan Central emerge as reorganized companies. Moreover, consummation of the Penn Central Plan would discharge the lien of the Collateral Indenture on the Michigan Central stock, and all other claims under the

---

**78.** Under the Plan the pledged Michigan Central stock is valued at $25.195 million. If Article 3, § 5 of the Michigan Central Collateral Indenture created a lien on the Michigan Central property, that lien would be subordinate to the outstanding debt. The amount of retained assets remaining after satisfaction of the outstanding debt is $28.076 million. Of this amount, $21.856 million, the amount of the claim of the Michigan Central Collateral Indenture, would be allocated to the Michigan Central Collateral Indenture. The balance, $6.2 million, would be assigned to equity, and the stock pledged under the Michigan Central Collateral Indenture would be valued at $33.11 per share, $5.567 million for all the pledged stock. The combined retained assets available to the Michigan Central Collateral Indenture would be $27.43 million, a retained asset coverage of 125%.

Indenture. In short, there is simply no basis for concluding that the provisions of Article 3, § 5 of the Collateral Indenture became operative upon the conveyance to ConRail, or would be triggered by consummation of the Plans.

### d. New York Central 6% Collateral Trust Bonds Due 1980

The allocation of retained assets to secured obligations, for purposes of the A–B bond distribution, is complicated by the fact that the methods of financing employed by Penn Central and its predecessors seldom involved wiping the slate clean, discharging existing obligations, and starting afresh. The result is that, at the present time, Penn Central is the owner of a great many of the bonds which it is obligated to pay, and most of these are pledged as collateral security for other obligations of Penn Central.

In the typical case, the mortgage provides that Penn Central is not required to pay interest on the bonds which it holds unless such payment is mandated under the pledge indenture. And the collateral trust indentures or other pledge documents generally provide that a default triggers a right on the part of the pledgee to receive the interest, as well as the principal, of the pledged bonds. Of course, the filing of the § 77 petition, and the concomitant suspension of all payments on secured debt, constituted defaults under all of the instruments involved.

When bonds owned by Penn Central are not pledged, the bonds are not included in the calculation of the retained asset coverage and no distribution is made to Penn Central as owner of the bonds. The analysis is more complicated, however, when bonds owned by Penn Central are pledged to secure another obligation. An owner of the New York Central 6% Collateral Trust Bonds due in 1980, one of seven collateral trust indentures secured in whole, or in part, by $119 million in R & I bonds, has objected to the way the Trustees allocated the R & I's retained assets to his Collateral Indenture.

R & I bonds in the principal amount of $156 million are owned by the public, in addition to the $119 million of Penn Central-owned R & I bonds pledged under these seven collateral trust indentures. The Trustees' analysis proceeds as follows: The first step is to marshall the security for the seven collateral indentures by initially applying security other than R & I bonds. The next step is to determine the extent to which the balance of the collateral claim (the "net claim" of the collateral trust indentures) is secured by retained assets represented by the R & I bonds pledged. For that purpose, the total amount due on the R & I bonds (the "base claim" on the R & I bonds) is calculated at $333.981 million, representing the total principal amount of the outstanding bonds, plus interest on the bonds held by the public. The retained assets allocable to the R & I mortgage (approximately $98 million) provide 29.3% coverage.[79] That percentage is applied to the principal amount of the R & I bonds pledged under each collateral indenture, in order to determine the retained assets attributable to each such collateral indenture. The remaining R & I retained assets are, of course, allocated to the claims of the public holders of R & I bonds. Where this calculation renders some of the collateral indentures more than fully secured by retained assets, the excess is then marshalled among the issues not thus fully secured.

The objection is that it is inappropriate to exclude interest on the pledged bonds in calculating the allocation of retained assets to the collaterals. If interest were included, there would be significant changes in how the R & I retained assets were allocated among the collaterals *inter se* and as between the collaterals and the public holders of R & I bonds. For example, including interest on the collateral bonds would decrease the retained asset coverage of the public holders from 29.7% to 26.4%, but would increase the retained asset coverage

---

**79.** For the complete calculations, *see* note 68 *supra*.

of the New York Central 6% of 1980 from 58% to 71%.[80]

While the exclusion of interest on pledged R & I bonds appears at first blush to be an unfair discrimination against the holders of collateral trust bonds, this is not the case. Interest on the pledged bonds was not recognized prior to default, whereas interest did accrue and was paid on the publicly held R & I bonds. Thus, the Trustees' approach comports with the actual way the bonds were treated. More importantly, including interest on the pledged bonds for the purpose of computing the retained asset coverage of the collateral trust bonds would be a form of double-dipping. All collateral trusts have had interest added to their claims and they are treated as fully secured under the Plan. To include interest on the pledged R & I bonds would be, in effect, giving the collaterals preferential treatment.

Admittedly, the Trustees' solution does not represent the only possible way out of this labyrinth. But it produces a result which is at least as fair to all creditors as any other solution which might be devised.

e. Carthage & Adirondack

A further refinement of the retained asset allocation problems discussed in the preceding section is the correct treatment of bonds held, not by Penn Central itself, but by its subsidiaries. For purposes of computing the percentage of retained asset coverage of a particular mortgage, the total claim of the mortgage is the aggregate amount due on all outstanding bonds held by others than Penn Central itself (i. e., the holdings of subsidiaries are included in the total claim). The Plan does not, however, provide for any distributions in payment of bonds held by either Penn Central or its subsidiaries; all such bonds will simply be cancelled. Manufacturers Hanover Trust Company, as Indenture Trustee of the Carthage & Adirondack Mortgage, contends that the bond holdings of subsidiaries should be excluded in calculating the retained asset coverage of its mortgage. If that were done, the percentage of retained

**80.** Collateral Trust Bonds—015 Mortgage

| Mtg. | Description | | Net Claim | Claim on 015 Assets** | Underlying Security | Underlying Security Versus Net Claim | | Distribution of Excess | Total Distribution |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Deficiency | Excess | | |
| CTB | PC 6½ . | 1993 | $ 140 | $ 5,760 | $ 1,492 | | $1,352 | | $ 140 |
| CTB | NYC 6 | 1980 | 26,967† | 73,018 | 18,911 | $ 8,056 | | $ 170 | 19,081† |
| CTB | NYC 5¼ | 1980 | 248 | 1,243 | 322 | | 74 | | 248 |
| CTB | NYC 5¾ | 1980 | 685 | 2,537 | 657 | 28 | | | 661 |
| CTB | NYC 6 | 1990 | 1,117 | 5,369 | 1,391 | | 274 | | 1,117 |
| CTN | NYC 5 | 1974 | 14,012 | 40,195 | 10,410 | 3,602 | | 88 | 10,498 |
| 109 | CR&I | | 13,001 | 35,929 | 9,306 | 3,695 | | 82 | 9,388 |
| | Total | 015 | 56,170 | 164,051 | 42,489 | 15,381 | 1,700 | 344 | 41,133 |
| 015-1 | R&I A | 2013 | 125,689 | 125,689 | 32,553 | 93,136 | | 792 | 33,345 |
| 015-3 | R&I C | 2013 | 89,119 | 89,119 | 22,082 | 67,037 | | 561 | 23,643 |
| | Total 015 bonds | | 214,808 | 214,808 | 55,635 | 157,410 | | 1,353 | 56,643 |
| | Grand Total | | $270,978 | 378,859 | 98,124* | 174,679 | 1,700 | 1,697* | 98,121* |

STEP 1. To allocate retained assets first determine the percentage that total retained assets are of all claims on 015 assets (98,000/378,859 = 25.9%). The amount of 015 assets available to satisfy a claim is computed by multiplying the claim by the percentage. (E.g., NYC 6s of 1980: 25.9% of $73,018 equals $18,911 available).

STEP 2. To allocate the excess of 015 assets first determine the net claim unsatisfied by subtracting from the total net claim the net claim of collateral indentures which have excess 015 assets ($270,978-$1,505 = $269,473). Divide the excess by the net claim unsatisfied to give the percentage excess assets are of the net claim unsatisfied ($1,700/$269,473 = .63%), and multiply each unsatisfied claim by that percentage.

† Retained asset coverage of the NYC 6's of 1980: $19,081/$26,967 = 71%.

* Discrepancy due to rounding.

** Figures taken from brief of Samuel Schuckman (Doc. No. 14620).

asset coverage of that mortgage would be increased.

This objection lacks merit. The fundamental purpose of the retained asset analysis is to accord to creditors the same respective positions relative to each other that they would enjoy in the absence of a Plan. In the absence of a Plan, subsidiary-held bonds would have to be reckoned with, and it is entirely proper to take them into account in determining retained asset coverage.

In any event, the fact that the Plan makes a partial concession, by excluding subsidiary-held bonds from the distributions under the Plan, is simply not a valid reason for insisting upon further concessions. Here again, the treatment of all mortgages is uniform.

## H. CLAIMS FOR PRIORITY UNDER THE "SIX MONTHS RULE"

In some circumstances, unpaid claims stemming from a railroad's operations during the six months period before the filing of the bankruptcy petition are entitled to priority over the claims of mortgagees and other secured creditors. The "six months rule," as it has come to be known, was developed by the courts in the early days of railroad receiverships, and later refined and qualified. Because it is based entirely upon equitable considerations, and because the equities of different cases may be perceived differently by different courts, application of the rule has not always produced consistent results.

The six months rule is made applicable in proceedings under § 77 of the Bankruptcy Act by virtue of § 77(b), which provides, inter alia :

For all purposes of this section unsecured claims, which would have been entitled to priority if a receiver in equity of the property of the debtor had been appointed by a Federal court on the day of the approval of the petition, shall be entitled to such priority and the holders of such claims shall be treated as a separate class or classes of creditors . . . . .

See generally 5 Collier on Bankruptcy § 77.21, at 573 (14th ed. 1974).

In the present case, creditors holding claims in excess of $60 million seek priority

treatment under the six months rule, and it is therefore necessary to determine whether they would have been entitled to such priority if this were an equity receivership proceeding instituted on June 21, 1970.

### 1. Definition and Development of the Six Months Rule

The six months rule has been developed and analyzed in literally scores of reported cases, and has been the subject of much scholarly comment over the years. Only so much of this history as is essential to an understanding of the application of the rule in the present case will be mentioned here.

The rule was first recognized by the Supreme Court in the famous dictum in *Fosdick v. Schall*, 99 U.S. 235, 25 L.Ed. 339 (1878), where the Court expressed its concern that railroads in financial difficulties would seek to postpone mortgage foreclosure proceedings by allowing current operating expenses to go unpaid, so that the money which normally would be used to pay such operating expenses could be paid to the mortgagee. The Court reasoned that if that happened, and if the mortgagee later sought the aid of the court to achieve an orderly and beneficial foreclosure, the mortgagee would have no grounds for complaint if the court-appointed receiver used the current earnings of the railroad to pay the unpaid operating expenses. The Supreme Court stated:

In this way the daily and monthly earnings, which ordinarily should go to pay the daily and monthly expenses, are kept from those to whom in equity they belong, and used to pay the mortgage debt. The income out of which the mortgagee is to be paid is the net income obtained by deducting from the gross earnings what is required for necessary operating and managing expenses, proper equipment, and useful improvements. Every railroad mortgagee in accepting his security impliedly agrees that the current debts made in the ordinary course of business shall be paid from the current receipts before he has any claim upon the income. If for the convenience of the moment

something is taken from what may not improperly be called the current debt fund, and put into that which belongs to the mortgage creditors, it certainly is not inequitable for the court, when asked by the mortgagees to take possession of the future income and hold it for their benefit, to require as a condition of such an order that what is due from the earnings to the current debt shall be paid by the court from the future current receipts before any thing derived from that source goes to the mortgagees.

*Id.* at 252–53. The Court further stated that, even if no provision for such payment of outstanding current debts were made in the order appointing the receiver,

> if . . . it appears in the progress of the cause that bonded interest has been paid, additional equipment provided, or lasting and valuable improvements made out of earnings which ought in equity to have been employed to keep down debts for labor, supplies, and the like, it is within the power of the court to use the income of the receivership to discharge obligations which, but for the diversion of funds, would have been paid in the ordinary course of business. This, not because the creditors to whom such debts are due have in law a lien upon the mortgaged property or the income, but because, in a sense, the officers of the company are trustees of the earnings for the benefit of the different classes of creditors and the stockholders; and if they give to one class of creditors that which properly belongs to another, the court may, upon an adjustment of the accounts, so use the income which comes into its own hands as, if practicable, to restore the parties to their original equitable rights. While, ordinarily, this power is confined to the appropriation of the income of the receivership and the proceeds of moneyed assets that have been taken from the company, cases may arise where equity will require the use of the proceeds of the sale of the mortgaged property in the same way. Thus it often happens that, in the course of the administration of the cause, the court is called upon to take income which would other- wise be applied to the payment of old debts for current expenses, and use it to make permanent improvements on the fixed property, or to buy additional equipment. In this way the value of the mortgaged property is not unfrequently materially increased. . . . Under such circumstances, it is easy to see that there may sometimes be a propriety in paying back to the income from the proceeds of the sale what is thus again diverted from the current debt fund in order to increase the value of the property sold. The same may sometimes be true in respect to expenditures before the receivership. No fixed and inflexible rule can be laid down for the government of the courts in all cases. Each case will necessarily have its own peculiarities, which must to a greater or less extent influence the Chancellor when he comes to act. The power rests upon the fact, that in the administration of the affairs of the company the mortgage creditors have got possession of that which in equity belonged to the whole or a part of the general creditors. Whatever is done, therefore, must be with a view to a restoration by the mortgage creditors of that which they have thus inequitably obtained. It follows that if there has been in reality no diversion, there can be no restoration; and that the amount of restoration should be made to depend upon the amount of the diversion.

*Id.* at 253–54.

The Court thus laid down broad equitable principles for later refinement and application on a case-by-case basis. The subsequent development of the rule can be properly understood only if one recognizes that the entire law of bankruptcy was then in its infancy; that many of the claims benefitted by the rule's priority (*e. g.*, wage claims) are no longer dependent upon the rule for priority treatment; and that the rule developed in what were relatively straightforward mortgage foreclosure proceedings.

Perhaps the fundamental legal concept to be kept in mind is that, until the debtor was ousted from possession of the mortgaged property, the lien of the mortgage did not extend to the earnings of the company.

While the mortgagee's claim against income was solidified by the appointment of a receiver following default, it was still desirable to have the railroad continue functioning; and this often necessitated, as a practical matter, payment of pre-receivership operating expenses. Moreover, in many of the early cases, the mortgage being foreclosed had been created in connection with an overly optimistic program of expansion of the railroad; the completion of certain capital projects already under construction obviously benefitted the mortgage security. It is also important to bear in mind, as pointed out in the SEC Report (at 94 n.159) that there are "semantic pitfalls" in attempting a literal transposition of the language of the reported cases to the problems of today, as financial and accounting concepts have grown more sophisticated.

■ Before any right to priority under the six months rule can be established, it must appear that the obligation was incurred as an expense of current operations, in the ordinary course of business, for material or services used in the operation of the railroad; that the creditor expected to be paid out of the current operating receipts of the railroad (as distinguished from reliance upon the general credit of the railroad); and that the claim arose within six months before the filing of the petition. For purposes of the present discussion, it will be assumed that all of the claims for which six months priority is sought meet these criteria. But it must also appear that a fund exists, or should equitably be recreated, for the satisfaction of six months claims; and this aspect of the rule requires further discussion.

### 2. The "Current Debt Fund"

By definition, six months claimants have extended credit in reliance upon the current revenues of the railroad. This does not mean that anyone—and, specifically, the mortgagees—can be said to have guaranteed that current revenues will always be sufficient to pay all current operating expenses.

■ The six months creditor's claim to current revenues is superior to that of the mortgagee, but it does not extend to the "corpus" of the estate except to the extent that current revenues have been improperly diverted for the benefit of the mortgagee.

■ The six months rule, when properly applicable, gives the claims of six months creditors priority over the claims of pre-bankruptcy secured creditors; it does not grant priority over administration claims.

■ Finally, the rule is based upon equitable considerations governing what the receiver/trustee should do to achieve the proper balance between the claims of operations creditors and the claims of other creditors; and its application is therefore limited to the revenues and other assets in the possession or control of the receiver/trustee.

When the foregoing principles are kept clearly in mind, most of the confusion in the language of the reported cases, and in the briefs of the parties in these proceedings, concerning pre- and post-bankruptcy revenues, gross versus net revenues, surplus revenues, diversions and free funds, disappears.

Perhaps the most thorough discussion of the six months rule, its history and ramifications, is contained in Judge Anderson's excellent opinion in *In re N.Y., N.H., & H. R.R.*, 278 F.Supp. 592 (D.Conn.1967), aff'd, 405 F.2d 50 (2d Cir. 1968), *cert. denied*, 394 U.S. 999, 89 S.Ct. 1592, 22 L.Ed.2d 776 (1969) (*New Haven* case), in which the possible sources of payment of six months claims (*i. e.*, the "current debt fund") were summarized as follows: [81]

81. The inclusion of unmortgaged assets is based upon the decision in an early Second Circuit case, *Pennsylvania Steel Co. v. New York City Ry.*, 216 F. 458 (2d Cir. 1914), which has been followed in several other early cases. The only rationale for this inclusion seems to have been notions of "public policy," in that six months creditors contributed to the operation of the railway, whereas other unsecured creditors hindered such operations. I have great difficulty squaring this reasoning with the fundamental basis for a six months priority, namely, reliance of current operations creditors upon current revenues.

However, it is probable that the Third Circuit Court of Appeals has accepted the Second Cir-

Such a fund may arise out of one or more of the following: (a) current earnings in the sense of surplus earnings during the six months period and during the reorganization itself; (b) unmortgaged assets of the debtor; and (c) income diverted during the six months period or during the reorganization for the benefit of the mortgagees.

278 F.Supp. at 598.

■ This formulation represents a distillation of the expressions of a large number of earlier cases. The District Court Opinion in that case was affirmed on appeal, and has been referred to favorably by our own Third Circuit Court of Appeals. *See Central R.R. of New Jersey v. Manufacturers Hanover Trust Co.,* 421 F.2d 604 (3d Cir. 1970). It will therefore be adopted here.

a. Net Income rather than Gross Income

■ The six months claimants argue that the current debt fund includes all of the current income of the estate, rather than "surplus" or "net" income. In my opinion, this would be correct only to the extent that "diversions" for the benefit of mortgagees can be shown. The debts owed to six months creditors have priority over debts owing to other pre-bankruptcy creditors, which remained unpaid when the petition was filed, but six months creditors are not in a position to insist that non-operating current debts paid by the railroad before bankruptcy be refunded; moreover, the receiver/trustee is responsible only for the funds coming into his hands. Hence, the use of "surplus" income for the pre-petition six months period is clearly correct. Since the six months claims do not have priority over administration claims, and since all expenses of current operations after bankruptcy are in that category, the use of "net"

or "surplus" income for the post-petition period is also clearly correct.

b. Inclusion of Non-Rail Income

The Trustees have argued that only income produced by rail operations is to be considered. The six months claimants contend that all of the Debtor's income is to be taken into account. The existence of this controversy points up the lack of absolute consistency between the way the rule has been applied in the decided cases, and the stated reasons upon which the rule is based.

If the basis for the rule is the notion that operations creditors are entitled to share in the income which their goods and services have helped to produce, there is no logical reason for extending the priority to reach non-operational income. The *New Haven* case appears to have so held. 278 F.Supp. at 600 n. 12. But if that is the basis for the rule, there would likewise be no justification for extending the priority to "unmortgaged assets" (except to the extent of "diversions" from net income). Yet several cases, including the *New Haven* decision itself, 278 F.Supp. at 602, have held, or at least stated, that unmortgaged assets, if any, should be devoted to the payment of six months claims, before those of other pre-bankruptcy unsecured creditors.

As many courts and commentators have pointed out, it is simply impossible to reconcile the language or the holdings of all of the reported cases on the six months rule. Some of the difficulty stems from the intermingling of several discrete equitable concepts, and from the tendency to overstate the equities favoring the parties in whose favor decision is being rendered. The notion that operations creditors who contribute to the continued operation of the enterprise ought to share in the income produced

---

cuit's statement of the nature of the priority of operations claims expressed in the *Pennsylvania Steel* case. *See Central R.R. of New Jersey v. Manufacturers Hanover Trust Co.,* 421 F.2d 604, 609 n. 14 (3d Cir. 1970).

In the *New Haven* case, it was made clear that "unmortgaged assets" are indistinguishable from "cash and other current assets," since the lien of mortgages would have attached to

everything else by virtue of the after-acquired property clauses of the mortgages. The mortgage liens attach to cash and other current assets upon default, but since these items were produced by the goods and services supplied by the operations creditors, these operations claims take precedence over mortgage liens with respect to those assets.

by continued operations seems, in many of the reported decisions, to merge into the notion that operations creditors who enable the railroad to keep operating ought to receive some special recognition even though the railroad has long been, and will continue to be, a hopeless loser. The latter concept, in turn, is based upon the assumption that continuation of the "going concern," even at a loss, benefits secured creditors. Intertwined with these concepts is the theme that the operations creditors extended credit in reliance upon the current earnings of the railroad, and should be regarded as quasi-secured by that current income.

 Sorting out these various concepts, and giving consideration to each in the context of the present case, it would seem that the calculation of a current debt fund should probably include not only the revenues directly produced by rail operations, but the total net income of the Debtor to the extent that it was customarily made available for the support of rail operations, and hence could properly have been relied upon by operations creditors as a source of payment. This is, of course, intended to be limited to "earnings," not proceeds from sales of capital assets or other extraordinary items.

c. Determination as of Distribution Date

 In the *New Haven* case, it was squarely held that the relevant date for determination of a current debt fund is the date of distribution. That is, for purposes of determining the net income component of a possible current debt fund, one looks at the entire history of the railroad's operations, beginning six months before the petition was filed and extending through the end of such operations during bankruptcy. The fact that on a given day, or for a given week or month, current income may have exceeded current obligations then paid is not decisive; cash flow is not the criterion. The issue is whether there was any current income above administration expenses that should have been used for the payment of six months claims.

I accept this reasoning as essentially correct. While it is of no significance in the present case, I suggest that there may be cases in which a further refinement would be appropriate. For example, if operating income exceeded operating expenses for a considerable period after a bankruptcy petition was filed, so that the six months claims should have been paid, but thereafter the Debtor's fortunes declined, and prolonged deficit operations wiped out the previous surplus, it may be that some equitable adjustment should be made in favor of the six months claimants. But that is not our case.

It should also be emphasized that, in computing a current debt fund as of the present time, any "diversions" during the entire period must be taken into account.

d. Accounting Methods

As stated by Judge Anderson in the *New Haven* case,

The words used must be interpreted in the light of a generally recognized and accepted system of accounting. . . . While a rigid and mechanistic application of accounting terms should not be adopted to thwart the equitable consideration which the courts have afforded six months claimants, such terms, recognized and used for more than half a century, should not be so distorted, for the purpose of granting the six months creditors a recovery, that the terms no longer relate to the concepts for which they have traditionally stood and are no longer descriptive of the Railroad's financial operations. The phrase "generally accepted accounting principles" does not mean precisely the same thing in all businesses because allowances must be made as the Interstate Commerce Commission has said, 309 I.C.C. 289, 293 (1959), "for variations among different industries because of special conditions or long-established usage." As far as this present case is concerned, any difference between the Interstate Commerce Commission's prescribed system of accounting for railroads and "generally accepted accounting principles" is minor and falls within the toler-

ance which the generally accepted practice allows for the railroad industry.

278 F.Supp. at 599–600.

In affirming this decision, the Second Circuit Court of Appeals stated:

> We hold that the availability of a current expense fund under the six months rule is to be determined by generally accepted accounting practices, including those prescribed by the Interstate Commerce Commission, and that under those practices the current expense fund is to be computed by deducting operating expenses and depreciation from operating revenues.

405 F.2d at 52.

### 3. The Existence of a Current Debt Fund in the Present Case

#### a. The Earnings Component

In 1970, which includes all but 11 days of the six months period plus the first six months of bankruptcy, the Debtor experienced a deficit in net railway operating income aggregating $236,518,000. It received gross income from non-rail sources in the amount of $66,550,000 ($55,145,000 net). There was thus a deficit of total income in the sum of $169,968,000, and a deficit in income available for fixed charges in the sum of $181,373,000.[82] It seems obvious that the most relevant figure for present purposes is the latter, income available for fixed charges. It is stretching matters somewhat to include non-rail income at all; surely there is no basis for disregarding the cost of obtaining that income.

The deficits in income available for fixed charges for the succeeding years are as follows: 1971, $148,435,000; 1972, $67,311,000; 1973, $53,908,000; 1974, $53,515,000; 1975, $196,238,000; 1976 (first 3 months), $53,515,000.

The magnitude of these deficits amply demonstrates the unavailability of any net income component of a current debt fund. Further discussion in unnecessary.

I have not overlooked the point that the amounts owing to the six months claimants are included in the current expense calculations which produce the net loss for that year. But so long as the deficit in income available for fixed charges, as shown on the Schedule 300 filing, is in excess of the total amount of the six months claims, there would be no income available for the payment of six months creditors. Thus, adjusting the 1970 net loss figure to eliminate the unpaid six months claims would still leave a deficit in income available for fixed charges of approximately $120 million.

#### b. Diversions from Earnings to Benefit Secured Creditors

During the entire period, from six months before bankruptcy until April 1, 1976, Penn Central paid a total of $13,231,000 in interest, and $6,149,000 in principal, on its secured debt, for a total of $19,380,000 in direct payments for the benefit of secured creditors. During the same period, it expended $220,699,000 on capital improvements to mortgaged property, but accrued $25,854,000 in retirements (write-offs of non-depreciable property) and $544,209,000 in depreciation.

Expenditures from operating income for improvements of mortgaged assets are considered "diversions" for the benefit of secured creditors, at the expense of the six months creditors, whose claims should have been paid out of that income. Expenditures for the preservation or repair of mortgaged assets are not diversions. *St. Louis, A. & T.H. R.R. v. Cleveland, C.C. & I. Ry.*, 125 U.S. 658, 667–78, 8 S.Ct. 1011, 31 L.Ed. 832 (1888). By the same token, depreciation, which reflects the consumption of assets for the purpose of running a railroad, does not result in enhancement, and is not to be regarded as diversion. *In re N.Y., N.H. & H. R.R.; Burnham v. Bowen*, 111 U.S. 776, 781–82, 4 S.Ct. 675, 28 L.Ed. 596 (1884).

---

**82.** Unless otherwise indicated, the figures used in this section are derived from the Debtor's schedule 300 filings with the ICC. The figures are summarized in tabular form in the exhibits attached to the Trustees' Memorandum in Support of its Position Statement (Doc. No. 12994), and in attachments to the affidavit of Norman Hull, Vol. 1, p. 43.

The six months claimants argue, however, that the Trustees' method of accounting for depreciation in this context amounts to "double-dipping," since depreciation has already been deducted in computing net operating income. I am inclined to believe that this point is well taken, but the result in this instance remains the same. If the company had actually set aside cash reserves for depreciation, in the amounts shown on the annual income statements, the company could have expended that reserve to correct the physical depreciation of the mortgaged assets, and would not thereby have enhanced the mortgaged assets at the expense of the six months claimants. But if that had occurred, the properties would not now be in a depreciated condition, there would be no occasion for a further deduction in computing the capital expenditure accounts, and any further sums spent for actual improvements would constitute diversions. But the crucial factor here, in my judgment, is that taking depreciation into account only once, rather than twice, it is still evident that no diversion has occurred.

The aggregate of the deficit in income available for fixed charges for the entire period is $754,295,000. Since the unpaid six months claims (approximately $60 million) should be eliminated from the calculation of operating deficits, the correct figure for present purposes is $694,295,000. The aggregate of the depreciation already deducted in arriving at that figure is $544,209,000. Thus, disallowance of depreciation as a factor in computing net income still leaves a deficit in income available for fixed charges in the sum of $150,086,000, so there is no earnings component for a "current debt fund." And the actual expenditures for capital improvements ($220,699,000) are far less than the actual depreciation of the properties which has occurred ($544,209,000), so there has been no enhancement and no diversion.

▮ The final, and rather obvious, point to be made with respect to the claimed diversions is that even if enhancement of the value of mortgaged assets had occurred, restoration for the benefit of six months claimants could be required only if operating income of the Debtor had been used for that purpose. As noted above, I have given these claimants the benefit of the doubt, and have rejected the Trustees' not insubstantial argument that non-rail income should be excluded. The fact remains, however, that pre-bankruptcy payments on account of secured debt were made possible only by sales of assets and extensive borrowings; and that operations during bankruptcy were made possible only through additional borrowings, on Trustees certificates and under the § 215 and § 211(h) programs of the RRRA, greatly in excess of all expenditures which even arguably benefitted secured creditors. Thus, even if there had been enhancement of the properties securing the mortgages, "free funds" (*i. e.*, other than income) made the expenditures possible, and there is no basis for allowance of the priority claimed by the six months creditors.

### c. Unmortgaged Assets

In the interests of completeness, mention should be made of the absence of unmortgaged assets as a potential source of payment of the claims of six months creditors. Although, as mentioned above (*see* note 81 *supra*), there are conceptual difficulties in arriving at an acceptable rationale for giving six months claims priority with respect to unmortgaged assets of the estate, that issue need not be pursued in this case. The pervasive lien of the Government-guaranteed Trustees certificates, and of the Government's § 211(h) claims, have effectively eliminated the concept of unmortgaged assets, in the present context. Acceptance of the Government compromise does free up cash for the payment of certain personal injury claims, state and local taxes and other unpaid administration expenses, but leaves no room for payment of six months claims from that source. Moreover, absent the Government compromise, the recent decision of the Third Circuit Court of Appeals in the consolidated cases of *In re Penn Central Transp. Co., appeal docketed; In re Lehigh Valley R.R., appeal docketed,* and *In re Reading Co., appeal docketed,* 570 F.2d 1189 (3d Cir., Feb. 3,

1978), would seem to provide a further barrier precluding access of six months claims to the Debtor's cash and current assets.

Further discussion of this issue is unnecessary. Actually, no six months claimant has asserted that unmortgaged assets represent a potential source of payment of the claimed priority.

### 4. Claims for Priority Based Upon the "Necessity of Payment" Rule

Closely related to, and sometimes confused with, the "six months" rule is the "necessity of payment" doctrine, established in such cases as *Gregg v. Metropolitan Trust Co.*, 197 U.S. 183, 25 S.Ct. 415, 49 L.Ed. 717 (1905); *Miltenberger v. Logansport Ry.*, 106 U.S. 286, 1 S.Ct. 140, 27 L.Ed. 117 (1882); *In re N.Y., N.H. & H. R.R.*, 278 F.Supp. 592 (D.Conn.1967), *aff'd*, 405 F.2d 50 (2d Cir. 1968), *cert. denied*, 394 U.S. 999, 89 S.Ct. 1592, 22 L.Ed.2d 776 (1969). As summarized by Judge Hastie for the Third Circuit Court of Appeals:

> These cases permit immediate payment of claims of creditors where those creditors will not supply services or material essential to the conduct of the business until their pre-reorganization claims shall have been paid. .

*In re Penn Central Transp. Co.*, 467 F.2d 100, 102 n. 1 (3d Cir. 1972).

A group of creditors, most notably Consolidated Edison Corporation and various other electric utilities, Trailer Train, and the interline railroads, have asserted that their claims are entitled to priority under the necessity of payment doctrine.

■■■■ The two rules are related because the six months priority cannot be claimed except with respect to goods or services which were, at least in a general sense, "necessary" to the operation of the railroad. That is, all of the claimants advancing the "necessity of payment" doctrine are also claiming "six months" priori-

ty. The distinction to be observed, however, is between whether the goods and services were necessary for rail operations (one facet of the six months rule), and whether *payment* of the claim was necessary to enable the railroad to continue operating (the necessity of payment rule). If a creditor, by refusing to deal with the railroad during reorganization unless his prebankruptcy claims are paid, threatens to make continued operations impossible, then, as a matter of economic necessity, the Trustees may properly be permitted to pay such claims, even out of the corpus of the estate. By definition, the necessity of payment rule is one to be invoked by Trustees, as justification for their decision to pay these unsecured pre-bankruptcy claims. Ordinarily, then, there would be no occasion for creditors to seek priority treatment in a plan of reorganization on the basis of the necessity of payment rule; rather, creditors would invoke the rule by applying economic sanctions, which, if effective, would trigger a request by the Trustees for authority to pay out under the rule. In the absence of that kind of business judgment by the Trustees, there is no occasion for a reorganization court to invoke the necessity of payment doctrine.

■■■■ As a general proposition, therefore, the Trustees are undoubtedly correct in pointing out that the "necessity of payment" doctrine has no application to the present case, since failure to pay the claims now being considered did not interfere with the conduct of rail operations, and since the Trustees are no longer operating a railroad.[83] The "necessity" claimants assert, however, that this defense is not available in the present case for two reasons: (1) The decision of the Fourth Circuit Court of Appeals in *Southern Ry. v. Flournoy*, 301 F.2d 847 (4th Cir. 1962), and certain language in an earlier Opinion of this Court, *In re Penn Central Transp. Co.*, 328 F.Supp. 1276, 1278

---

**83.** In connection with the transfer of operating responsibilities from Penn Central to ConRail, the economic factors undergirding the necessity of payment doctrine are reflected in the § 211(h) agency arrangement, which assures payment of post-bankruptcy operations credi-

tors and thus avoids disruption of ongoing business relationships. Implicit in the § 211(h) program is the assumption that non-payment of prebankruptcy claims poses no threat to ConRail's operations.

(E.D.Pa.1971), *aff'd*, 467 F.2d 100 (3d Cir. 1972), establish that the necessity of payment rule is a rule of priority, and not of payment; and (2) they justifiably relied upon both of these cases, assumed that "necessity of payment" would be recognized as a basis for granting them priority, and therefore refrained from exerting the economic sanctions which would have triggered immediate payment of their claims in order to protect the continued operation of the railroad. The argument is that these creditors should not now be penalized because they proceeded in a civilized fashion, and did not resort to the "law of the jungle."

It is true that, if the *Flournoy* case was correctly decided and if it represents the law of this Circuit, the claims now being considered would be entitled to priority treatment. But, as was amply demonstrated by Judge Anderson in the *New Haven* case, the *Flournoy* court simply confused the "necessity of payment" rule with the "six months" rule. Its decision is contrary to the decision of the Supreme Court in *Gregg v. Metropolitan Trust Co.*, 197 U.S. 183, 25 S.Ct. 415, 49 L.Ed. 717 (1905). In any event, its decision does not represent the law of this Circuit, as set forth in *In re Penn Central Transp. Co.*, 467 F.2d 100 (3rd Cir. 1972).

It is also true that this Court's dictum in the case mentioned above (which referred to the rule as providing that "certain unsecured claims incurred in operating the railroad may be entitled to priority over secured claims, on the theory that the corpus would be unjustly enriched otherwise," 328 F.Supp. at 1278, and that "assuming the existence and applicability of this doctrine, it does not require immediate payment, but rather deals with the assignment of priorities as among claims," *id.*) represents either a thoroughly garbled statement of the "six months" rule or a partial adoption of the discredited *Flournoy* approach which impermissibly combines the two rules. This unfortunate dictum does not, however, give rise to equities favorable to these claimants. Even taking this Court's language at its face value, and assuming it had remained the last word on the subject, the creditors were told that "assuming the existence and applicability of this doctrine" they might be entitled to priority over secured claims "on the theory that the corpus would be unjustly enriched otherwise." That statement surely does not amount to a guarantee that their claims would be granted priority merely by virtue of the nature of the claim; and it remains true that these claims would be given priority if "unjust enrichment" of the corpus securing the mortgages (*i. e.*, diversions) could be shown.

More importantly, this Court's Opinion was not the last word on the subject. Whatever confusion and inaccuracy may have existed in this Court's formulation was eliminated on appeal; Judge Hastie's Opinion for the Court of Appeals clearly sets forth the correct statement of the necessity of payment doctrine. Needless to say, the Court of Appeals decision is controlling. And no creditor, having read the Court of Appeals Opinion, could be under any illusion that he need not attempt to exert economic sanctions, or that withholding such action would result in priority treatment in the Plan.

Indeed, the principal thrust of both this Court's Opinion and the Court of Appeals Opinion was to suggest the unlikelihood that any creditor could successfully insist upon payment of pre-bankruptcy claims as a condition of continuing to do business with the Debtor. This Court had directed the Trustees to pay all current utility bills during reorganization, but refused to require the Trustees to pay pre-bankruptcy claims in that category. The Court of Appeals affirmed. Similarly, in the case of the interline railroads, this Court ordered the Trustees to pay all such claims presented after bankruptcy, but declined to order payment of pre-bankruptcy claims. *In re Penn Central Transp. Co.*, 340 F.Supp. 857 (E.D.Pa.1972). The Court of Appeals affirmed (except that it concluded that certain of the pre-bankruptcy accounts involved "trust funds" belonging to the interline creditors and not to the Debtor's estate). 486 F.2d 519 (3d Cir. 1973), *cert. denied*, 415 U.S. 990, 94 S.Ct. 1588, 39 L.Ed.2d 886 (1974). The combined effect of

these decisions can properly be said to reflect the full extent to which the "necessity of payment" doctrine should be recognized in this entire proceeding; namely, that it justifies judicial mandates requiring current payment of post-bankruptcy claims of such creditors, rather than merely authorizing their payment (or, as in the case of tax claims, simply deferring them).

All else aside, the necessity of payment doctrine, by its very nature, depends for its applicability upon the economic realities of the market place, and the dominant or subservient positions of the parties. It is simply unrealistic to suggest, for example, that an electric utility such as Con Ed would even consider cutting off a customer paying it well over $1 million per month (and paying it promptly, under a Court order) merely because a single month's pre-bankruptcy bills remained unpaid. And it is obvious that the interline railroads, to whom Penn Central service was essential, were never in a position to sever relationships, and thus could never qualify under the necessity of payment rule.[84]

With respect to other suppliers, alternative sources of supply were always available to an enterprise of the size and strength of Penn Central. The possibility of invoking the necessity of payment doctrine simply did not arise.

## I. OTHER ASSERTIONS OF PRIORITY STATUS

### 1. Bank Setoff Claimants

When the reorganization petition was filed, Penn Central had substantial sums of money on deposit with numerous banks throughout the country, and also owed very substantial sums to many of those banks; these debt obligations were unsecured. Under state law, these banks had the power to obtain immediate payment of their loans by simply setting off Penn Central's deposits against the amount owed. However, Order No. 1, supplemented by specific injunctive orders of this Court, prohibited the banks

from exercising their right of setoff, thus ensuring that the deposited funds would continue to be available to the Debtor. A group of these banks (herein denominated for convenience as the "Setoff Banks") which had an aggregate of $6.97 million of Penn Central's deposits when the reorganization petition was filed, now assert that they should be treated as secured creditors for purposes of the Plan.

In rejecting challenges to the earlier injunction against setoffs, neither this Court nor the Court of Appeals, *In re Penn Central Transp. Co.,* 315 F.Supp. 1281 (E.D.Pa. 1970), *aff'd,* 453 F.2d 520 (3d Cir.), *cert. denied,* 408 U.S. 923, 92 S.Ct. 2493, 33 L.Ed.2d 334 (1972), reached the question of how the claims of such banks should be treated in the Plan. But in a later decision involving Penn Central, in reviewing a decision from another circuit which had permitted a shipper to set off claims for freight loss and damage against the Penn Central Trustees' claims for freight charges due, the Supreme Court held that the setoff should not have been allowed. *Baker v. Gold Seal Liquors,* 417 U.S. 467, 94 S.Ct. 2504, 41 L.Ed.2d 243 (1974). The Court reasoned that to permit an unsecured creditor to exercise a right of setoff would result in granting that creditor a priority over other unsecured creditors to the extent of the setoff, and that such priority would be inconsistent with the fair and equitable treatment of all creditors mandated by § 77. The Setoff Banks have now presented vigorous and scholarly arguments to the effect that the *Baker* case was either wrongly decided or would be decided differently today; and that in any event bank setoffs are unique and therefore distinguishable from the shippers setoffs involved in the *Baker* case. Notwithstanding the earnestness with which these arguments have been pressed, I find it impossible to avoid the conclusion that the Plan correctly treats the claims of the Setoff Banks as unsecured claims.

---

84. Some diversion of traffic to other, non-bankrupt, lines may have been possible, and some no doubt occurred, but the direction to pay post-bankruptcy interlines currently served to obviate this difficulty for the most part. Moreover, since all of the major Northeastern railroads were in bankruptcy, the interline railroads were not in a strong bargaining position.

■ Evaluation of the banks' arguments begins with recognition of the fact that bank deposits simply do not constitute either security in the normal legal sense of that term, or the functional equivalent of security.[85] Until the banks' right of setoff is actually exercised, the depositor may withdraw any or all of the funds, and other creditors of the depositor can reach them by levy or attachment. From the moment the reorganization petition was filed and approved, federal bankruptcy law became the source of the rights of the Debtor, and thereafter of the Trustees. The banks were prohibited from exercising their right of setoff after the petition was filed. This prevented the banks from improving their position from that of an unsecured creditors to secured creditors. Thus, the banks were treated the same as other unsecured creditors, all of whom were also prohibited from levying upon the Debtor's bank deposits. If one were to accept the banks' argument that the injunction somehow provides a basis for treating their claims as secured claims, it would seem to follow that all unsecured claims must be treated as secured, since all creditors were prohibited from attaching bank deposits.

It is asserted, however, that the claims of these banks are unique, because of the existence of "compensating balance" arrangements between Penn Central and the banks. A compensating balance arrangement is simply an agreement between the depositor and the bank to the effect that the average amount on deposit will not fall below a specified minimum balance.[86] It seems clear that the principal purpose of such arrangements is to enable the bank to be assured of its ability to use the depositor's money for investment purposes, and thus to obtain some measure of compensation for the services it provides in connection with the bank account. In addition, of course, the ability to derive benefits from the depositor's bank account may well affect the availability and terms of loans to the depositor.[87] Failure of the depositor to maintain the required minimum balance ordinarily has no more serious consequences than a request to take the account elsewhere, or to pay for the services rendered, and perhaps a less cordial attitude toward future credit applications or requests to extend existing lines of credit.[88]

The Setoff Banks now contend that a further principal purpose of the compensating balance arrangements with Penn Central was to reassure the bank as to the financial soundness of its unsecured loans to Penn Central, because of the existence of the right of setoff.

■ Even assuming these banks sought minimum balances for the specific purpose of enabling them to exercise their right of setoff, I fail to see how that alters the

---

85. A commentator cited by the Setoff Banks, although supporting the right to set off, has dealt crisply with the equivalent of the security argument.

> The analogy to 'security' is hardly convincing since the bank may not demand that deposits be made in order to create a right of setoff for fear of losing deposits as a preference under sections 60 and 68 [of the Bankruptcy Act]. Nor may the bank rely on deposits since they may be withdrawn at any time by the debtor. While superficially representing security for any debt, the debtor's commercial deposits are not a voluntary or consensual security arrangement as is understood in commercial transactions.

Justman, *Comments on the Bank's Right of Setoff Under the Proposed Bankruptcy Act of 1973*, 31 Bus. Lawyer 1607, 1612 (1976).

86. Whether the Setoff Banks' compensating balance arrangements with Penn Central were informal or "formal contractual agreements, both explicit and implicit by which the parties were bound" (Doc. No. 14175, p. 3) has been a contested point. The contest is without moment. If a binding contract existed, the only benefit would be that the Setoff Banks would have a pre-reorganization claim for damages. It is the funds which were on deposit which are in issue.

87. A recent empirical study indicates that compensating balances are sought because of the *earnings on the deposits, the favorable effect* such deposits have on the bank's reserve position, and the increased yield on the loan. Baxter & Shapiro, *Compensating Balance Requirements: The Results of a Survey*, 19 J. Finance 483 (1966).

88. The documentary evidence submitted by the Setoff Banks demonstrates the accuracy of the description in the text.

situation. The fact remains that the banks did not exercise their right of setoff before bankruptcy. An agreement between Penn Central and creditor $X$ assuring him of preferential treatment in the event of bankruptcy would plainly be null and void. An agreement between Penn Central and a bank to the effect that, in the event of bankruptcy, Penn Central would permit the bank to exercise a right of setoff after the bankruptcy petition was filed would fare no better. And if an express agreement of that kind would be unenforceable, surely the arrangements described by the Setoff Banks do not justify conferring secured status upon the banks' claims.

The banks rely in part upon a footnote to the *Baker* opinion, in which the Court referred to its earlier opinion in *Lowden v. Northwestern Nat'l Bank & Trust Co.*, 298 U.S. 160, 56 S.Ct. 696, 80 L.Ed. 1114 (1936), and stated that, "The preference sought here shows no exceptional circumstances which in equity justify the discrimination;"[89] and upon a statement in the text that "to the extent that [the setoff] is allowed, it grants a preference to the claim of one creditor over others by the happenstance that it owes freight charges that the others do not."[90] The banks argue that all setoffs which do not arise from happenstance constitute exceptional circumstances under the *Baker* decision; that their compensating balances did not arise from happenstance but were bargained for; and therefore that the Setoff Banks should be treated as secured creditors. I believe this is a misreading of the *Baker* opinion.[91] The Court's rationale was simply that unsecured creditors should all be treated alike. The Setoff Banks are unsecured creditors. Moreover, the amount actually on deposit at any given time is a happenstance; and so is the coincidence of a depositor relationship with a lending bank, at least when compared with a formal pledge of collateral or other legally effective security interest. Indeed, it seems probable that the "exceptional circumstances" language of the *Baker* Court was intended to cover, for example, a lender who was fraudulently induced by a borrower to refrain from exercising a setoff which would otherwise have been asserted before bankruptcy.

The Setoff Banks' brief contains an additional argument which is not altogether clear. The claim is that unless the Setoff Banks are treated as secured creditors, they will have been denied procedural due process. Apparently, this refers to their alleged lack of opportunity to demonstrate the nature of the agreements between Penn Central and the banks. But the procedural orders which governed the Plan proceedings were quite elaborate, and accorded full opportunity for all to present evidence and argument. In fact, the banks did file a supplementary evidentiary submission; it was not objected to, and has been considered by the Court. Due process has been accorded, but the banks' request to be treated as secured creditors must be rejected.

### 2. Interline Railroads' Equitable Lien and Setoff Theories

Closely related to the interline railroads' claims for priority under the six months and necessity of payment rules, discussed and rejected in Section II–H, are their claims for priority based upon theories of equitable lien and setoff. Earlier attempts by the interlines to obtain payment of their pre-bankruptcy claims on the basis of these theories were rejected by both this Court and the Third Circuit Court of Appeals, but neither Court has had occasion to consider the possible bearing of these arguments upon the treatment of the interlines' claims in a Plan of Reorganization. For the rea-

89. 417 U.S. at 474 n. 13, 94 S.Ct. at 2509.

90. 417 U.S. at 474, 94 S.Ct. at 2508.

91. Reliance is placed on the note accompanying § 7–204 of the bankruptcy statute proposed by the Commission on the Bankruptcy Laws of the United States. The report of the Commission was filed before *Baker* was decided. The report of the House Judiciary Committee concerning the House version of a new bankruptcy act, H.R. 8200, while supporting a procedure which would insure that when setoff is enjoined the creditor should be treated as secured, also points out that such treatment is inconsistent with *Baker*. House Judiciary Comm., H.R. Doc. No. 595, 95th Cong. 1st Sess. 183–86 (1977).

sons which follow, I have concluded that the interline railroads' claims are not entitled to priority treatment.

 The primary interline accounts are freight and passenger, car repair, overcharge and loss and damage, switching, and per diem. In the previous litigation, the following principles were established: (1) Freight and passenger account balances are trust funds, and such balances in the hands of Penn Central belong to the interline railroads and must be paid currently; (2) All other accounts are not trust funds, and the pre-bankruptcy amounts due other railroads need not be paid during reorganization; (3) Other railroads may not setoff the balances due from Penn Central (other than trust funds) against the balances owed by such railroads to Penn Central; and (4) subject to their right to set off trust fund balances due from Penn Central, the interline railroads must pay the account balances owned to Penn Central. *In re Penn Central Transp. Co.,* 340 F.Supp. 857 (E.D.Pa.1972), *aff'd in part and rev'd in part,* 486 F.2d 519 (3d Cir. 1973), *cert. denied,* 415 U.S. 990, 94 S.Ct. 1588, 39 L.Ed.2d 886 (1974) (*Trust Funds Case*). Under the Plan, pre-bankruptcy interline accounts totaling more than $20 million are treated as unsecured claims.[92]

### a. Equitable Lien

The interline railroads contend that they are entitled to an equitable lien on the Debtor's assets, subordinate only to claims of administration. This argument is pressed as an alternative more sweeping, formulation of the interlines' six months and necessity of payment theories.

It is clear that the interline accounts are not secured by any consensual security arrangement. And, as the interlines appear to concede, the traditional concepts of equitable jurisprudence which would support the imposition of an equitable lien do not apply here. Rather, the interline railroads contend that, since they were compelled by law to render services to Penn Central, their claims are unique; and that this legal compulsion justifies creation of an equitable lien. In my judgment, the premise is dubious, and the asserted conclusion is a non sequitur.

Stripped of its equitable trappings, the interlines' argument amounts to an assertion that other railroads may not be permitted to sustain any economic losses in a § 77 reorganization proceeding. There is simply no basis for such a preference in the Bankruptcy Act, and to create one by judicial fiat (if indeed that could lawfully be done) would be inequitable. The interline carriers have been the primary beneficiaries of the reorganization process. Their business relationships with Penn Central continued without interruption, and they received the benefit of the revenues thus derived. Alone among all of Penn Central's creditors, they benefitted from the continued operation of the railroad by Penn Central and, incidentally, will presumably continue to benefit from ConRail's operations. The "trust funds" portion of their pre-bankruptcy claims have been paid in cash, as have all of their post-bankruptcy claims. In stark contrast, state and local taxes remain unpaid and the preservation of the rail system so essential to the interlines' revenues has been achieved at heavy cost to the secured creditors.

 It is argued that unless this Court imposes an equitable lien for the benefit of the interline railroads, they will have been relegated to the position of "involuntary sureties of the other creditors of Penn Central." The logic of this assertion escapes me. The interlines are not sureties for anyone, nor have they suffered any detriment for the benefit of other creditors. Surely, it would be impermissible to deprive the secured creditors of the property interests represented by their security in order to provide priority treatment for the unsecured claims of the interline railroads.

Ultimately, the interlines' argument is simply that priority status must be accorded

---

**92.** The interlines' brief, Doc. No. 13783, also refers to certain remaining post-bankruptcy pre-conveyance interline balances which were still unpaid. These are all to be paid under the so-called "netting program" of Order No. 3029.

because of the "compelled business dealings imposed on the interlines." The compulsion stems from the nature of the interlines' business. Moreover, there are no unpaid obligations stemming from post-bankruptcy dealings, compelled or otherwise. The voluntariness or involuntariness of the relationship is simply irrelevant in this context.[93]

#### b. Setoff

■ Thirteen of the interline railroads earlier attempted to set off approximately $6 million in pre-bankruptcy account balances owed to them by Penn Central, against amounts they owed Penn Central. Various Orders of this Court precluded them from achieving such setoff, and they now assert that they should be treated in the Plan as secured creditors. For the reasons discussed in Section II–I–1, where the same argument made by the setoff banks was rejected, I am satisfied that these claims must be treated as unsecured. In applying the doctrine of the *Gold Seal Case,* I perceive no basis for distinguishing between the claims of the banks and those of the interline carriers.

Although not specifically argued in connection with the setoff issue, I have considered whether the allegedly compulsory nature of the business relationship between the Debtor and the interlines has any bearing on the setoff question, and have concluded that it does not.

#### c. Per Diem Accounts

The claims of the interline railroads include approximately $8.4 million owed by Penn Central for use of rail cars belonging to other railroads. In the *Trust Funds Case,* the Third Circuit Court of Appeals affirmed this Court's holding that per diem accounts were not trust funds and that pre-bankruptcy claims in that category need not be paid immediately. Later, however, the Court of Appeals of the Seventh Circuit held that although per diem accounts were not trust funds, pre-bankruptcy balances in that category may not be

deferred during reorganization, but must be paid currently. *Chicago, R. I. & Pac. R.R.,* 537 F.2d 906 (7th Cir. 1976), *cert. denied,* 429 U.S. 1092, 97 S.Ct. 1102, 51 L.Ed.2d 537 (1977). That decision was based primarily upon an argument which had not been raised in the *Trust Funds Case,* namely, that an order of the Interstate Commerce Commission requiring prompt payment of per diem accounts was binding upon railroads in reorganization, by virtue of § 77(c)(2) of the Bankruptcy Act. The interlines now ask this Court to follow the *Rock Island* holding to the extent of according some form of priority to their per diem claims.

■ Strict application of *res judicata* and law of the case principles would seem to preclude reconsideration of this matter, but the equitable nature of a reorganization proceeding counsels a more flexible approach, and I shall therefore consider the issue on its merits. Unfortunately for the interlines' position, however, the Third Circuit Court of Appeals has recently rejected the very same arguments which carried the day in the *Rock Island* case. *In re Penn Central Transp. Co.,* 553 F.2d 12 (3d Cir. 1977) *(Per Diem Case).* It follows that the per diem claims cannot be accorded any form of priority.

The *Per Diem Case* presented the issue of how interline account balances outstanding on the date of conveyance of the Debtor's rail properties to ConRail should be treated. Although Congress had provided, in § 211(h) of the RRRA, a mechanism for funding Penn Central's pre-conveyance payables, the cash actually available for that purpose immediately after the conveyance was quite limited. The question was, which claims should be paid first. I directed immediate payment of the "trust fund" portion of the interline accounts, but notwithstanding the arguments made by the ICC in support of immediate payment of per diem accounts in compliance with its orders, I declined to require immediate payment of per diems, and the Third Circuit Court of

---

**93.** Indeed, the only significance of the alleged compulsion would seem to be that it renders

the necessity of payment rule totally inapplicable.

Appeals affirmed. The Court of Appeals held: (1) The *Trust Funds Case* did decide that per diem claimants "are in the same position as other unpaid suppliers," and the failure of the interline carriers to call attention to the ICC's per diem order in that litigation did not impair the continued validity of the *Trust Funds Case* holding; (2) in any event, § 601(b)(4) of the RRRA rendered the ICC per diem order irrelevant to the issues before the Court; and (3) to the extent that there was conflict between § 77 of the Bankruptcy Act and the ICC per diem order "with respect to the time, mode and amount of per diem payments[94]," the conflict must be resolved against the ICC and the interline railroads. The Court concluded its Opinion with the following language:[95]

> We have carefully considered the contentions raised on this appeal. Far from eroding our confidence in the *Trust Funds Case,* they reinforce our view that the case was correctly decided and that it controls this appeal. We cannot distinguish the *Trust Funds Case;* nor would we be inclined to re-examine it if that were in our power which, of course, it is not. A panel of this Court cannot overrule a decision of the court en banc, and, as we have noted, the *Trust Funds Case* was decided by the court en banc.

The *Per Diem Case* is controlling, and requires rejection of the interlines' claim for priority treatment of per diems.[96]

Moreover, if the issue were still open in this Circuit, I should decline to adopt the *Rock Island* court's choice among the conflicting policy interests at stake here.[97] The principal basis for that decision was the court's belief that failure to accord priority to per diem claims could result in the interline railroads subsidizing the car rentals of § 77 debtors. While this may be true to a limited extent, to accord decisive weight to that factor is to treat the entire question as merely a matter of arbitrating private arrangements between the railroads, and does not give proper weight to the interests of other claimants and the public. It simply creates a preference for railroads over all other creditors, for no other reason than that they are railroads.

Whenever a railroad petitions for reorganization under § 77, there is concern lest other railroads dependent upon the Debtor for sustenance may also be forced into reorganization. And there is an undeniable public interest in avoiding this "domino effect." But in my judgment, that problem is best addressed on an *ad hoc* basis, within the framework of the necessity of payment doctrine, rather than by judicial creation of a blanket priority rule which has not been sanctioned by Congress.[98] In any event, it is clear that the "domino" argument is irrelevant to the treatment of claims in a plan of reorganization; that argument relates to the actions to be taken during the early stages of the reorganization proceeding.[99]

A railroad does not petition for reorganization under § 77 of the Bankruptcy Act if it is able to pay its bills. Unless "breathing

---

94. 553 F.2d 12, 16.

95. 553 F.2d 12, 16–17.

96. The interlines have carefully selected a few sentences of the Third Circuit's opinion and developed an argument to the effect that the *Per Diem Case* adopts the Seventh Circuit's approach. Reading the opinion as a whole, however, it is not possible to accept the interlines' position.

97. If the Seventh Circuit Court of Appeals' approach is correct, all that need be done to insulate railroads from all consequences of § 77 proceedings is for the ICC to promulgate an order incorporating the American Association of Railroads' Rules relating to the payment of interline accounts. Such a result is simply inconsistent with § 77. If the railroads of the

nation are to be insulated, it is Congress which should make that decision.

Indeed, the Congress is in the process of considering this question. Compare § 1164 of H.R. 8200 (95th Cong. 1st Sess.) with § 1169(a) of S.2266 (95th Cong. 1st Sess.).

98. *See, e. g., In re Penn Central Transp. Co.,* 325 F.Supp. 294 (E.D.Pa.1970).

99. Needless to say, the asserted "domino effect" is not limited to other railroads. As the experience of this case demonstrates, the impact of Penn Central's filing for reorganization was felt most harshly by Penn Central's nonrailroad suppliers, particularly the smaller firms, many of which were forced into, or to the brink of, bankruptcy.

room" can be provided by holding creditors at bay for a reasonable period, reorganization is impossible. A blanket rule immunizing interline accounts from deferral places a powerful weapon in the hands of the interline carriers, the Debtor's competitors, enabling them virtually to control the Debtor's fate. I respectfully suggest that the *Trust Funds Case* has gone about as far in that direction as can be tolerated if § 77 of the Bankruptcy Act is to achieve its laudable goals.[100]

The interline railroads also assert that failure to accord per diem claims priority would be contrary to public policy, in that it would inhibit the growth of the rail car fleet of the nation's railroads. There is no evidence that the original rulings in this case, in 1972, had any such effect. Moreover, the traditional view has been that a principal purpose of the reorganization process is to stabilize the economic environment and create a climate which will encourage private investment in railroad enterprises. Promoting per diem accounts over the liens of secured creditors would have precisely the opposite effect.[101]

### 3. *Freight Loss or Damage Claims*

▇ When goods are lost or damaged in transit, the liability of the carrier to the shipper is virtually absolute. The shipper may have recourse against any of the carriers involved in the shipment, without being required to prove fault. When a carrier pays such a claim, it has a right (a) to recover from the offending carrier the full amount of the claim which it has paid, if it can show that the loss or damage occurred while the goods were in the control of that carrier; or (b) if the circumstances do not permit a determination as to which carrier had control of the goods when the loss or damage occurred, to recover a pro rata portion of the amount expended from the other carriers involved in the shipment. Rules of the Association of American Railroads establish the formulae to be applied in determining the pro rata share of each of several carriers involved in a shipment, as well as the procedures to be followed in asserting and processing such claims.[102]

For present purposes, the significant features of the AAR rules and arrangements are these: (1) The shipper may assert the claim against any of the carriers involved, and may alter its decision as to which carrier to pursue, so long as the claim has not been reduced to judgment; but once the shipper has obtained a judgment against a particular carrier, he may not thereafter seek recovery from any of the other carriers. (2) A carrier's right to obtain indemnity or contribution from one or more of the other carriers involved does not arise until the carrier has paid the claim of the shipper. And (3) all claims for indemnity or contribution among the carriers are netted out and settled in the normal, ongoing process of settling interline accounts.

In the normal course of railroad operations, the task of investigating claims for freight loss and damage, both to determine the merit of the claim itself, and to determine whether or not responsibility of a particular carrier can be fixed, often takes many months, or even years; and the paperwork involved in the interline settlement process can also be time consuming. Thus,

---

**100.** Even if the Third Circuit Court of Appeals were to reverse its position and hold that per diem accounts should be paid in § 77 proceedings, how that new rule should be applied in pending § 77 proceedings is uncertain. It would be necessary to carefully consider the rights of all creditors, as well as the implications of reliance by this Court and the parties on the *Trust Funds Case.*

**101.** If the Court of Appeals had mandated immediate compliance with its trust fund decision, Penn Central's rail operations would have come to a halt. If the trust funds doctrine had been the law of this Circuit when the petition

was filed, a similar crisis might well have occurred, unless, of course, the officials of the company had foreseen the impact of the doctrine and filed the petition sooner. Any doctrine which discourages procrastination in filing a petition which must inevitably be filed is undoubtedly beneficial; but the history of railroad reorganizations in this country provides little basis for optimism that the doctrine will have that effect.

**102.** *See* Appendix to *In re Penn Central Transp. Co. (Interline Balances),* 340 F.Supp. 857 (E.D. Pa.1972), *aff'd in part and rev'd in part,* 486 F.2d 519 (3d Cir. 1973).

the actual exchange of funds between carriers bears little or no temporal relationship to the assertion of the claim by the shipper, or even to the initial payment to the shipper.

Because of the nature of interline accounting, the distinction between pre-bankruptcy and post-bankruptcy claims in this context is essentially arbitrary. Interline settlements first presented for payment after June 21, 1970, have been treated as post-bankruptcy claims, and have been paid on a current basis.[103] Interline claims presented before bankruptcy, and remaining unpaid on the date the petition was filed, are treated as pre-bankruptcy obligations. However, to the extent that, under the ruling in *In re Penn Central Transp. Co.*, 477 F.2d 841 (3d Cir.), *probable jurisd. noted, United States Steel Corp. v. Penn Central Transp. Co.*, 414 U.S. 885, 94 S.Ct. 231, 38 L.Ed.2d 137, *cert. denied*, 414 U.S. 923, 94 S.Ct. 219, 38 L.Ed.2d 157 (1973), *aff'g and rem'g*, 339 F.Supp. 603 (E.D.Pa. 1972), a trust relationship arose (*e. g.*, freight charges), these claims, too, have been paid.

In short, the pre-bankruptcy interline claims remaining open for disposition in the Plan of Reorganization are those claims which were presented before bankruptcy, and in which only a normal debtor-creditor relationship existed. Claims for freight loss and damage are in this category.

When the bankruptcy petition was filed, most, if not all, of the shippers who had claims for freight loss and damage which could have been asserted against either Penn Central or some other carrier, abandoned their claims against Penn Central and asserted them against other, non-bankrupt, carriers. Penn Central's obligations with respect to such claims are reflected in the post-bankruptcy program of interline settlements. Thus, the only shippers' claims for pre-bankruptcy freight loss and damage which remain to be disposed of

under the Plan are those in which Penn Central was the only carrier involved in the shipment, or in which the claim against Penn Central had already been reduced to judgment. The Plan classifies these claims as within Class M, general unsecured.

The claims in question undoubtedly arose before bankruptcy, and undoubtedly are unsecured. Indeed, the claims arising from shipments where Penn Central was the only carrier involved do not differ in any material respect from typical unsecured pre-bankruptcy claims. But the claims arising from shipments in which other carriers were also involved have a unique attribute: When these claims are "paid" by the distributions contemplated in the Plan, Penn Central may be able to obtain full or partial reimbursement from other carriers. The Trustees are undoubtedly correct in their contention that any sums thus recovered would not constitute trust funds under the Court of Appeals' Opinion cited above, or on any other basis; nevertheless, the question remains whether the distributions contemplated in the Plan give proper recognition to this unique characteristic of the claims.

The first point to be noted is that this possibility of a future subrogation [104] right does not enhance the "value" of the shipper's claim entitled to treatment in the Plan. At the present time, and on the consummation date, the "value" of each such claim is the same as any other unsecured claim of a general creditor. Thus, for purposes of the absolute priority rule, it is appropriate to rank these claims in Class M, without distinction.

The circumstances which may be said to give rise to equitable considerations favorable to such claimants will not arise until after the consummation date, perhaps long after that date. If the Trustees thereafter pursue a claim for reimbursement from other railroads, and *if* responsibility for the loss can be fixed on some other railroad, or

---

**103.** Post-bankruptcy interline claims remaining unpaid on the date of conveyance of the railroad to ConRail, April 1, 1976, after some initial confusion and uncertainty, have been, and are being, taken care of through the ConRail Agency Agreement and the § 211(h) program.

**104.** The term "subrogation" is not technically correct, but is a useful shorthand description of the indemnity/contribution rights under the AAR Rules.

cannot be fixed at all, some benefits may then accrue to the estate. But the shippers have no right to require the Trustees (or the reorganized company) to pursue subrogation; the right of subrogation does not arise until the shipper's claim is discharged under the Plan; and it is impossible to ascertain at this juncture just which claims may give rise to subrogation rights, or in what amount.

Notwithstanding these uncertainties, and the impossibility of attributing a present value to the estate of whatever subrogation rights may arise, it might be possible to require, as an adjunct to the consummation process, that the net proceeds of any such subrogation recoveries should somehow be utilized so as to expedite or enhance the ability of the affected shippers to obtain cash payment under the Plan. That is, cash later received by the reorganized company from other railroads might be used to underwrite repurchase of, or additions to, the securities distributed to these shippers.

Unfortunately, however, the practical obstacles to any such arrangement appear formidable. The reorganized company will not receive cash from other railroads, and will not even be managing the subrogation process. All such matters are a part of the agency arrangement between the Trustees and ConRail. It is not at all clear that the detailed accounting and tracing which would be required to implement any such adjustments would be compatible with the terms of the agency agreement.

The most that can be said, as a practical matter, is that after claims of this type are discharged under the Plan, ConRail may obtain subrogation recoveries which will have the effect of slightly reducing the total amount of the Government's § 211(h) claims. Given the magnitude of the § 211(h) claims, I believe that, in the context of this Reorganization Plan, the impact of that speculative reduction can properly be regarded *de minimis.*

■ Moreover, since there could be no Reorganization Plan at all except for the Government's willingness to defer its § 211(h) claims, I perceive no lack of fairness in declining to pursue this matter fur-

ther. The claims of these shippers are properly classified and fairly treated under the Plan.

### 4. Priority of the United States under Revised Statutes 3466

Two aspects of the Plan's treatment of the Government's claims against the Debtor are in dispute. One is a long-pending dispute involving alleged income tax deficiencies, including interest, in excess of $50 million, going back as far as 1954. Section 7 of the Plan provides that when this tax liability is resolved, any amount due the Government will be satisfied in B notes or assumed by the reorganized company. The Government contends that R.S. 3466 requires that such tax claims be paid in cash. The other dispute involves a claim of the United States for approximately $2 million in pre-bankruptcy unsecured obligations. Unless this claim is within R.S. 3466, it will be treated as an unsecured claim, but if R.S. 3466 does apply, the claim will be within Class L and satisfied with B notes. The Government asserts that R.S. 3466 does apply to its pre-bankruptcy claims but acknowledges that although such claims should ordinarily be paid in cash, B notes are acceptable.

#### a. Pre-bankruptcy Claims

R.S. 3466 provides as follows:

Whenever any person indebted to the United States is insolvent, or whenever the estate of any deceased debtor, in the hands of the executors or administrators, is insufficient to pay all the debts due from the deceased, the debts due to the United States shall be first satisfied; and the priority hereby established shall extend as well to cases in which a debtor, not having sufficient property to pay all his debts, makes a voluntary assignment thereof, or in which the estate and effects of an absconding, concealed, or absent debtor are attached by process of law, as to cases in which an act of bankruptcy is committed.

The essential question dividing the parties is whether or not the commission of an act

of bankruptcy triggers the application of R.S. 3466. Penn Central's filing of a § 77 petition when it was unable to meet its debts as they matured constitutes the fifth act of bankruptcy. However, that does not mean that Penn Central was then or is now insolvent.

The controlling case is *United States v. Oklahoma,* 261 U.S. 253, 43 S.Ct. 295, 67 L.Ed. 638 (1923). The Government concedes that in that case the Court specifically stated that R.S. 3466 applied only in instances in which a debtor was insolvent in the bankruptcy sense, *i. e.,* its liabilities exceeded its assets. Indeed, the Court held that the United States' allegation that a bank was insolvent under state law was inadequate on its face because state law defined "insolvency" as the failure to be able to meet debts as they accrue. The Court went on, however, to examine whether or not the Government had alleged adequate facts to constitute the commission of what was then the fourth act of bankruptcy, the voluntary relinquishment of assets to a receiver or trustee. At that time, the fourth act of bankruptcy was committed only when a debtor's assets were voluntarily conveyed to a receiver or a trustee when the Debtor was also insolvent in the bankruptcy sense. The Court concluded that the Government had not pleaded adequate facts to constitute the fourth act of bankruptcy because the bank had been involuntarily placed in receivership by state banking commissioner. The important point, however, is that under the bankruptcy law as it was then written, the act of bankruptcy which the Court inquired into required that the debtor be insolvent in the bankruptcy sense.

Under the present version of the Bankruptcy Act an act of bankruptcy is committed by the filing of a § 77 petition by a debtor which is insolvent in the bankruptcy sense or unable to meet its debts as they mature. The Government therefore argues that Penn Central's § 77 petition brought R.S. 3466 into play. *United States v. Oklahoma* did not determine the issue now before this Court because the act of bankrupt-

cy there considered did require that the debtor be insolvent in the bankruptcy sense.

R.S. 3466 has been the subject of much debate for many years. The case law is quite extensive, but to some extent inconclusive. With respect to the issue under discussion, the Government has not cited any case which is controlling. As pointed out above, *United States v. Oklahoma* is not conclusive; indeed, there is ample ground to argue that that case points to a result exactly opposite to that sought by the Government.

The complete implications and policy ramifications of R.S. 3466 are discussed in detail in Plum, *The Federal Priority in Insolvency: Proposals for Reform,* 70 Mich. L.Rev. 3 (1970). The governing law is summarized as follows: [105]

> Although the first clause of § 3466 appears to give the Government priority 'whenever any person indebted to the United States is insolvent,' the Supreme Court, viewing the provision as a whole, has determined that, except in the case of a decedent's estate, something more than insolvency is required. The insolvency of a living debtor must be manifested by (1) 'a voluntary assignment' made by one not having sufficient property to pay his debts, (2) the attachment of the estate and effects of an absconding, concealed, or absent debtor, or (3) the commission of an act of bankruptcy (even though not followed by a bankruptcy proceeding).

I subscribe to the view that R.S. 3466 is applicable only when the debtor is insolvent in the bankruptcy sense and one of the additional events specified in the statute occur, including an act of bankruptcy.

The remaining question is whether the Debtor is insolvent in the bankruptcy sense. No one knows the answer to that question; the answer will be revealed at the conclusion of the Valuation Case. The problem then becomes one of burden of proof. The Government suggests that this problem should be solved in the unique circumstances of this case by adopting a compromise

**105.** 70 Mich.L.Rev. 3, 12–13 (1970).

solution; namely, that in lieu of satisfaction of its asserted unsecured claims in cash the Government should receive B notes. If the Trustees had proposed such a compromise, it might well have been approved. However, they have steadfastly refused to compromise the Government's claim on that basis.[106]

There is support for the proposition that when a solvent debtor files a reorganization petition R.S. 3466 may apply if at the time of distribution the debtor is insolvent. *Hatch v. Morosco Holding Co.,* 61 F.2d 944 (2d Cir. 1932), *cert. denied,* 288 U.S. 613, 53 S.Ct. 404, 77 L.Ed. 986 (1933). That suggestion, while not easily squared with the language of the statute, does make sense, but the issue has never been decided squarely by the Supreme Court. There is a special difficulty in this case in deciding whether or not insolvency must exist at the time the petition was filed or at the time of distribution. At the time of distribution whether or not the Debtor is insolvent will still be unknown. Concededly, the issue is a difficult one, but ultimately the severance of the Debtor's estate into retained and conveyed assets and the resultant lack of information concerning the Debtor's solvency is a condition not within the control of the Trustees or any of the parties interested in the Penn Central estate. In such unique circumstances, I am persuaded that the appropriate solution is to hold that the Government is not entitled to priority under R.S. 3466.

### b. Tax Claims

For some time now the Trustees and the United States have been attempting to arrive at a settlement of the income tax claims. There is now under review, by the various governmental agencies involved, a settlement proposal tendered by the Trustees. Counsel for the United States has informed the Court that the proposals are "within a reasonable range of settlement." The settlement proposal involves payment of modest amounts of cash, B notes, the release of certain refund claims, and the

possibility of reducing the Debtor's accumulated net operating loss carry-forwards. Consummation of this settlement or any similar arrangement would not have any effect on the feasibility of the Plan.

Because the pending settlement proposal specifies the manner of satisfaction of the Government's claim, consummation of the proposal would obviate the need to decide the validity of the Government's objections to the Plan. Of course, one of their objections, the failure to recognize their priority under R.S. 3466, has been disposed of adversely to the Government above. In addition, § 77(e) contains a special procedure for handling Government tax claims. A § 77 plan · which provides for payment of the Government tax claim in an amount less than the established tax obligation, may not be confirmed unless there is actual acceptance of the plan by the President or his delegate or the President fails to act within 90 days of receipt of the plan. Hence, at confirmation the United States will be free to argue that B notes constitute payment of a "lesser amount" of its tax claim.

Therefore, the following possibilities exist: The tax claim settlement proposal will be accepted by the United States and the matter will be at an end if this Court approves the settlement. If no settlement is reached, it will be necessary to liquidate the claim before this Court. At the time of confirmation, the United States will be able to assess the situation and determine whether or not B notes are satisfactory to it and if not, to reject the Plan as it pertains to their tax claims. In that event, there may or may not be an issue concerning whether or not the rejection is valid under § 77(e). Perhaps at that juncture the Trustees would choose to provide an alternate method of satisfaction. The point simply is that § 77(e) contemplates a procedure which takes place at confirmation rather than at approval.

---

**106.** It may be permissible to require the Trustees to incorporate in the Plan "compromise" proposals they are unwilling to accept (see Section II–C); but in view of their fiduciary obligations to all concerned, I prefer not to do so.

## J. CLASS G CLAIMANTS

Administration claims, other than those of the United States, taxing authorities, and persons entitled to compensation or reimbursement for expenses under § 77(c)(2) or (c)(12) are Class G administration claims. For the most part, the claims which may fall within Class G are either contingent or disputed by the Trustees. One such dispute will be resolved if this Court approves a recently proposed settlement between Amtrak and the Trustees. ConRail has also asserted a number of claims in litigation, which if proven to be valid, will be treated as Class G claims.

Under the Plan, Class G claimants are to receive C–2 notes. These notes bear interest at 8% compounded annually and mature on December 31, 1987. C–2 notes and the tax authorities' C–1 notes have a claim to the proceeds of the Valuation Case subordinate only to the B notes distributed to the United States. The interest of the C–1 and C–2 notes is to be satisfied first, then the principal. If any interest or principal is not paid, the remaining portion of the C–1 and C–2 notes will be discharged.

### 1. Amtrak

National Rail Passenger Corporation ("Amtrak") has asserted various claims against the Debtor's estate, none of which has yet been liquidated. These claims include miscellaneous accounting claims under the operating arrangements between Amtrak and Penn Central, claims that Penn Central has an obligation to rebuild all of the highway bridges over the Northeast Corridor, and claims for alleged pre-conveyance breaches of Penn Central's contract obligations to maintain its tracks for Amtrak's benefit. The Trustees have acknowledged some potential liability on the accounting claims, but have vigorously contested the validity of the claims in the remaining two categories, and have asserted that any such obligations would be more

that offset by the amounts due and owing from Amtrak to Penn Central when the final compensation arrangements between the two are established by the Interstate Commerce Commission pursuant to the Amtrak statute. 45 U.S.C. § 562.

Irrespective of the merit or lack of merit in any of the claims asserted by Amtrak, the Court must be satisfied that the Plan provisions are adequate to accommodate, in a fair and equitable manner, whatever liability may be established; and that the feasibility of the Plan would not be undermined by even the most adverse likely outcome.

Amtrak did not participate in the Plan hearings, except to the extent of filing a brief written objection to the Plan. Accordingly, so that this Court might be further enlightened as to the nature and amount of Amtrak's claims, and perhaps even resolve some of them on their merits, a further hearing to explore the Amtrak situation was held on December 9, 1977.[107] Although Amtrak was not in a position to present evidence in support of any of its claims, and could provide no more than very rough estimates of the total amounts claimed in each category, some elucidation of Amtrak's legal theories was provided, and the Court was placed in a somewhat better position to assess the fairness and feasibility of the Plan provisions pertinent to Amtrak's claims. Shortly thereafter, however, the Court was advised that the parties were pursuing a possible amicable resolution of all of their disputes, and that settlement seemed imminent. On February 24, 1978, a comprehensive settlement agreement was presented to the Court for approval. Service of the proposed settlement agreement is being made upon all participants in the Plan proceedings, and a hearing has been scheduled for April 7, 1978.

Under the proposed settlement, all of Amtrak's claims here pertinent would be

---

**107.** The hearing also embraced the issues presented by the Third Circuit Court of Appeals remand of one aspect of the track maintenance controversy, *In re Penn Central Transp. Co.*, 560 F.2d 169 (3d Cir. 1977), *vacating in part and aff'g in part*, 422 F.Supp. 67 (E.D.Pa.

1976), including its seeming direction to this Court to decide the post-conveyance maintenance liabilities of ConRail; substantial jurisdictional questions were therefore involved, in view of the exclusive jurisdiction of the Special Court under the RRRA.

liquidated in the aggregate amount of $40 million, and would be discharged by the payment of $15 million in cash over a three-year period, and the issuance of $25 million in C–2 notes. However, since Penn Central will cancel receivables due from Amtrak of approximately $6 million (which will correspondingly increase the estimated Section 211(h) claims), and will be required to pay $2 million to other parties, the total effect of the settlement will be $48 million. I express no view whatever as to the reasonableness of the proposed settlement, nor as to the likelihood of its being approved or disapproved. But since the function of the Court in the approval proceedings will be to determine whether the settlement is in the best interests of the Debtor's estate, it is appropriate for present purposes to assume that the claims of Amtrak will impose no greater burdens upon the estate than those embodied in the proposed settlement. That is, it is reasonable to suppose that the settlement will be approved unless the Court is convinced that it is unduly generous to Amtrak. It is therefore sufficient for present purposes to note that the terms of the proposed settlement can be carried out without doing violence to the Plan as submitted, and that no other interested party would have cause for complaint by reason of this treatment of Amtrak's claims.

### 2. ConRail

Penn Central acquired most of its rail equipment by conditional sale, lease, equipment trust, or some other form of vendor or third-party financing. Pursuant to § 303(b)(3) of the RRRA, the Trustees assigned their interests under these financing agreements to ConRail. There is now pending in the Special Court litigation between ConRail and the Trustees in which ConRail contends that after conveyance it made about $39.9 million in equipment payments which were attributable to the pre-conveyance period and that under § 303(b)(3) the Trustees are liable to ConRail in that amount. ConRail has also asserted in that litigation a claim for about $14.7 million allegedly arising from the defective condition of certain conveyed equipment. The Special Court has denied the Trustees' motion to dismiss on jurisdictional grounds, but the case has not proceeded on the merits. The only issue before this Court is whether whatever claim ConRail may eventually establish before the Special Court may properly be satisfied in C–2 notes.

If it should become necessary to issue $65 million in C–2 notes (e. g., $25 million to Amtrak and $40 million to ConRail), the interest on C–2 notes would be paid if the Valuation Case recovery in 1976 dollars is $326 million, and the principal would be paid if the recovery is $406 million. ConRail has not asserted that its treatment as a Class G creditor is unfair because the Valuation Case recovery will be less than $404 million, but rather that deferral of its claim is improper under § 77 and § 303(b)(3) of the RRRA.

Within the framework of § 77 and this Plan, there is no basis for treating ConRail better than other administration claimants. Neither the tax claimants nor the United States is paid fully in cash. It would indeed be anomalous if the entity which benefitted from the transfer of the Debtor's rail assets and the valuation standard of the RRRA were itself to be exempted from the consequence of the severance of the Debtor's estate into retained and conveyed assets and the delay in the recovery of the value of the conveyed assets.

If ConRail is entitled to payment in cash, all administration claimants would be entitled to the same treatment. In that event, it would be necessary to determine whether the very large claims of the United States and the tax authorities have priority over ConRail's claim. If they do, ConRail would have to wait until cash became available. That wait would be prolonged by litigation over the availability of escrow funds to satisfy administration claims and the allocation of administration claims among secured creditors. This is a familiar line of analysis. By and large the arguments made by ConRail for cash payment are the same as those unsuccessfully raised by the taxing authorities.

▪ It is interesting to analyze ConRail's position as that of the subrogee of the

equipment financier whose obligation was paid by ConRail. The equipment financier would ordinarily have to look to his collateral before participating under the Plan. In a very real sense, that is precisely the position in which the Plan places ConRail. C–2 notes do not mature until the conclusion of the Valuation Case, but the proceeds of the Valuation Case are, in effect, a statutory substitute for the equipment financier's collateral. The treatment provided for ConRail in the Plan is fair and equitable.

ConRail argues that no matter what result is reached under § 77, § 303(b)(3) of the RRRA supersedes § 77 and mandates payment of its claims in cash. That section provides in pertinent part:

If [any equipment obligations] (accrued prior to the date of conveyance) are paid by or on behalf of any person or entity other than the assignor [Penn Central], such person or entity shall have a claim to direct reimbursement, as a current expense of administration, from such assignor together with interest on the amount so paid.

"Reimbursement" is argued to mean reimbursement in cash. Unfortunately, no legislative history has been cited which either supports or negates ConRail's interpretation. But ConRail seeks to support its position with the following observation:

The phrase 'direct reimbursement' is also utilized in Section 504(e) and 504(g) of the Rail Act where ConRail is given a claim to direct reimbursement against United States Railway Association ('USRA') in the form of a Section 211(h) loan after ConRail's assumption in payment of certain defined employee-related obligations. In that context, ConRail has always sought and received from USRA cash repayment.

USRA's interpretation of subsections (e) and (g) of § 504 is not quite binding authority concerning the proper interpretation of § 303(b)(3). Moreover, the differences between § 303(b)(3) and subsections (e) and (g) of § 504 conclusively refute rather than support ConRail's interpretation of § 303(b)(3).

Subsections (e) and (g) provide that under certain circumstances ConRail is entitled "to direct reimbursement from the USRA pursuant to § 211(h) of this Act." In contrast, § 303(b)(3) provides that ConRail "shall have a *claim* to direct reimbursement, as a current expense of administration." There is a vast difference between according ConRail the right to reimbursement by way of a § 211(h) loan and a *claim* for direct reimbursement which shall constitute an expense of administration. Section 303(b)(3) also requires that interest be paid on ConRail's claim, but there is no similar provision in either subsections of § 504. Thus, it is quite apparent that by incorporation of the § 211(h) funding mechanism in § 504 Congress intended speedy reimbursement of ConRail, but the same conclusion cannot be drawn with respect to § 303(b)(3).

There is another interesting comparison of the statutory language. Under subsections (e) and (g) of § 504 when USRA makes a § 211(h) loan to ConRail, USRA is "entitled to a direct claim as a current expense of administration" against the Debtor whose obligation ConRail paid. If ConRail's interpretation of § 303(b) is correct, the absence of the phrase "direct reimbursement" in § 504 would mean that ConRail's claim against Penn Central is qualitatively better than USRA's claim against Penn Central under § 504. There is a similar incongruity in § 211(h). There ConRail is accorded a "direct claim, as a current expense of administration, for reimbursement from [an] estate . . . for all obligations of such estate (plus interest thereon) which are paid by [ConRail]." Again, ConRail's interpretation of § 303(b) would lead to the conclusion that its § 303(b) claims are to be treated better than its claims arising under § 211(h).

It is simply not plausible to suggest that Congress intended, when it used the word "reimbursement," to create a claim in favor of ConRail which was different in kind from the claims it created for ConRail under § 211(h) or for USRA under § 504(b). Rather, the most reasonable interpretation of these sections is that Congress intended to make certain that both ConRail and USRA would be treated as administrative

claimants under § 77. The word "reimbursement" is used throughout the statute for the purpose of reinforcing the idea that ConRail would be satisfying a claim against the Debtors rather than its own obligation.

ConRail also argues that because of its delicate financial situation, Congress must have intended to grant ConRail a claim for immediate reimbursement in cash. There is certainly no indication of that condition in the Final System Plan financial projections, which are all that Congress had available at the time. And as the Trustees point out, Congress was fully aware of the dire straits of the bankrupt estates at the time it enacted § 303(b). Congress repeatedly increased the funding of §§ 213 and 215, increased the scope of the latter, and added § 211(h), all for the purpose of alleviating the cash crisis caused by the Government-imposed cash management practices in the pre-conveyance period. In the absence of explicit language, it is not reasonable to suppose Congress intended to mandate a special preference for ConRail which would not only further drain the estates but also subordinate the Government trustees' certificates and § 211(h) claims to ConRail's equipment obligation claims under § 303(b).

## K. TREATMENT OF GUARANTEE CLAIMS

A footnote to the schedule of unsecured claims states that certain claimed amounts have not been included in the totals of unsecured claims because these claims were "guarantee claims for which liability is deemed to have been assumed by another party or disaffirmance of the contingent liability is deemed to result in no damage." Penn Central is a sole or joint guarantor of bonds of several corporations which are not in any way affiliated with Penn Central. The Indenture Trustees under four of these guaranteed bond issues have objected, not to the Plan as such, but to the legal conclusions contained in the footnote quoted above.

 Apparently, the Indenture Trustees are concerned that approval of the Plan might constitute a final determination that their guarantee claims may not participate under the Plan and are discharged. Approval of the Plan in no way precludes, however, the objecting Indenture Trustees from seeking to establish their claims in the Proof of Claims Program. There is no dispute concerning the classification of any claim which they may be able to prove—all are unsecured claims.

Earlier in these proceedings the Trustees purported to disaffirm bond guarantees of Secondary Debtor bonds as well as third-party-issued bonds. Petitions were filed to annul that act of disaffirmance on the theory that a guarantee is not an executory contract which may be disaffirmed by a trustee in a § 77 reorganization. Although those petitions remain *sub judice*, the issues have been mooted by the filing of the Plan. The Secondary Debtor guarantees have become irrelevant because the Plans accord participation to the bondholders of the Secondary Debtors. As to the third-party guarantees, the issue is also now moot. The focus is no longer on disaffirmance, but on the status of contingent claims. In a § 77 proceeding contingent claims are provable and dischargeable. Thus, it is in the Proof of Claims Program that the proper amount, if any, of the unsecured claims of the Indenture Trustees are to be established. A second possible issue is to what extent satisfaction of the unsecured claims would result in the reorganized company's being subrogated to the bondholders' claim against, and security interest in, the property of the third-party issuer. These issues are also amenable to resolution in the Proof of Claims Program.

Finally, Section 7 of the Plan contemplates if after consummation an unsecured claim is established, the reorganized company will discharge that claim by issuing the distribution provided in the Plan for unsecured creditors. Decision of the executory contract issue in favor of the Trustees' position would have had the limited procedural effect of fixing the date of accrual of the guarantee claim, whereas the combined effect of the dischargeability of the guarantee claims and Section 7 of the Plan is to leave that question open. Of course, the parties may seek to have the underlying issues resolved at their convenience in further proceedings.

## L. EQUITY INTERESTS HELD BY PENN CENTRAL COMPANY

Penn Central company owns 100% of the common stock of the Debtor. Under the Plan, it will receive 10% of the common stock of the reorganized company. This distribution would be impermissible if it were concluded that the Debtor is insolvent; that is, unless the total value of the Debtor's assets (including, here, the proceeds to be received from the Valuation Case) exceeds the amount owed to its creditors, the present stockholders would not be allowed to participate in the Plan distributions or voting. In the comments summarizing the Plan (Section II–B), I pointed out that, since no finding of insolvency could now legitimately be made, the Trustees' proposal to permit equity interests to participate is reasonable and should be approved. Conversely, however, I am also persuaded that no greater participation than the Plan provides can be justified on the present record.

Penn Central Company itself supports the Plan. However, various individual stockholders of the Penn Central Company, in person or through representatives, strenuously object to the Plan provisions. Upon analysis, it is clear that many of these objections relate not to the Plan, but to the outcome of the Chapter XI reorganization of the Penn Central Company, a matter over which this Court has no control.

Much has been made by one shareholder of the value of the Debtor's coal assets. The impression sought to be conveyed is that the coal assets have not been properly valued. This simply is not accurate. The coal assets were a major aspect of the valuation of Pennco and have otherwise been the subject of intense management by Pennco and the Trustees. The SEC has discussed the coal properties in great detail in its report, and little would be served by repeating that discussion here.

The remaining objections are addressed, not so much to the Plan as to the governmental actions which, in the view of these objectors at least, created the circumstances which have made it impossible to achieve a Plan which would more favorably treat the equity holders.

I have carefully reviewed all of these objections, but have concluded that they do not justify rejection or modification of the Plan.

## PART III

## SECONDARY DEBTORS

Previous sections of this Opinion have dealt with various aspects of the relationship between the Penn Central's Plan and Penn Central's proposed Plans for the Secondary Debtors. All but one of the major disputes between the Penn Central Trustees and the Secondary Debtor Trustees have now been amicably resolved, and the Secondary Debtor Trustees have adopted the proposed Plans as in the best interests of their respective estates. Suffice to say, only the most compelling evidence would cause this Court to do other than accept the judgments of the Secondary Debtor Trustees who are directly charged with the fiduciary responsibility to protect those interested in their estates.

In connection with considering the challenges by the Penn Central interests (the Michigan Central Collateral Indenture Trustee and the PRR General Mortgage Indenture Trustee) to the key provision of the Secondary Debtors' Plans, the mutual cancellation of debts between Penn Central and the Secondary Debtors, it became apparent that the mutual cancellation of debts compromise is well within the range of litigation results. The complexities of the legal and factual issues are immense. Nothing would be gained by reviewing in detail those issues. A further aspect of the Plans does merit mention. Consummation of the Plans will permit the reorganized company to conduct the Special Court Valuation Case litigation in a consolidated or unified way. Absent the Plans, the Valuation Case litigation might well turn into a donnybrook between Penn Central and the 15 Secondary Debtors, each seeking to gain the largest possible share of whatever Valuation Case recovery is obtained. The Plans obviate that unhappy prospect. The Valuation Case may now be conducted for the best

interest of all because the securities package which is distributed to the public debt and equity holders of the Secondary Debtors confers on the holders the opportunity to benefit from a favorable result in that litigation.

■ The distributions provided under the Secondary Debtors' Plans are by and large uniform. The differences that do exist have been reached as a result of negotiations between the Penn Central Trustees and the Trustees of several of the Secondary Debtors. Those issues in many instances were briefed and argued to this Court before settlement was reached. I am satisfied that these individual compromises are fair and reasonable and should also be approved.

The one major issue remaining unresolved with respect to a number of the Secondary Debtors is the treatment of accrued dividends due their public stockholders. Under the Plan, the stockholders' claims are generally calculated by capitalizing, by a multiple of 10, the annual dividend and adding accrued dividends through March 31, 1976. On the other hand, bondholders of the Secondary Debtors and Penn Central have interest through December 31, 1977, included in the calculation of their claims. Thus, the respective Secondary Debtor Trustees argue that the Plan should be internally consistent. The basic methodology of quantifying the claim and the distribution for stockholders' claims, in effect, results in the stockholder being treated as a secured creditor. But the Trustees distinguish between the stockholders' claims and those of the bondholders when they use a different cutoff date in determining the amount of the claim.

■ There is no benchmark by which the Court can analyze the respective arguments of the parties. Cutting off the claim on March 31, 1976, is justified to the extent that the equity holders were not in fact actual creditors and by the argument of the Secondary Debtor Trustees that the leases terminated as of March 31, 1976. On the other hand, the notion of equality in treatment is appealing. For that reason, I find the Secondary Debtors' contention more

persuasive. The Plan should be amended accordingly.

There remain only two relatively minor issues. The Indenture Trustee of the Connecting Mortgage has disputed the underlying Retained Asset Analysis as it pertains to the Connecting. Reorganization Library Document J–19 contains an exhibit which shows that there is an account balance of $8,000 in favor of the Connecting. The Indenture Trustee contends that that money has not been credited to the Connecting's Retained Asset Analysis and that because the account is a scrap account, it is appropriate that it be so credited. In the welter of paper which this case has generated, this isolated issue has not been adequately developed. For that reason I will reserve judgment with respect to it, and I direct that the parties confer to see if it can be resolved amicably, and if not, to so inform the Court. Additional written submissions will permit the Court to resolve the issue forthwith. There is no reason to delay approval of the Plan pending final resolution of this matter.

The Big Four Trustee has objected to the Penn Central's debiting in the Retained Asset Analysis an amount owed by the Big Four to Penn Central under a tax allocation agreement. The objection is that it is inappropriate to debit the amount of retained assets of the Big Four by the amount of the tax allocation liability without offsetting a $175,000 pre-bankruptcy claim of a subsidiary of the Big Four against Penn Central. The objection is unsound. The basic mutual cancellation of debt compromise clearly is designed to encompass and fairly does encompass the subsidiary's claim. The tax allocation claims have uniformly been treated differently both during the course of the reorganization and in the Plan. I am satisfied that the Trustees' Retained Asset Analysis of the Big Four is correct.

## PART IV

### A. CONSUMMATION DATE

After an Order is entered by this Court approving the Plan, the voting process will begin. At this juncture it is of course not possible to know what the result of the

voting may be, or whether thereafter this Plan will be confirmed and consummated. It is nevertheless necessary at this time to address an issue which may arise if this Plan is ultimately consummated, but if the consummation date is, of necessity, postponed for one reason or another.

It is fair to state that the arguments presented at the Plan hearings were, for the most part, based upon the assumption that interest would run on all claims until December 31, 1977; that the consummation date would be approximately July 1, 1978; and that the securities would be issued as of the consummation date. Therefore, it is reasonable to suppose that a substantial delay in the consummation date would result in some deviation from the expectations of the parties. Because cash distributions would be postponed, the reorganized company should have accumulated more cash, from interim investments. Interest on B, C, and D notes would not begin to accrue until the postponed consummation date, hence, fewer of these securities would remain outstanding by 1987. Redemptions of the D serial notes and of the A and B bonds would not be affected, so long as the timetables of the existing Plan are adhered to.

The impact of these potential variations from the expectations of the parties is somewhat lessened, of course, by the fact that any net cash benefit to the reorganized company resulting from the delay would ultimately redound to the benefit of its stockholders, primarily the secured and unsecured claimants.

I am inclined to believe that substantial delay of the consummation date should not be permitted to alter the relationships among the various classes of claimants which are reflected in the Plan. That relationship could be maintained notwithstanding a delay in the consummation date if (1) interest on B, C and D notes were calculat-

ed as beginning to run on or about July 1, 1978; (2) the redemption provisions of the D serial notes and of the A and B bonds were given effect as stated in the Plan; and (3) those claimants entitled to receive cash distributions on consummation date, and who would not benefit from any equity participation in the reorganized company, should receive some further cash participation in the additional income earned by the reorganized company from interim investments during the period of postponement. This could perhaps be done by adding an appropriate amount of post-July 1, 1978 interest to the cash distributions on consummation date.

Of course, it must be recognized that the circumstances may be somewhat different when consummation date arrives, and it may then appear that there is legitimate need to retain the additional income from interim investments. I mention the matter at this time only so that all parties may be conscious of the uncertainties involved, and of the possible need for minor adjustments at consummation.[108]

## B. CONCLUSIONS

■■■ In conformity with the views expressed in the foregoing Opinion, I now set forth this Court's conclusions with respect to the Plans of Reorganization of the Penn Central Transportation Company, and of the Secondary Debtors, as amended in conformity with the requirements of this Opinion:

1. The Plan complies with all requirements of law.
2. The Plan is feasible.
3. The Plan is fair and equitable.

Pursuant to these conclusions, when the Plan embodying the amendments required by this Opinion is filed with the Court, an Order will be entered approving the Plan and directing its submission to the voting process.[109]

---

**108.** These issues have now been substantially resolved by Order No. 3451, entered March 15, 1978. Interest on all claims runs only to December 31, 1977; interest on Series C and D notes accrues from January 1, 1978; cash distributions to secured creditors and tax claim-

ants on the Consummation Date will include some interest.

**109.** The changes required have now been made. The Plan submitted for vote complies with the requirements of this Opinion and the Orders relating thereto.

Approval of this Plan marks an important milestone in the long and tortuous struggle toward a better tomorrow for the creditors and stockholders of the Penn Central Transportation Company and its affiliated companies. The Trustees and their staff, and the many other entities and individuals who have labored so long and diligently to produce this Plan are to be congratulated for their monumental achievement. Like all products of human endeavor, the Plan may not be perfect, but in my judgment it provides entirely fair and workable solutions to all of the complex and difficult problems confronting the Debtor's estate.

## ORDER APPROVING THE PLAN

AND NOW, this 17th day of March, 1978, upon consideration of the "AMENDED PLAN OF REORGANIZATION FOR PENN CENTRAL TRANSPORTATION COMPANY DATED MARCH 17, 1978" (Doc. No. 15220), including the Plans of Reorganization of each of the Secondary Debtors therein contained (all of which are hereafter referred to, collectively, as "THE PLAN"), and the schedule of distribution set forth in Appendix B to Doc. No. 15221, the Court makes the following findings:

1. The Plan conforms to the requirements of this Court's Opinion dated March 9, 1978.

2. The Plan complies with § 77(b) of the Bankruptcy Act.

3. The Plan is fair and equitable, affords due recognition to the rights of each class of creditiors and stockholders with no unfair discrimination among classes of creditors or stockholders, conforms to the law regarding participation of various classes of creditors and stockholders, and complies with all of the requirements of law.

4. The Plan is feasible.

5. The Plan makes adequate provision for the payment of allowances, including compensation and reimbursement of expenses as provided in § 77(c)(12); the amount reserved in the Plan for such purposes is in excess of the total amount of claims for such payment which can reasonably be anticipated.

WHEREFORE, IT IS HEREBY ORDERED THAT:

1. The Plan is APPROVED.

2. The final date for mailing written acceptances or rejections of the Plan shall be May 12, 1978.

3. Voting on the Plan shall be governed by the provisions of the Voting Order, Order No.3456, entered this date.

4. The provisions of § 6.2 of the Plan ("Treatment of Other Executory Contracts") shall be deemed to be without prejudice to the contentions asserted by various parties in response to the "Report of the PCTC Trustees and the Trustees of the Secondary Debtors with Respect to Prebankruptcy Executory Contracts" (Doc. No. 14122), all of which are reserved for later determination by this Court.